# EXHIBIT B

| | | |
|---|---|---|
| PHILADELPHIA RESTAURANT | : | |
| OWNERS AGAINST LOCKDOWN, LLC | : | |
| | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| v. | : | DECEMBER TERM, 2020, NO. |
| | : | |
| JAMES KENNEY, in his official capacity | : | THE HONORABLE PAULA PATRICK |
| as Mayor of the City of Philadelphia | : | |
| | : | |
| AND | : | |
| | : | |
| THOMAS A. FARLEY, in his official | : | |
| capacity as Health Commissioner | : | |
| | : | |
| AND | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| | : | |
| AND | : | |
| | : | |
| PHILADELPHIA DEPARTMENT OF | : | |
| PUBLIC HEALTH | : | |
| | : | |
| Defendants. | : | |

## **RULE TO SHOW CAUSE AND SPECIAL INJUNCTION ORDER**

**AND NOW**, this _____ day of _____, 2020, upon

consideration of Plaintiff's Motion for a Special and Preliminary Injunction (hereinafter

"Motion"),

**IT IS ORDERED** that Defendants show cause before this Court on the _____

Day of _____, 2020, at _____ a.m./p.m. in Courtroom

_____, or as soon thereafter as counsel may be heard, why a Preliminary

Injunction providing the relief sought in the accompanying Motion should not be entered.

**BY THE COURT:**


_____
**THE HONORABLE PAULA PATRICK**

| | | |
|---|---|---|
| PHILADELPHIA RESTAURANT | : | |
| OWNERS AGAINST LOCKDOWN, LLC | : | |
| | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| v. | : | DECEMBER TERM, 2020, NO. |
| | : | |
| JAMES KENNEY, in his official capacity | : | THE HONORABLE PAULA PATRICK |
| as Mayor of the City of Philadelphia | : | |
| | : | |
| AND | : | |
| | : | |
| THOMAS A. FARLEY, in his official | : | |
| capacity as Health Commissioner | : | |
| | : | |
| AND | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| | : | |
| AND | : | |
| | : | |
| PHILADELPHIA DEPARTMENT OF | : | |
| PUBLIC HEALTH | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2020, upon consideration of Plaintiff's Motion for Special and Preliminary Injunction and Prayer for Declaratory Judgment as Ancillary Relief, it is hereby **ORDERED**:

1.  An injunction is necessary to prevent immediate and irreparable harm to Plaintiff that cannot be adequately compensated by damages;

2.  Greater injury will result from refusing this injunction than from granting it; and an injunction will not substantially harm other interested parties from proceeding;

3.  A preliminary injunction will properly restore the Plaintiff and Defendants to their status as it existed immediately before the alleged wrongful conduct;

4.  Plaintiff is likely to prevail on the merits;

5.  The instant injunction is reasonably suited to abate the offending activity; and

6.  An injunction will not adversely affect the public interest.

It is therefore hereby **ORDERED** that Plaintiff's Motion for Special and Preliminary Injunctive Relief is **GRANTED**.

Defendants are **enjoined from enforcing their Emergency Restrictions including the November 24, 2020 "Safer at Home" Restrictions**, as said restrictions are found to be unconstitutional.

It is further ORDERED that Plaintiff's Prayer for Declaratory Judgment as Ancillary Relief is hereby GRANTED, Defendants' Emergency Regulations are deemed void and unenforceable for the following reasons:

- Defendants' Emergency Regulations, including the Safer at Home Restrictions are violative of Plaintiff's Constitutional and Civil Rights;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the Non-Delegation and Separation of Powers of the Pennsylvania Constitution;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the requirements of the Philadelphia Home Rule Charter, as well as, City Council's intent.

**BY THE COURT:**

_____

**THE HONORABLE PAULA PATRICK**

**FRITZ & BIANCULLI, LLC**
By:    BRIAN E. FRITZ, ESQUIRE
       WILLIAM A. WEISS, ESQUIRE            **ATTORNEYS FOR PLAINTIFF**
Attorney ID No.: 84044 / 309817
1515 Market Street, Suite 1801
Philadelphia, Pennsylvania 19102
(215) 458-2222
*bfritz@fbesq.com*
*wweiss@fbesq.com*

| | | |
|---|---|---|
| PHILADELPHIA RESTAURANT OWNERS AGAINST LOCKDOWN, LLC | : : : | |
| Plaintiff, | : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| v. | : : | DECEMBER TERM, 2020, NO. |
| JAMES KENNEY, in his official capacity as Mayor of the City of Philadelphia | : : : | THE HONORABLE PAULA PATRICK |
| AND | : : | |
| THOMAS A. FARLEY, in his official capacity as Health Commissioner | : : : | |
| AND | : : | |
| CITY OF PHILADELPHIA | : : | |
| AND | : : | |
| PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH | : : : | |
| Defendants. | : | |

## <u>PLAINTIFF'S MOTION FOR A SPECIAL AND PRELIMINARY INJUNCTION AND PRAYER FOR DECLATORY JUDGMENT AS ANCILLARY RELIEF</u>

Plaintiff, Philadelphia Restaurant Owners Against Lockdown, LLC, hereby files this

Motion for a Special and Preliminary Injunction and Prayer for Declaratory Judgment as Ancillary

Relief pursuant to Pennsylvania Rules of Civil Procedure §§ 1531 and 1602 against Defendants,

James Kenney, in his official capacity as Mayor of the City of Philadelphia, Thomas A. Farley, in his official capacity as Health Commissioner, the City of Philadelphia, and the Philadelphia Department of Public Health, and respectfully request this Court grant their motion and issue an injunction consistent with the Order attached hereto, and in support thereof, Plaintiff avers as follows:

## I.   <u>INTRODUCTION</u>

1. The liberties protected by the Constitution are not fair-weather freedoms that can be cast aside in times of trouble, including during a pandemic. *Cty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544, at 99 (W.D. Pa. Sept. 14, 2020). The solution to a crisis can never be permitted to supersede the liberty and freedom that stands as the bedrock of our society. Indeed, the Constitution sets lines that may not be crossed. *Id*. at 100.

2. The "Safer at Home" Restrictions, as set forth in the Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses for Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise that Philadelphians are Safer at Home (hereinafter "Safer at Home Restrictions"), and adopted by the City of Philadelphia Department of Public Health in the Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions), violate bedrock constitutional principles of our Commonwealth and our nation, namely, the prohibition against the delegation of power, and the due process right to work.

3. Contrary to these constitutional guarantees, since March 2020 with emergency regulations, and most recently by enacting and enforcing the Safer at Home Restrictions, Defendants

have encroached into impermissible territory across all three (3) branches of government – legislative, executive, and judicial.

4. The accrual of this unchecked power by Defendants is antithetical to the constitutional principles set forth in the founding of our nation. As the Pennsylvania Supreme Court has held: "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." *See Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645, 656 (2017) The Federalist No. 47 (J. Cooke ed. 1961)

5. Additionally, the Safer at Home Restrictions, by placing arbitrary and unjustified restrictions across entire industries, such as indoor dining and catering, impermissibly impedes on the freedom to work.

6. As set forth by Justice Douglas of the United States Supreme Court:

> The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on Politics, 'A man has a right to be employed, to be trusted, to be loved, to be revered.' It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.
>
> *Barsky v. Board of Regents of University of State of New York*, 347 U.S. 442, 472 (1954) (Douglas, J., dissenting).

7. An economy is not a machine that can be shut down and restarted at will by government. It is an organic system made up of free people each pursuing their dreams. The ability to support oneself is essential to free people in a free economy. *Butler*, 2020 U.S. Dist. LEXIS 167544, at 92.  The ability to earn a living by pursing one's calling and to support oneself and one's family is not an economic good, it is a human good. *Id.* at 93.

8.  This essential right and human good is trampled by the ongoing arbitrary, unconstitutional actions of Defendants, and most recently with the "Safer at Home" Restrictions.

9.  Arbitrary has been defined by the Pennsylvania Supreme Court as "based on random or convenient selection or choice rather than on reason or nature." *Thunberg v. Strause*, 545 Pa. 607 (1996).  As set forth at greater detail herein, the Defendants' ongoing restrictions, and most recently the Safer at Home Restrictions, have never been supported with data, or undergone any of the constitutional and procedural safeguards required to ensure that regulations are not *ad hoc* and irrational.

10. This Honorable Court should not stand for such an unprecedented power grab and shockingly arbitrary shutdown by the Defendants, and must enjoin them from continuing to violate the rights of the citizens of Philadelphia.

11. A preliminary injunction is designed to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status quo until the legality of the challenged conduct can be determined on the merits." *Greater Nanticoke Area Education Association v. Greater Nanticoke Area School District*, 938 A.2d 1177, 1183 (Pa. Cmwlth. 2007).

12. Plaintiff is entitled to an injunction because they are suffering ongoing and irreparable harm in the deprivation of their constitutional rights, which is causing them a greater injury than would be caused if the Defendants were enjoined from enforcing their perpetual Emergency Restrictions which have cumulated in the present Safer at Home Restrictions. A preliminary injunction would preserve the status quo. Plaintiff is likely to prevail on the merits of this case, as the Defendants have engaged in multitudes of unconstitutional conduct, as referenced herein, and an injunction would abate the

offending conduct by invalidating their ongoing regulations, including the Safer at Home Restrictions. The public clearly has an interest maintaining the guaranteed rights of the United States' Constitution and Pennsylvania Constitution, including the right to work, and the right to be free from usurpation of power by administrative agencies.

## II.    BASIS FOR RELIEF /FACTUAL BACKGROUND

1. On March 11, 2020, Defendant, Mayor James Kenney, entered an Order suspending the legislative provisions afforded under Philadelphia Code § 8-407.

2. In conjunction with this suspension, Defendants, Dr. Tom Farley (a pediatrician) and the Philadelphia Board of Health, issued the first of eighteen Emergency Regulations.

3. These regulations effectively closed gyms, catering halls, restaurants and other businesses.

4. In the months that followed, Defendant, Dr. Tom Farley (a pediatrician), allowed the closed businesses to re-open on a limited basis and with restrictions in place.

5. These initial business lock downs and ongoing operating restrictions were premised on a notion that these businesses were likely to cause the spread of the COVID virus.

6. Over the course of the next 281 days (March 11, 2020 to December 17, 2020), Defendants had the opportunity to engage in efforts and scientific methodology to determine if their initial hunches and guesses were correct.

7. To date, Defendants have provided no evidence that the gyms, restaurants or catering halls or other businesses had/have contributed to the COVID infections in the City of Philadelphia.

8. To date, Defendants have provided no information on what efforts, if any, they took to determine if operating limitations imposed on gyms, restaurants or catering halls in Philadelphia were effective.

9. To date, Defendants have provided no information on what efforts they undertook or the results of same to determine whether any other businesses contributed to the spread of COVID.

10. To date, Defendants have provided no information to support their notion that Philadelphia gyms, restaurants or catering halls are more likely contributors to the spread of COVID than other businesses or activities.

11. To date, Defendants have provided no information to support their notion that lockdowns of Philadelphia gyms, restaurants or catering halls actually mitigates the spread of COVID.

12. In fact, the last published meeting minutes of the Board of Health indicate the following:

- Gyms in Philadelphia were largely compliant with COVID restrictions

- Philadelphia had more restrictions on restaurants than the surrounding suburbs

- The less restrictive suburbs reported that they had seen no increase in COVID infections related to restaurants

  *See* infra.

13. From March 11, 2020 to present, Defendant, Dr. Tom Farley (a pediatrician), has referenced and relied upon the Centers for Disease Control (CDC) as an authority on the COVID virus.

14. On November 18, 2020, the CDC published guidelines for dining establishments related to COVID mitigation.  *See* infra.

15. Nowhere in these published guidelines did the CDC ever mention, discuss or recommend lockdowns of restaurants as a necessary step to prevent the spread of COVID.  *Id.*

16. The CDC Guidelines expect that restaurants would continue to operate, and do not express the looming fear that the Board of Health has promoted without substantiation.

17. For example, the CDC sets forth as follows:

## Promoting Behaviors that Reduce Spread

Restaurants and bars may implement several strategies that reduce the spread of COVID-19 among employees and customers.

## Maintaining Healthy Environments

Restaurants and bars may implement several strategies to maintain healthy environments.

## Maintaining Healthy Operations

Restaurants and bars may consider implementing several strategies to maintain healthy operations.

## Preparing for Sick Employees

Restaurants and bars may implement several strategies to prepare for when someone gets sick.

*See Infra.*

18. The CDC, the authority relied upon and referenced by Defendants, does not share or support the Defendants' pessimism regarding restaurants.

19. In fact, the tone and content of the CDC guidelines for restaurants paint a picture of an expectation that restaurants can and will continue to be open and operational.

20. The CDC does not remotely state, suggest or imply that the Draconian action of shut downs is necessary, warranted or even effective.

21. To the contrary, the CDC actually says that restaurants can implement several strategies that reduce the spread of COVID.

7

22. The contrast between the authority in the field, the CDC, versus Defendants, Dr. Tom Farley and the Philadelphia Health Department, begs specific questions that have never been answered:

- What has the Philadelphia Department of Health compiled to reach such a drastic conclusion that shut downs are a remedy?

- What has the Philadelphia Department of Health relied upon to reach its conclusions that are so starkly different from the Center for Disease Control?

- What studies has the Philadelphia Department of Health commissioned or conducted regarding Philadelphia based businesses and the spread of COVID since March 2020?

- What has the Philadelphia Department of Health done to determine that continuing the implementation of restrictions during restaurant operations would be less effective than a full shut down of an entire industry?

- What exactly is the "science" that the Philadelphia Department of Health has either compiled, generated or relied upon to justify an of the restrictions that it has implemented since March 2020?

23. Notwithstanding the lack of CDC support of lockdowns in relation to COVID, Defendant, Dr. Tom Farley (a pediatrician), issued an Order to close indoor dining, gyms and catering halls in the City.

24. This Order went into effect on November 20, 2020, two days after the aforementioned guidelines of the CDC.

25. For nearly one year, the Defendants have acted as the legislative, executive and judicial branches ruling over the City and wielding power through perpetual "Emergency" regulations.

26. There is no evidence that the Defendants have engaged or consulted with City Council, the actual legislative body of the City, in relation to the enactment of COVID restrictions.

27. There is no evidence that the Defendants intend to yield their unprecedented consolidation of power.

28. The actions of the Defendants against the business owners subject to the November 20, 2020, lockdowns supports that position, as well as the instant application and requirement for judicial relief.

### a. THE BOARD OF HEALTH HAS ENGAGED IN INTIMIDATION TACTICS AGAINST BUSINESS OWNERS

29. As soon as the lockdown regulations went into effect, Board of Health inspectors began to descend on restaurant owners to issue citations, threaten and close businesses down entirely for periods of 48 hours or more.

30. To display their power, the Health Inspectors would arrive at establishments accompanied by multiple Pennsylvania State Troopers, with as many as 20 troopers with them.

31. This complement of State Troopers may be something expected with the apprehension of a dangerous fugitive, but it is entirely illogical with enforcing COVID regulations.

32. In fact, the only logical explanation for such an unnecessary show of force is to scare and intimidate business owners, while simultaneously placing them on display for public ridicule and stigmatization.

### b.  THE BOARD OF HEALTH ISSUES CEASE OPERATION ORDERS BASED ON NON-EXISTENT OR INAPPLICABLE CODE SECTIONS

33. To further their lockdown order, the Board of Health is issuing cease operation orders that must be posted on the front windows of businesses.

34. The Board of Health has issued these cease operation orders on the basis of Philadelphia COVID Code §§70.0.1, 70.0.2, 70.0.3 and 70.0.4.

35. However, these sections DO NOT EXIST in the Philadelphia Code and the Philadelphia City Council never passed any such sections.

36. This reference is the belief that the Board of Health's regulations are NOW the Philadelphia Code, which it does not have the power to do.

37. Further, the Board of Health has issued COVID cease operation orders pursuant to §§6-205, 6-206 and 19-2602. These sections actually state as follows:

**Title 6. Health Code**
**Chapter 6-200. Preventive Medicine**

**§ 6-205.  Emergency Epidemic Control.**

(1)   Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.

**§ 6-206.  Prevention of Congregation of Persons.**

(1)   Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the

Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.

**Title 19. Finance, Taxes and Collections**
**Chapter 19-2600. Business Income and Receipts Taxes**

**§ 19-2602.  Licenses.**

(1)  Every person desiring to engage in or to continue to engage in any business within the City of Philadelphia shall, whether or not such person maintains a place of business in the City, prior to engaging in such business, procure a commercial activity license from the Department of Licenses and Inspections. A person exclusively engaged in a hobby or other not-for-profit activity, excluded from the definition of business set forth in Section <u>19-2601</u>, shall not be required to procure or maintain a commercial activity license.

(2)   There shall be no fee for the issuance of the business privilege license required by this Section...

38. The foregoing Code sections are entirely inapplicable to any basis for closure of a business for purported COVID violations.

39. The Board of Health clearly has no idea what is or is not a violation, but is intent on citing these business owners for something and closing their businesses down for days on end.

40. Business owners cannot comply with non-existent code sections or sections that have absolutely nothing to do with COVID restrictions.

41. In fact, what business owners should or should not do is not known and is strictly left to the whimsical and subjective determination of the Health Inspector.

42. The Health Inspectors when concluding an outdoor tent arrangement is "non-compliant" they have refused to provide their basis stating "I cannot say, because you will hold me to it."

43. In essence, the Board of Health has created a Kafkaesque game of "Go Fish" for the Business Owners as they have no idea what they have violated, how they can be in

compliance or what the inspector may find wrong at any given "COVID" inspection. However, their businesses continue to be closed by the Health Department.

### c. THE BOARD OF HEALTH HAS ENGAGED IN THREATS AGAINST BUSINESS OWNERS

44. In the process of attempting to appease the Board of Health and have cease operations orders lifted, Business Owners have been confronted with Health Inspectors threatening to force the owners to remove outdoor tents or state that the business needs additionally permits from the department of Licenses and Inspections (L&I).

45. In fact, the Health Inspectors have threatened to bring L&I to the location for a "full inspection" of the premises.

46. What is implied with that threat, is the prospect of L&I possibly issuing fines, requiring additional construction or possibly declaring that some other forms of operation permits are required. All of which serves to add potential costs to the business owners, who are already on financial life support.

47. The Health Inspectors have even refused to return to locations for a "re-inspection," which leaves the cease operations orders in place with an ongoing loss of revenue.

48. To the extent these business owners have been able to expend the vast sums to provide for "outdoor dining" in the Winter months in Philadelphia, they are now burdened with the Health Department threatening to increase their costs or subject the business owners to the threat of additional inspections, fines and extended cease operations orders.

### d. THE BOARD OF HEALTH'S DETERMINATION OF WHICH BUSINESSES MUST BE LOCKDOWNED AND WHICH BUSINESSES CAN REMAIN OPEN IS INEXPLICABLE AND ARBITRARY

49. Defendants have now reverted to the business closures that existed in March 2020.

50. However, since the initial Orders were put in place, the Defendants have failed to provide any information or scientific validation that closing gyms, restaurants and/or catering halls actually achieves their stated purpose.

51. In fact, Defendants' determination of what is safe versus unsafe has not been explained.

52. Thus, one is left to their own attempts to reach a logical conclusion, which proves to be a maddening Sisyphean endeavor.

53. For example, the Defendants have failed to explain how the COVID virus behaves so differently in big box retail stores versus a restaurant or a gym.

54. Or, how dining in an outdoor enclosure in the Winter months is safer than the more traditional dining setting at an indoor table.

55. The Defendants have had almost one year to prove or disprove their hunches and theories; however, their lack of produced information on these issues suggests they have failed to do so.

56. The Defendants have issued regulation after regulation impacting businesses based on their beliefs without providing the necessary support, which should not have to be requested.

57. At present, the Defendants have condemned business owners and their employees to economic annihilation, while they watch other businesses, including the City operated Christmas Village, flourish and be packed with patrons.

58. Our Courts and the Framers of our State and Federal Constitutions prophetically anticipated that consolidation of power into one group would lead to arbitrary decision making when left unchecked, and they prohibited such occurrences.

59. The present Safer at Home restrictions, as well as the perpetual Emergency powers of the Defendants provide a concrete and real-life depiction of what our Supreme Court and the

Framers provided safeguards against, as the actions of Defendants and the application of their restrictions squarely fits within our Supreme Court's definition of arbitrary: "based on random or convenient selection or choice rather than on reason or nature."  *Thunberg v. Strause*, 545 Pa. 607 (1996).

60. The Defendants' *ad hoc* regulations, which are heavy on fear, and light on facts, have led to absurd results. We are living in a city where this is "legal:"



*Christmas Village packed with guests*

But this is illegal, and will result in numerous fines and a cease operations order:



Where Walmart is allowed to operate like this:



*Photo taken at the South Philadelphia Walmart on 12/17/20*

But, this indoor dining is forbidden:



### III.    THE PENNSYLVANIA CONSTITUTION PROHIBITS THE DELEGATION OF POWERS

59. Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." *See* PA CONST. art. II, § 1.

60. When the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the legislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975).

61. This constraint against the delegation of power serves two purposes. First, it ensures that duly authorized and politically responsible officials make **all** the necessary policy

decisions, as is their mandate per the electorate. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 291 (Pa. 1975) (emphasis added). And second, **it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power**. *Id.*(emphasis added)

62. At the heart of the non-delegation doctrine is the tenet that the General Assembly cannot delegate "to any other branch of government or to any other body or authority" the power to make law. *See State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 480 (Pa. 1971). Or, as John Locke put it, legislative power consists of the power "to make laws, and not to make legislators." *Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645, 655 (2017) (*citing* JOHN LOCKE, SECOND TREATISE OF GOVERNMENT 87 (R. Cox ed.1982)).

63. Indeed, the rule against delegation of power is essential to the American system of representative government. The framers of the Constitution believed that the integrity of the legislative function was vital to the preservation of liberty. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S.Ct. 1225, 1237 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested power exists to protect liberty.")

64. Our Courts have frequently reviewed "delegation of powers" cases and placed significant restraints on agencies, such as the Department of Public Health, that make laws and regulations pursuant to their purported delegated authority.

65. For example, in *Tosto v. Pennsylvania Nursing Home Loan Agency*, 331 A.2d 198 (Pa. 1975), the Pennsylvania Supreme Court reviewed a taxpayer's lawsuit seeking an injunction of the Nursing Home Loan Agency Law, which was passed by the defendant, and stressed the importance of procedural mechanisms that serve to limit or prevent the

arbitrary and capricious exercise of delegated power.  The statute at issue in *Tosto* required that the administrative agency establish neutral operating procedures, develop standardized documents, and give the public notice of proposed agency rules and regulations before promulgating them. *Id*. at 204.  Although the Court upheld the law, it found that such procedural mechanisms were "important safeguards against the arbitrariness of ad hoc decision-making."  *Id*.

66. As discussed more fully herein, the procedural safeguards and requirements identified by the *Tosto* court are not present in Defendants' actions in the present matter, or in the Safer at Home Restrictions.

67. Likewise, in *W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 635 Pa. 127 (2016), the Pennsylvania Supreme Court reviewed provisions in the Public School Code that gave sweeping power to the School Reform Commission to improve the finances of distressed Philadelphia public schools, with very few procedural restrictions. The Court found that this delegation of power was unconstitutional, and **violated the non-delegation doctrine, because it did not include concrete measures to channel the Commission's discretion to wield its suspension power, nor did it include safeguards to protect against arbitrary, *ad hoc* decision making,** such as a requirement that the Commission hold hearings, allow for public notice and comment, or explain the grounds for its suspensions in a reasoned opinion subject to judicial review. *Id*. at 142-43 (emphasis added).

68. The issues and concerns that formulated the basis for the holding in *W. Phila. Achievement Charter Elementary Sch.* are identical to our present situation, except the Safer at Home

19

Restrictions and the Defendants' actions since March 2020 provide the actual manifestation of the Pennsylvania Supreme Court's prophetic concerns, versus a theoretical potential.

69. In *Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645 (2017), the Pennsylvania Supreme Court invalidated Section 306(a.2) of the Workers' Compensation Act ("Act") for violating the non-delegation doctrine.  Section 306(a.2) permitted employers to demand an injured claimant undergo an evaluation to determine their level of impairment.  *Id*. at 650.  The Act required physicians determine a claimant's level of impairment using guidelines set forth by the American Medical Association ("AMA").  *Id*.  After being denied a permanent impairment rating, Plaintiff appealed, and claimed that Section 306(a.2), and its reliance on guidelines set forth by the AMA, was an unconstitutional delegation of power from the General Assembly to the AMA. The Pennsylvania Supreme Court agreed, and found Section 306(a.2) unconstitutional.  *Id*. at 668.  The Court found that the AMA failed to rely on a standardized methodology to create their guidelines.  *Id*. at 658.  They were, in essence, free to change their guidelines as frequently or as infrequently as they wished.  *Id*. at 659.  Thus, the AMA had *de facto*, unfettered control over Pennsylvania's Workers' Compensation Act.  *Id*.   In striking down the law, the Court held:

> The Pennsylvania Constitution prevents the General Assembly from passing off to another branch or body *de facto* control over matters of policy. As we have explained, this is exactly what the General Assembly did in Section 306(a.2). Because we must enforce Article II, Section 1 [of the Pennsylvania Constitution] without consideration of the exigencies that arise or "how trying our economic or social conditions become"… Section 306(a.2) violates the non-delegation doctrine.

> *Id*. at 668.

70. The Safer at Home Restrictions embody the concerns raised with the unconstitutional delegation of power in *Protz*. There is no standardized methodology or definition provided in the Safer at Home Restrictions as to why some businesses must shut down entirely, such

as indoor catering, while others are permitted to remain open, like national big-box retailers. Since there is no standardization to their methodology, the Defendants have been allowed to change their guidelines at will, as frequently or infrequently as they please, with no time constraints. Accordingly, the Safer at Home Restrictions are the very definition of arbitrary.

## IV.  THE SAFER AT HOME RESTRICTIONS ARE UNCONSTITUTIONAL BECAUSE THEY VIOLATE THE NON-DELEGATION OF POWERS DOCTRINE

### a.  BACKGROUND

71. On November 16, 2020, Defendant Kenney signed the Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses for Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise that Philadelphians are Safer at Home (hereinafter "Safer at Home Restrictions").  *See* Safer at Home Restrictions, attached as Exhibit "A." The Safer at Home Restrictions went into "law" at 5 p.m. on November 20, 2020, and expire at the end of the day on January 1, 2021.  *See* Exhibit "A" at p. 11. The Safter at Home Restrictions place a total ban on indoor on-site dining, catering, and gyms. *See* Exhibit "A" at §§ 5(A), 5(C) and 8(a).

72. On November 24, 2020, Defendant, City of Philadelphia, by and through Defendant, the Department of Public Health, adopted the Safer at Home Restrictions in its entirety, and enacted emergency regulations consistent thereto.  *See* Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions), attached as Exhibit "B."

**b. <u>LEGISLATIVE POWER BELONGS TO CITY COUNCIL, NOT ADMINISTRATIVE AGENCIES LIKE THE PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH</u>**

73. However, legislative power of the City of Philadelphia rests exclusively with an elected City Council. This is codified in Philadelphia Home Rule Charter §1-101, which says "[t]he legislative power of the City… shall be exclusively vested in and exercised by a Council, subject only to the provisions of this charter." *See* Philadelphia Home Rule Charter § 1-101.

74. The Department of Public Health was also created pursuant to the Philadelphia Home Rule Charter to administer and enforce statutes, ordinances, and regulations relating to public health. *See* Philadelphia Home Rule Charter § 5-300(a).

75. Pursuant to Philadelphia Home Rule Charter §5-301(b), the Board of Health was created to make "reasonable regulations, not contrary to any statute or ordinance, for the preservation and promotion of the health of the people of the City." *See* Philadelphia Home Rule Charter §5-301(b).

76. Critically, the Board of Health's power is limited and distinct from the legislative function of City Council.  As set forth in the notes to Philadelphia Home Rule Charter §5-301, "[t]he power of the Board to make regulations is, under existing case law, an administrative function. The Board, **<u>cannot</u>**, therefore, legislate. [Legislating] remains a function of the Council." *See* Philadelphia Home Rule Charter §5-301 at n. 3.

77. Philadelphia Code §§ 6-205 and 6-206 set forth emergency scenarios under which the Department of Health and Board of Health may act. *See* Philadelphia Code §§ 6-205 and 6-206.

78. Philadelphia Code § 6-205 relates to emergency epidemic control, and provides:

22

> Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.

> *See* Philadelphia Code § 6-205.

79. Philadelphia Code § 6-206 enables the Philadelphia Board of Health to enact restrictions on the congregation of persons during an epidemic:

> Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.

> *See* Philadelphia Code § 6-206.

80. Since March 2020, the Defendants have been acting pursuant to §§ 6-205 and 6-206 in an absolute and unchecked manner. This has now emerged in the most resent Safer at Home Restrictions presently in effect, and discussed herein.

   c. <u>**THE DEPARTMENT OF HEALTH HAS IMPERMISSIBLY ENGAGED IN LAW MAKING AND HAS FAILED TO FOLLOW PROCEDURAL LIMITATIONS AND REQUIREMENTS**</u>

81. The protocol and procedure that must be followed by the Defendants for enacting regulations is set forth in Philadelphia Home Rule Charter § 8-407, which provides that a department, board, or commission promulgating a regulation shall first submit them for approval to the Law Department, and, upon receiving approval from the Law Department,

file the regulation with the Department of Records, where the regulation shall be available for public inspection for thirty (30) days.  *See* Philadelphia Home Rule Charter § 8-407(a). The Department of Records shall give public notice of the regulation by advertising in three (3) daily newspapers, advising that any person affected by the regulation may request a hearing. If a person affected by the regulation requests a hearing, then he/she shall be afforded a public hearing before the department.  *See* Philadelphia Home Rule Charter § 8-407(b)-(c).

82. Critically for purposes of this motion, "the requirements of [Philadelphia Home Rule Charter § 8-407] may be suspended by the Mayor in writing and temporary regulations promulgated in emergencies affecting the public health or safety, **but any regulations so put into force shall NOT remain effective unless the procedures otherwise required by this section are complied with forthwith.**"  *See* Philadelphia Home Rule Charter § 8-407 (emphasis added).[1]

83. As the notes to Philadelphia Home Rule Charter § 8-407 explain, administrative agencies, such as Defendant, Philadelphia Department of Public Health, **may not legislate**.  *See* Philadelphia Home Rule Charter § 8-407 at n. 2 (emphasis added).  The requirement to hold a hearing **forthwith** is intended to protect persons who will be affected by arbitrary administrative action.  *See* Philadelphia Home Rule Charter § 8-407 at n. 3 (emphasis added).

84. Although emergencies affecting the public health or safety may require immediate action through regulations, and regulations in emergencies may go into force immediately if the

---

[1] Defendant Kenney did, in fact, suspend the formal requirements of §8-407 in writing on March 11, 2020. But, as referenced herein, the Defendants are required to comply with the plain-language and spirit of the law underlined_immediately thereafter. They have failed to do so.

Mayor suspends the procedural requirements of § 8-407, "for such **temporary** regulations to remain effective, the steps **normally** required by this section **must immediately be initiated and followed.**" *See* Philadelphia Home Rule Charter § 8-407 at n. 11 (emphasis added).

    **d.**   **THE DEFENDANTS HAVE FAILED TO FOLLOW THE SPECIFIC PROCEDURAL REQUIREMENTS OF § 8-407, THUS THEIR REGULATIONS INCLUDING THE SAFER AT HOME REGULATIONS ARE VOID**

85. Presently, the restrictions at issue have been elongated by the unquestioned "suspension" of § 8-407 by Defendant Kenney on March 11, 2020. That order has been in place for 9 months and 6 days, **without the procedural requirements of § 8-407 being observed.** Therefore, the failure to follow the required procedures renders the Mayor's emergency suspension of §8-407 , and the 18 derivative "emergency" orders and regulations issued by the Philadelphia Department of Heath and the Board of Heath **VOID**.

86. The Philadelphia Home Rule Charter specifically prohibits the Defendants' actions. It states that the procedural safeguards against arbitrary regulations must be immediately followed, or else the temporary, emergency regulations **cannot remain effective because administrative agencies cannot legislate and create new law.** *See* Philadelphia Home Rule Charter § 8-407 at n. 2.

87. Despite the limitations built into the Philadelphia Home Rule Charter and the Pennsylvania Constitution– namely, that only City Council may pass legislation, that agencies must follow a specific protocol to prevent passing arbitrary regulations, that administrative agencies are restricted from acting as legislative bodies, and the non-delegation doctrine – the Defendants have violated all procedural and constitutional norms in passing the "Safer at Home Restrictions."

25

88. The Defendants' actions are analogous to the unconstitutional delegation of power in *W. Phila. Achievement Charter Elementary Sch.,* where the Pennsylvania Supreme Court invalidated the Public School Code because the School Reform Commission was not mandated to hold hearings, allow for public notice and comment, or explain the grounds for its suspensions in a reasoned opinion subject to judicial review. *See W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 635 Pa. 127 (2016). Here, the Defendants have simply disregarded all requirements to provide notice, allow for public comment, and explain the rationale behind their decision-making. Failing to follow these critical safeguards allows for ad hoc policymaking, in contravention of the Pennsylvania Constitution.

89. The Defendants' conduct is also comparable to the unconstitutional behavior in *Protz*, because they have gained de facto control over all legislation surrounding COVID-19, and maintain unfettered, never-ending discretion to pass laws without following the procedural requirements. *See Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645 (2017). The Defendants then get to serve as prosecutor, judge and jury – enforcing their regulations, and imposing their own fines and sanctions for failing to comply.

90. With regard to the procedural safeguards of Philadelphia Home Rule Charter § 8-407, the Defendants have:

    a.   Failed to provide public inspection of the emergency regulations;

    b.   Failed to provide public notice of the emergency regulations;

    c.   Failed to allow affected citizens to request a hearing;

    d.   Failed to hold a public hearing;

e.  Failed to not act arbitrarily in the creation and imposition of the Safer at Home Regulations;

f.  Attempted to legislate by failing to set forth a time-limit on the Safer at Home Regulations.

91. While Philadelphia Code §§ 6-205 and 6-206 provide the authority to declare the spread of disease such as the novel coronavirus, COVID-19, an epidemic, and take steps to prevent the spread of the disease, **this authority is limited by the procedural protections of the Philadelphia Home Rule Charter §8-407, as referenced in the law itself**. Specifically, when the Mayor orders the suspension of the procedural requirements of Philadelphia Home Rule Charter § 8-407, then the Philadelphia Department of Health and Board of Health may enact regulations immediately, without following the usual requirements of the Philadelphia Home Rule Charter § 8-407, such as public notice and inspection for thirty (30) days, with the opportunity for an affected person to request a hearing prior to the enactment of the regulation. However, as previously referenced, the Philadelphia Department of Public Health does not have *carte blanche* authority to enact regulations that are free from public scrutiny by affected persons. The Philadelphia Home Rule Charter § 8-407 provides that, after a regulation is enacted emergently under the Mayor's emergency powers, the regulations put into force **will not remain effective unless the usual procedural requirements are immediately followed.** *See* Philadelphia Home Rule Charter § 8-407(c).  The steps normally required to enact regulations, such as providing public notice of their ability to request a hearing, and holding a public hearing, must be **immediately initiated, and followed**.  *See* Philadelphia Home Rule Charter § 8-407 at n. 11.

92. Thus, even under the authority provided by Philadelphia Code §§ 6-205 and 6-206, the Defendants have failed to comply with the procedural requirements since March 2020 – over 9 months. Likewise, the manifestation of their most recent transgression – the Safer at Home Restrictions – fail to comply.

93. Since the Safer at Home Restrictions failed to comply with the law and should be enjoined, as they are procedurally **void**. As referenced herein, Defendants failed to follow the procedural steps that must be immediately initiated after enacting emergency regulations, including failing to provide public notice to allow persons affected by the Safer at Home Restrictions to request a hearing, and failing to hold a public hearing (via remote technology or otherwise) with persons affected by the Safer at Home Restrictions, despite the requirement that the procedure be followed "forthwith."  Accordingly, pursuant to the Philadelphia Home Rule Charter § 8-407, "**any regulations so put into force shall not remain effective unless the procedures otherwise required by this section are complied with forthwith,**" thus the Safer at Home Restrictions violate the law on which they are based, and should be enjoined from further enforcement.

   e.  **THE SAFER AT HOME RESTRICTIONS VIOLATE THE SEPARATION OF POWERS DOCTRINE AS WELL AS THE NON-DELEGATION DOCTRINE, RENDERING THEM UNCONSTITUTIONAL**

94. Furthermore, this abrogation of authority is the exact conduct that was forbidden and deemed unconstitutional by our Supreme Court in *Protz* and *W. Phila. Achievement Charter Elementary Sch.,* as referenced herein.

95. The Defendants' appropriation of power far surpasses any official act done on behalf of the local legislative, executive, or judicial branch through our city's history. It has resulted

in a consolidation of all three (3) branches of government into a group of unelected officials in the Department of Health and Board of Health.

96. The separation of powers doctrine is essential to our tripartite governmental framework and is the cornerstone of judicial independence. It is inherent in the Pennsylvania Constitution and makes manifest that the three branches of government are co-equal and independent, and divides power accordingly. *Commonwealth v. Hill*, 2020 Pa. Super. LEXIS 774, *5 .

97. The governing structure of our Commonwealth, like the federal government, is divided into three equal branches, the legislative, *see* Pa. Const. art II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly ...."); the executive, *see* Pa. Const. art. IV, § 2 ("The supreme executive power shall be vested in the Governor ...."); and the judicial, *see* Pa. Const. art. V, § 1 ("The judicial power of the Commonwealth shall be vested in a unified judicial system ...."). *Id.*

98. The rationale underlying this separation of powers is that it prevents one branch of government from exercising, infringing upon, or usurping the powers of the other two branches. *Id.*

99. To avert the danger inherent in the concentration of power in any single branch or body, **no branch may exercise the functions delegated to another branch**. *Jefferson County Court Appointed Employees Association v. Pennsylvania Labor Relations Board*, 603 Pa. 482 (Pa.2009) (emphasis added).

100.      The prohibition on one branch of government encroaching upon a sister branch's powers is, in turn, related to the system of checks and balances, which prevents one branch from acting unchecked. *Id.*

101.      For checks and balances to properly work, each branch must be kept from controlling or coercing the other. Insuring that each branch is co-equal and independent is the foundation of the separation of powers doctrine, **and the avoidance of the concentration of governmental powers in one branch is essential to our freedom and liberty**. *See Commonwealth v. Hill, supra* (emphasis added).

102.      In our Commonwealth, the roots of the separation of powers doctrine run deep. The delineation of the three branches of government, each with distinct and independent powers, has been inherent in the structure of Pennsylvania's government since its genesis — the constitutional convention of 1776. *Id.*

103.      In the present scenario, Defendants have inserted themselves into all three branches of government under the guise of a perpetual emergency.

### 1.  <u>THE BOARD OF HEALTH HAS ASSUMED THE LEGISLATIVE FUNCTION</u>

104.      Intoxicated with their unchecked authority to legislate in violation of the Pennsylvania Constitution and Philadelphia Home Rule Charter, the Defendants have even insinuated their intention to make their emergency regulations **<u>permanent, as if it was a law</u>**:

**WHEREAS,** consistent with the foregoing, the Board hereby promulgates the below Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions) to adopt the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, as a temporary regulation effective upon delivery to the Department of Records, while the remaining procedures and formalities of Section 8-407 are followed to promulgate these amendments as a permanent regulation; and

See Exhibit "B" at p. 4.

105.　　In recognition of this unprecedented consolidation of power, a bill was recently proposed in City Council to reign in the Department of Public Health's unconstitutional encroachment on the legislature, seeking to put a sixty (60) day time limit on their authority under Philadelphia Code § 6-205 and § 6-206. See City of Philadelphia Bill No. 200678, attached as Exhibit "C."

106.　　The introduction of the aforementioned bill, coupled with the historically built-in restrictions on granting "emergency" powers, City Council has acknowledged that the Board of Health is not only "legislating," but also it is acting beyond Council's legislative intent in the passing of §§ 6-205, 6-206 and 8-407.

107.　　City Council's proposed bill to put a time limit on the Defendants' authority under Philadelphia Code § 6-205 and § 6-206 shows that the Defendants have clearly been acting contrary to City Council's legislative intent.

108.　　Indeed, the Safer at Home Restrictions, and the unfettered power being exercised by the Defendants under the guise of Philadelphia Code § 6-205 and § 6-206, goes far beyond that of other emergency regulations enacted by City Council throughout its history.

109.　　For example, the COVID-19 Emergency Housing Protections law was introduced as a bill by City Council pursuant to their legislative authority. The bill passed, and was

codified into law, with an end date of August 31, 2020. *See* Philadelphia Code § 9-809. Unlike the Safer at Home Restrictions, the COVID-19 Emergency Housing Protections law came from City Council, the legislative body of the City, and set forth a specific timeframe in which it would be valid: July 1, 2020 to August 31, 2020.

110.      Even the Mayor's emergency powers at times of civil unrest are not as broad as the unrestrained encroachment on the legislative branch by the Philadelphia Department of Health in the Safer at Home Restrictions. Pursuant to Philadelphia Code § 10-819, the Mayor may declare a state of emergency, and take specific enumerated actions if "the City or any part thereof is suffering or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens." *See* Philadelphia Code § 10-819. This power may only last two (2) weeks. *See* Philadelphia Code § 10-819(2). As the Pennsylvania Superior Court has explained, Philadelphia Code §10-819, and the State of Emergency power granted to the Mayor of Philadelphia therein, only applies to riots. *See Commonwealth v. Stotland*, 251 A.2d 701 (Pa. Super. 1968).

111.      In *Stotland*, the Superior Court reviewed three (3) summary criminal convictions following the enactment of a state of emergency from April 5, 1968 at 9:00 p.m. to April 10, 1968 at 6:00 a.m. in response to "widespread public disorder" across the city and nation in the aftermath of the Martin Luther King, Jr. assassination. *Id*. at n. 2. The state of emergency was enacted by the Mayor of Philadelphia, pursuant to Philadelphia Code §10-819, and set forth limitations on groups of twelve (12) people or more from assembling in the city. *Id.* The Petitioners challenged the constitutionality of §10-819, but the Superior Court upheld all three (3) convictions, and, in the concurring opinion, set forth a detailed

analysis of the purpose of §10-819, and the limitations on the Mayor of Philadelphia's emergency powers under the law.  Philadelphia Code §10-819 authorizes the Mayor of Philadelphia to declare a State of Emergency within the City, and to impose certain extraordinary measures to maintain public order for the duration of the emergency period. *Id.* at 702.  Emergency powers may only be invoked if may be invoked only if the city "is suffering, or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens…"  *Id.* at 704.  The words "imminent danger" mean a "clear and present danger." *Id.* Thus, Philadelphia Code §10-819 may only be enacted during a riot. As the Court explained:

> Both the ordinance and its history indicate that the only danger defined by the language "civil disturbance, disorder, riot or other occurrence" is a large scale urban riot. In 1964, a large scale riot occurring in Philadelphia resulted in scores of injuries and extensive property damage.  During the summer of 1967, only one month prior to the enactment of Ordinance 10-819, the prospect of an impending riot of these proportions prompted the Mayor of Philadelphia to make an executive decree similar to the Proclamation of April 5 without legislative authorization.  The ordinance was enacted to give the Mayor more effective power to restore order or prevent disorder in future outbreaks of this kind.

> The language of the ordinance supports the conclusion that the powers may be exercised only to control or avert a large scale riot. The eight specific measures which the Mayor is authorized to apply are uniquely designed to combat this catastrophic form of civil disorder. The powers to restrict surface and air transportation into and within the city are aimed at containing a riot within existing riot-struck areas.  The prohibitions upon the sale of weapons and inflammable liquids are designed to restrict or prevent arson and violence by limiting the availability of articles which might be employed to these ends.  Restrictions imposed on the sale of alcoholic beverages may prevent the further aggravation and release of inflamed passions and hostilities.  The powers to limit public assembly and to impose a curfew provide readily enforceable crowd control devices during an existing riot and limit the opportunities for the public venting of emotions which, when there is a clear and present danger of riot, may turn the possibility of riot into reality.
> A large scale urban riot involving widespread arson, looting, vandalism and sniping is the most destructive form of civil disturbance. The magnitude of the rioting

which has occurred in major cities in recent years is measured in scores of deaths, hundreds of injuries, and millions of dollars of property damage. 5 In many instances, city and state executives have been required to employ State National Guard or United States Army troops to restore order to the community.

*Id*. at 704-5.

112.     In fact, the Court declared that §10-819 <u>only</u> authorizes the Mayor of Philadelphia to declare a State of Emergency <u>only</u> after he has found there is a clear and present danger of a large scale civil disorder.  *Id*. at 705.  Such a State [of Emergency] may be declared <u>only</u> if the city is faced with the clear and present danger of a riot.  *Id*. at 706.

113.     The Defendants' ongoing usurpation is a consolidation of all three (3) branches of government, and violates the required separation of powers.

114.     To be sure, the Safer at Home Restrictions are an unprecedented and unconstitutional exercise of power by an administrative agency. The Defendants have encroached on the non-delegable legislative function of City Council, in violation of Pennsylvania law. *See e.g. Tosto*, *Protz*, supra.  They have ignored the procedural safeguards required by the Pennsylvania Constitution, and Philadelphia Home Rule Charter § 8-407, to protect citizens from the enactment and enforcement of arbitrary regulations. They have exercised unrestrained emergency authority in ways never before seen, even by City Council or the Mayor during times of emergency.

115.     The Safer at Home Restrictions also invade the executive and judicial functions of government.

## 2.   <u>THE BOARD OF HEALTH HAS ASSUMED THE EXECUTIVE FUNCTION</u>

116.     Under the Philadelphia Home Rule Charter § 4-100, the Mayor is the chief executive officer of the City, and shall be responsible for the conduct of executive work,

administrative work, and law enforcement within the City.  *See* Philadelphia Home Rule Charter § 4-100.

117.     The Board of Health demonstrates its usurping of the executive role through its administration of its restrictions, including the Safer at Home Restrictions.

118.      The Board now sits in  the executive role of law enforcement. Section 11 of the Safer at Home Restrictions, the Department of Health authorizes itself to allow continuous inspection of affected premises, such as catering halls, restaurants, bars and gyms:

> **C.    The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.**

*See* Exhibit "A" at § 11(c).

### 3.   <u>THE BOARD OF HEALTH HAS ASSUMED THE JUDICIAL FUNCTION</u>

119.     Under the Pennsylvania Constitution, judicial power of the Commonwealth rests in the unified judicial system.  See PA CONST. art. V, § 1.

120.     The Department of Health has assigned itself to hold hearings and determine not only guilt, but also the consequences levied against any business or individual it determines is recalcitrant to its directives.

121.     Specifically, the Safer at Home Restrictions allow Department of Health employees, or other city employees, acting pursuant to the Safer at Home Restrictions to impose penalties, fines, license suspensions, and, ominously, "other penalties."

D.   Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

*See* Exhibit "A" at § 11(d).

**f.   THE ARBITRARY SAFER AT HOME RESTRICTIONS HAVE LED TO IRRATIONAL RESULTS**

122.   The Defendants' *ad hoc* regulations, which are heavy on fear, and light on facts, have led to absurd results. We are living in a city where this is "legal:"



*Christmas Village packed with guests*

But this is illegal, and will result in numerous fines and a cease operations order:

36



Where Walmart is allowed to operate like this:



*Photo taken at the South Philadelphia Walmart on 12/17/20*

But, this indoor dining is forbidden:



123.     Accordingly, the Defendants' ongoing regulations and the most recent Safer at

Home Restrictions violate the non-delegation and separation of power doctrines of

Pennsylvania law, and are unconstitutional pursuant to Article 2, Section 1 of the

Pennsylvania Constitution. Moreover, they violate the procedural requirements to enact

emergency regulations pursuant to the Philadelphia Home Rule Charter and cannot be

enforced.

**V.     THE SAFER AT HOME RESTRICTIONS ARE AN UNCONSTITUTIONAL VIOLATION OF THE SUBSTANTIVE DUE PROCESS RIGHT TO WORK**

    **a.     THE RIGHT TO WORK IS PROTECTED BY THE UNITED STATES CONSTITUTION AND PENNSYLVANIA CONSTITUTION**

124.     Substantive due process guarantees that "all fundamental rights comprised within

the term liberty are protected by the Federal Constitution from invasion by the States."

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847

(1992)(*quoting Whitney v. California*, 274 U.S. 357, 373 (1927)). This includes the right

to work.

125.     In fact, the United States Supreme Court has stated:

> Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.
>
> While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also **the right of the individual to contract, to engage in any of the common occupations of life,** to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. *See, e. g., Bolling v. Sharpe*, 347 U.S. 497, 499-500; *Stanley v. Illinois*, 405 U.S. 645.

*Board of Regents v. Roth*, 408 U.S. 564, 572 (1972) (emphasis added)

126.     The Pennsylvania Constitution likewise guarantees the inherent and indefeasible

rights of its citizens: "all men are born equally free and independent, and have certain

inherent and indefeasible rights, among which are those of enjoying and defending life and

liberty, of acquiring, possessing and protecting property and reputation, and of pursuing

their own happiness."  *See* PA CONST. art. I, § 1.

127.     Our Constitution likewise explicitly prohibits the passage of laws that abridge our

civil rights: "[n]either the Commonwealth nor any political subdivision thereof shall deny

to any person the enjoyment of any civil right, nor discriminate against any person in the

exercise of any civil right."  *See* PA CONST. art. I, § 26.

128.     As the Pennsylvania Supreme Court has held: "within the concept of liberty protected by the Fourteenth Amendment [is] the right to engage in any of the common occupations of life.  The established doctrine… is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." *Adler v. Montefiore Hospital Asso.*, 453 Pa. 60, 72 (1972) (*citing* Meyer v. Nebraska 262 U.S. at 399, 400 (1923)).

129.     In *Adler*, the Pennsylvania Supreme Court reviewed whether a private physician associated with a public teaching hospital was entitled to render what he considered comprehensive medical treatment to his patients using hospital facilities and equipment, or whether his right to provide treatment must yield to rules and regulations established by the hospital. The hospital downgraded the physician's employment from full-time to part-time, which eliminated his ability to perform operations using the hospital's facilities.  *Id*. at 65-66.

130.     Although the Court upheld the hospital rules, it confirmed the significant limitations on the government's interference into protected freedoms, like the right to work. "[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id*. (*citing* NAACP v. Alabama, 377 U.S. 288 (1964)).

131.     Critically, a law "which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to

be attained.  Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations."  *Id.* (*citing* Gambone v. Commonwealth, 375 Pa. 547, 551 (1954)).

### b. THE SAFER AT HOME RESTRICTIONS ARE AN UNCONSTITUTIONAL LIMIT ON THE RIGHT TO WORK

132.    In the instant case, the Safer at Home Restrictions violate the protections enshrined in *Adler*. The regulations set forth by Defendants are overbroad, in that they shutdown all indoor dining, catering, and gyms, thereby depriving Plaintiff and others of the right to work, without any study of the safety protocols able to be followed by individual businesses. Furthermore, the Defendants have yet to publicly release any of their data showing how their regulations have a real and substantial relation to the goal of stopping the spread of COVID-19. The regulations also arbitrarily differentiate between businesses which are permitted to remain open, and those which must close.

133.    For example, the Christmas Village and national big-box retailers are allowed to remain open, despite the massive crowds of people they attract during the holidays, while mom-and-pop restaurants, catering halls and gyms are forced to close, regardless of how busy they become.  Such ad hoc and irrational regulations violate the mandate of Adler, which forbids imposing unusual and unnecessary restrictions upon lawful occupations under the guise if public interest.  *Id.* at 65-66.

134.    Government encroachment into the right to work via regulations and emergency orders in the context of the COVID-19 pandemic was recently addressed in *Cty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. Sept. 14, 2020). The Court affirmed that substantive due process includes the right of citizens to support themselves by engaging in

their chosen occupation, and invalidated Governor Wolf's business closures.  *Id*. at 5. The Court found "[t]here is no question… that the Fourteenth Amendment recognizes a liberty interest in citizens… to pursue their chosen occupation."  *Id*. at 79.

135.        In *Cty. of Butler*, the Court reviewed the constitutionality of public health measures enacted by Governor Wolf and the Commonwealth of Pennsylvania to stop the spread of COVID-19, including orders closing "non-life sustaining" businesses, and stay-at-home requirements. The challenge of this endeavor – the balance of constitutional freedoms versus a public health crisis – was not lost on the Court. Nonetheless, the Court found that the government cannot restrict the due process freedoms guaranteed by the Constitution:

> The unprecedented nature of the business closure—even in light of historic emergency situations—makes its examination difficult from a constitutional perspective. It simply does not neatly fit with any precedent ever addressed by our courts. Never before has the government exercised such vast and immediate power over every business, business owner, and employee in the Commonwealth. Never before has the government taken a direct action which shuttered so many businesses and sidelined so many employees and rendered their ability to operate, and to work, solely dependent on government discretion. As with the analysis of lockdowns, the unprecedented nature of the business shutdowns poses a challenge to its review. **Nevertheless, having reviewed this novel issue in light of established Due Process principles, the Court holds that the business closure orders violated the** **Fourteenth Amendment.**

*Id*. at 74-75 (emphasis added).

136.        The Court found that the restrictions set forth by Governor Wolf were unconstitutional because they had the potential, and actual effect, of destroying businesses and putting employees out of work.  *Id*. at 89.  Although the defendants were acting hastily to prevent a public health situation, they exercised "raw governmental authority in a way that could (and did) critically wound or destroy the livelihoods of so many."  *Id*. at 90.  The citizens of the Commonwealth deserved an objective plan, the ability to determine with

certainty how the critical classifications were to be made, and a mechanism to challenge

an alleged misclassification, but the arbitrary design, implementation, and administration

of the business shutdowns deprived the plaintiffs of all protection. *Id*.

137.     As in *Cty. Of Butler*, the Defendants' ongoing restrictions, including their Safer at

Home Restrictions, are likewise an arbitrary deprivation of Plaintiff's constitutional right

to work. Under the Constitution's substantive due process protections, Plaintiff has the

right to pursue his chosen occupation. The Safer at Home Restrictions, however, have

forced Plaintiff to lose their jobs, livelihoods and, if prosecuted for violating the

restrictions, potentially fines, jail time reputation, Despite this significant encroachment,

the Defendants have failed to provide to the public with any of their rationale or data to

support the Safer at Home Restrictions, and demonstrate their necessity.

138.     A non-exhaustive list of the Defendants' "findings" and "rationale" that they have

failed to explain or support with data, studies, and/or scientific methodology includes, but

is not limited to:

   a.   The differentiation between "essential" business and "non-essential" business;

   b.   That COVID-19 may remain viable for hours or days on surfaces;

   c.   That group settings are at a heightened risk for transmission of COVID-19 when

        individuals leave and return;

   d.   That construction creates a heightened risk for transmission of COVID-19 and

        should therefore be limited;

   e.   That reopening in phases reduces the risk for transmission of COVID-19;

   f.   That indoor exercise creates a heightened risk for transmission of COVID-19;

   g.   That indoor dining creates a heightened risk for transmission of COVID-19;

h.   That indoor catering creates a heightened risk for transmission of COVID-19;

i.   That indoor theaters create a heightened risk for transmission of COVID-19;

j.   That outdoor sports create a heightened risk for transmission of COVID-19;

k.   The differentiation between small-business retail stores and national retailers;

l.   That gatherings with persons from different households creates a heightened risk for transmission of COVID-19;

m.   That indoor facilities such as museums, concert halls, arcades, bowling alleys, private clubs, and event centers create a heightened risk for transmission of COVID-19;

139.   By failing to report the underlying data or studies surrounding the above-referenced "findings" and "rationale" behind their regulations, the Defendants violated Philadelphia Home Rule Charter § 8-407 because they passed arbitrary and inconsistent regulations, and the due process protections of the Fourteenth Amendment.

140.   To date, the Defendants have not shown any analysis of whether their purported "findings" and "rationale" will hurt, rather than help, the city.

141.   At the enactment of the Safer at Home Restrictions, nearby counties remained operational and unrestricted, permitting indoor dining, to the detriment of similarly-situated Philadelphia businesses, like Plaintiff's.

142.   In fact, the Center for Disease Control (hereinafter "CDC"), which the Defendants have referenced since March 2020 as an authoritative agency with regard to information and guidance on stopping the spread of COVID-19, does not recommend lockdowns and a total ban of indoor dining. The CDC has published mitigation guidelines for the restaurant industry. *See supra.*

143.     Nowhere in the guidelines does the CDC recommend that the restaurant industry should or must be "locked down" to mitigate COVID-19 spread.  See Centers for Disease Control Guidelines, attached as Exhibit "D."

144.     Moreover, at the last published Department of Public Health meeting minutes of September 10, 2020, Dr. Farley noted that indoor gyms **were compliant** with distancing, masking and capacity restrictions, and that the Department of Health was just starting to monitor their compliance with health restrictions.  *See* Department of Public Health Meeting Minutes from September 10, 2020, attached as Exhibit "E."

145.     To date, Defendants have not made the Department of Health's inspection data on indoor gyms publicly available, or any other data.

146.     Further, at the September 10, 2020 Department of Public Health meeting, Dr. Farley indicated that even though Philadelphia's restrictions on indoor dining were stricter than the rest of the Commonwealth, other counties have **not** seen an increase of coronavirus cases due to indoor dining.  *See* Exhibit "E" at p. 2.

147.     Furthermore, the fact that the CDC has not issued any guidelines that suggest a lockdown of restaurants, catering halls, and gyms would be necessary, couple with the lack of Defendants' own data, renders any argument that the public interest is supported by a lockdown to be unsubstantiated.

148.     Before exercising "raw governmental authority that could critically wound or destroy the livelihoods of so many," Plaintiff and others deserved to see objective regulations supported by scientific fact, an ability to analyze the data to see how and why specific regulations were made, and a mechanism to challenge the regulation.  *See Cty. of Butler*, at 90 (W.D. Pa. Sept. 14, 2020).

149.     Instead, Defendant, the Philadelphia Department of Public Health, through its Board of Health, all unelected officials who do not have legislative powers, enacted the Safer at Home Restrictions pursuant to their unfettered and unchecked discretion. Their reasoning has not been explained, nor has any appeal mechanism been provided. They did not follow the procedural requirements of the Philadelphia Home Rule Charter. Simply put, the Defendants have created a system where they can deprive citizens of their property rights, intrude on their business, and destroy their livelihood, without any potential recourse for those affected by the government's actions.

## VI.     AN EMERGENCY INJUNCTION IS NECESSARY TO STOP THE DEFENDANTS FROM VIOLATING THE CONSTITUTION BY USURPING THE LEGISLATIVE FUNCTION AND DEPRIVING PLAINTIFF OF THE RIGHT TO WORK

150.     Preliminary injunctive relief is an equitable remedy available in equity actions. *Barcia v. Fenlon*, 37 A.3d 1, 6 (Pa. Cmwlth. 2012). "A preliminary injunction is designed to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status quo until the legality of the challenged conduct can be determined on the merits." *Greater Nanticoke Area Education Association v. Greater Nanticoke Area School District*, 938 A.2d 1177, 1183 (Pa. Cmwlth. 2007).

151.     To issue a preliminary injunction pursuant to Pa. R.C.P. § 1531(a), Plaintiff must show:

     a.   An injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

     b.   Greater injury will result from refusing an injunction than from granting it, and an injunction will not substantially harm other interested parties in the proceedings;

c. A preliminary injunction will properly restore the parties to their status as it existed immediately before the alleged wrongful conduct;

d. The moving party is likely to prevail on the merits;

e. The injunction is reasonably suited to abate the offending activity; and

f. A preliminary injunction will not adversely affect the public interest.

See e.g. *Summit Towne Centre, Inc. v. Show of Rocky Mount, Inc.*, 573 Pa. 637, 646-47 (2003).

### a. <u>PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM</u>

152.   A party seeking a preliminary injunction must show the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. *Com. Ex rel. Corbett v. Snyder*, 977 A.2d 28, 41 (Pa. Commw. Ct. 2009).

153.   This Honorable Court granted a preliminary injunction in *SPTR, Inc. v. City of Phila*, 2015 Phila. Ct. Com. Pl. LEXIS 280 at 17. In that case, Plaintiff was operating a beer garden in a yard on their property, until the City issued a cease and desist order because the yard was not properly zoned. *Id*. at 2-4. Profits from the beer garden were going to be donated to charity. *Id*. at 2.

154.   In finding that an injunction was warranted to prohibit the City from shutting down the beer garden, this Court found that Plaintiff suffered immediate and irreparable harm – namely, that "several charitable organizations relied upon the beer garden for funding, including funding a trip for a youth dance troupe to travel to New Orleans to teach local children, which would not be possible without said funding." *Id*. at 18.

155.   The Court indicated the license to operate a business, such as Plaintiff's, is a property right, which cannot be adequately compensated by damages. *Id*. at 20.

156.     Here, Plaintiff will suffer similar immediate and irreparable harm from the Safer at Home Restrictions, which provide the Board of Health with unchecked power to enforce mercurial regulations and continuous close Plaintiff's businesses, as well as, ban indoor dining. Plaintiff's businesses will be lost, their employees without jobs and plaintiff unable to provide themselves or their families with a way of life they have worked so hard to build and have struggled to maintain since Defendants began issuing shut down and restrictive operation Orders in March 2020. The effect of the Safer at Home Restrictions will not only be felt by Plaintiff but will have reverberating effects throughout the community.

157.     Furthermore, the ongoing imposition of fines, costs and business closures at the hands of the Defendants as they have assumed all three (3) branches of government is an immediate and irreparable harm. Plaintiff has no recourse but to bow to the Defendants' authority, and serve any imposed penalties, unless Defendants' power grab is placed in check and their Safer at Home Restrictions are enjoined. Each unconstitutional and invalid encroachment on the Plaintiff's property by the Defendants inflicts new harm on Plaintiff, and those similarly situated.

### b.  PLAINTIFF WILL SUFFER A GREATER INJURY THAN DEFENDANTS

158.     "The accumulation of all powers, legislative, executive, and judiciary, in the same hands… may justly be pronounced the very definition of tyranny." *See* The Federalist No. 47 (J. Cooke ed. 1961).

159.     The Defendants have violated the Pennsylvania Constitution's prohibition on delegated authority, as well as the separation of powers, the Fourteenth Amendment's due process guarantee of the right to work, and the Philadelphia Home Rule Charter's procedural protections against arbitrary regulations.

160.     They have yet to provide the underlying data and rationale for their ban on indoor dining, gyms and catering, while leaving other indoor facilities open to the public, and permitting other mass gatherings in close environments, such as the Christmas Village. At the time the Safer at Home Restrictions were enacted, nearby counties remained operational and unrestricted, permitting indoor and other banned activities to continue. In light of such inconsistent, unexplained, unjustified, and nonsensical reasons for restricting businesses, such as Plaintiff's, the Defendants have failed to demonstrate any harm if their power was placed in check and their Safer at Home Restrictions enjoined.

### c.   A PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO

161.     An injunction is proper to restore the parties to their status quo as it existed "immediately prior to the alleged wrongful conduct." *Summit Towne Ctr., Inc.*, 828 A.2d at 1001.

162.     This Court has found that the status quo was preserved when a business (the beer garden) was operating prior to a cease order, and an injunction would return it to operation. *SPTR, Inc.*, 2015 Phila. Ct. Com. Pl. LEXIS 280 at 23.

163.     Here, enjoining the Safer at Home Restrictions would prevent the city from shutting down Plaintiff's business with aggressive and unnecessary enforcement tactics, thus returning it to its unencumbered status before the Defendant's regulations.

**d.  PLAINTIFF'S RIGHT TO RELIEF IS CLEAR**

164.     Pursuant to the Pennsylvania Rules of Civil Procedure and case law, the party

seeking an injunction must show that their right to relief is clear. *Anglo-Am. Ins. Co. v.*

*Molin*, 547 Pa. 504, 691 A.2d 929, A.2d 929, 933-34 (1997).

165.     Plaintiff, as well as all Philadelphians, have an absolute right to their

Constitutionally guaranteed rights and liberties and to be free from being subjected to

oppressive, arbitrary, overly broad and unsubstantiated restrictions that are derived from

an administrative agency's abuse of authority and power that has been specifically

prohibited by our Supreme Court's rulings.

166.     Plaintiff has a right to relief when the City is required to issue permits for the

operation of a business, but failed to follow the Philadelphia Code.  *SPTR, Inc.*, 2015 Phila.

Ct. Com. Pl. LEXIS 280 at 23.

167.     In the instant case, Plaintiff cannot operate their business if the Defendants impose

regulations prohibiting its operation, and **Defendants have not followed the required**

**procedures, as set forth in the Philadelphia Home Rule Charter.**  Moreover, Plaintiff's

constitutional rights are being actively violated by the Defendants, in their encroachment

into the legislative, executive and judicial branches of government, and impeding on

Plaintiff's right to earn a living.

**e.  AN INJUNCTION IS REASONABLY SUITED TO ABATE THE**
**OFFENDING ACTIVITY**

168.     A preliminary injunction must also be reasonably suited to abate the offending

activity. *Com. ex rel. Corbett v. Snyder*, 977 A.2d 28, 48 (Pa. Commw. Ct. 2009).

169.     Here, an injunction would stop the Defendants from their unprecedented and unconstitutional overextension of power and enforcing the Safer at Home Restrictions, which are unconstitutional. Thus, the offending activity would be prohibited, and abated, by the injunction.

**f.   AN INJUNCTION IS IN THE PUBLIC INTEREST**

170.     A party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest. *Philadelphia v. District Council 33, AFSCME*, 528 Pa. 355, 598 A.2d 256, 260-61 (1991).

171.     Moreover, there is public interest in maintaining the guaranteed rights of the United States' Constitution and Pennsylvania Constitution, including the right to work, and the right to be free from usurpation of power by administrative agencies.

172.     The public has an interest in not having their rights and way-of-life trampled by the arbitrary, unexplained, and unjustified conduct of the Defendants.

173.     There is a public interest in avoiding Plaintiff's economic destruction, and the reverberating cataclysmic impact on the livelihoods of thousands of residents of Philadelphia through the shutdown of small businesses, like Plaintiff's.

174.     The vibrancy of neighborhoods, maintained by a strong foundation of small businesses, would remain intact. Tens of thousands of Philadelphians who depend on the restaurant industry for work and income, and to support their families and feed their kids, will not be displaced.

175.     The city, already dealing with a crime epidemic, will not be confronted with the sudden influx of thousands of newly unemployed citizens and a dearth of job opportunities, while the Defendants close the last of the remaining businesses.

176.     Granting an injunction preserves the status quo. Denying an injunction will alter the nature of the City of Philadelphia for years into the future.

## VII.    PRAYER FOR DECLARTORY JUDGMENT AS ANCILLARY RELIEF:

177.     In any civil action, a party may include in the claim for relief a prayer for declaratory relief and the practice and procedure shall follow, as nearly as may be, the rules governing that action. *See Pa.R.C.P. § 1602.*

178.     The Declaratory Judgments Act, **which is to be liberally construed and administered**, **was promulgated to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations**. *Pa.Democratic Party v. Boockvar,* 238 A.2d 345 (2020) (emphasis added); *see also 42. Pa.C.S. §7541(a).*

179.     The Act  provides in pertinent part as follows:

"Any person… whose rights, status, or other legal relations are affected by a statute, municipal ordinance...may have determined any question of construction or validity arising under the... statute, ordinance… obtain a declaration of rights, status, or other legal relations thereunder. *Pa. Democratic Party*, supra, *quoting 42 Pa.C.S. §7533.*

180.     As has been set forth at length herein, it is clear that Plaintiff's Constitutional rights are directly affected by the Defendants' ongoing restrictions.

181.     Liberally construing and applying the right to declaratory relief as is prescribed by the Act and our Supreme Court, it is clear that Plaintiff is entitled to declaratory relief from the uncertainty and insecurity that surrounds their Constitutional rights as set forth herein. See *Pa. Democratic Party, supra*.

182.      Therefore, Plaintiff prays that this Court grant Declaratory Relief and Order that Defendants' Emergency Regulations are void and unenforceable for the following reasons:

- Defendants' Emergency Regulations, including the Safer at Home Restrictions are are violative of Plaintiff's Constitutional and Civil Rights;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the Non-Delegation and Separation of Powers of the Pennsylvania Constitution;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the requirements of the Philadelphia Home Rule Charter, as well as, City Council's intent.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court enter an Order in the form attached hereto, granting Plaintiff's Motion for Special and Preliminary Injunctive Relief and Plaintiff's Prayer for Declaratory Judgment as Ancillary Relief.

Respectfully Submitted,

**FRITZ & BIANCULLI, LLC**

By:___ */s/ **Brian E. Fritz**_____
BRIAN E. FRITZ, ESQUIRE (84044)
WILLIAM A. WEISS, ESQUIRE (309817)
*Attorneys for Plaintiff, Philadelphia Restaurant Owners Against Lockdown, LLC*

## CERTIFICATE OF SERVICE

I, Brian E. Fritz, Esquire, attorney for Plaintiff, hereby certify that a true and correct copy of Plaintiff's Complaint in Equity, Motion for Special and Preliminary Injunction, and Memorandum of Law, were served on the following defendants:

JAMES KENNEY, in his official capacity
as Mayor of the City of Philadelphia
City Hall, Rm. 204
Philadelphia, PA 19107

THOMAS A. FARLEY, in his official
capacity as Health Commissioner
1101 Market Street, 13th Floor
Philadelphia, PA 19107

CITY OF PHILADELPHIA
1515 Arch Street, Suite 15
Philadelphia, PA 19102

PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH
1101 Market Street, 13th Floor
Philadelphia, PA 19107


By:___*/s/ Brian E. Fritz*_____
BRIAN E. FRITZ, ESQUIRE (84044)
*Attorneys for Plaintiff, Philadelphia Restaurant*
*Owners Against Lockdown, LLC*

DATE: December 18, 2020

# EXHIBIT "A"



CITY OF PHILADELPHIA

OFFICE OF THE MAYOR
DEPARTMENT OF PUBLIC HEALTH

## EMERGENCY ORDER CONCERNING ADDITIONAL LIMITATIONS ON VISITING, GATHERINGS, EVENTS AND BUSINESSES FOR FALL/WINTER 2020-21, ESTABLISHING ADDITONAL SAFETY MEASURES TO PREVENT THE SPREAD OF THE 2019 NOVEL CORONAVIRUS (COVID-19) AND CONTINUING TO ADVISE THAT PHILADELPHIANS ARE SAFER AT HOME

**WHEREAS**, the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS**, on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS**, on March 12, 2020, the City's Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS,** on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS,** on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS**, on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the

Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS**, the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19): Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS**, on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS**, since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities; and

**WHEREAS**, on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS**, although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City has taken a cautious approach to moving to the Green Phase; and

**WHEREAS** on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS**, at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in recent days, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS**, after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS**, the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS**, these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS**, there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS**, the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS**, the spread of COVID-19 through outdoor gatherings and activities is

less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS**, pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS**, Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease;

**NOW, THEREFORE**, James F. Kenney, Mayor of the City of Philadelphia, and Dr. Thomas A. Farley, Health Commissioner of the City of Philadelphia, pursuant to all authority granted under the Philadelphia Home Rule Charter, The Philadelphia Code, the Regulations of the Board of Health of the City of Philadelphia and applicable state law, hereby **ORDER** as follows:

**Section 1.      Scope and Consistency with Prior Emergency Orders.**

This Order modifies, but not does not replace, some of the City's previous emergency COVID-19 related health orders, as applicable.  Any such previous order in effect that addresses and restricts any matter or activity not addressed in this Order, or that authorizes any activity not addressed in this Order, remains in effect.  To the extent any aspect of this Order is more restrictive than any such previous order or requirement, or in the event of a conflict between any such orders and this Order, this Order controls.  All applicable health and safety guidance incorporated in prior orders remains in effect for all activities allowed under this Order.  To the extent any such guidance conflicts or is less restrictive than this Order, this Order controls.

**Section 2.      Definitions.**

For purposes of this Order:

A. "Gathering" means any pair or group of individuals who reside in different households who are in close proximity of one another for more than several minutes.

4

B. "Indoor" means a location enclosed by three or more walls or other non-permeable barriers and an overhead covering, such as a roof or a tent top. Tents with one side open are considered indoor spaces. In contrast, a space that is fully open on two or more sides is considered an outdoor space.

**Section 3.    Indoor and Outdoor Social Gatherings of Persons from Different Households**

A. Except as otherwise provided in this Order, indoor gatherings of persons from more than one household in a residence or other private indoor location, other than to provide necessary care for a family member or as necessary due to emergency circumstances, are prohibited.

   1. Governmental and private personal care services (*e.g.*, governmental home visitation programs, home health aides, and childcare services) that require access to a person's home to provide such services are permitted.

   2. Home-based construction, renovation, repair and maintenance is permitted.

   3. Any person from outside a household entering the home for a purpose authorized under this or any other applicable order shall strictly comply with applicable Commonwealth and City guidance, including masking and distancing requirements.

B. Except as otherwise provided in this Order, outdoor social gatherings of persons including people from more than one household are limited as follows:

   1. No more than 10 people are permitted per 1,000 square feet of occupiable space and no more than 2,000 people total may gather;

   2. No food or drink service may be provided (*e.g.*, by a caterer) in any such gathering, and food or drink may only be consumed in a gathering of ten or fewer people in which all individuals maintain at least 6 feet of physical distance from all individuals who reside in a different household (including, for example, not sharing a table with members of a different household), according to applicable guidance, and all individuals gathering must remove their masks only while actively consuming food or drink. This rule applies to private gathering and not to restaurant dining, to which specific restaurant dining rules apply.

5

4.  Outdoor social gatherings are subject to all applicable guidance and requirements of the Commonwealth and the City, including masking and social distancing requirements.

**Section 4.**    **Educational Settings.**

A. Secondary education (high schools); colleges and universities; and all other types of vocational, trade or other classroom-based educational programs are prohibited from conducting in-person classes or other instruction, except for the following, in each case subject to strict compliance with applicable Commonwealth and City guidance:

1.  Childcare and early education programs;

2.  Elementary and middle school education (K-8th grades);

3.  Virtual learning centers for supervised on-line learning (Access Centers); and

4.  Certain health care and allied professional clinical instruction as further provided in guidance of the Department of Public Health.

**Section 5.**    **Restaurants and Catered Events.**

A. Indoor on-site dining at restaurants or other food service businesses is prohibited.

B. Outdoor dining service may continue, but is limited to no more than four people per table.  No outdoor dining service for unseated customers is permitted.

C. Catering service is prohibited at any gathering, or indoor or outdoor events or in connection with any activity comprising more than one household.

D. Takeout and delivery service continue to be permitted.

**Section 6.      Retail Stores, Personal Care Services and Office-Based Settings.**

A. All non-restaurant retail and personal care service establishments, as well as indoor shopping malls, must maintain density limits of no more than 5 people per 1,000 square feet of occupiable space, as further defined in, and except as otherwise specifically provided with respect to a particular activity in, guidance of the Department of Public Health, and such activities must remain in strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

B. All work in office-based settings that does not involve the direct provision of services (such as medical services) must generally continue to be conducted remotely, and only those on-site business operations that are not conducive to operating remotely may be conducted on-site, all as required pursuant to the May 29, 2020 Yellow Phase Order.  Density limits of no more than 5 people per 1,000 square feet of occupiable space must be maintained in connection with all such work, as well as strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

**Section 7.      Religious, Cultural, Recreational, Sports and Entertainment Activities.**

A. The following indoor facilities are prohibited from operating:  theaters, concert venues, museums, movie theaters, arcades, casinos, bowling alleys, private clubs, event centers and locations rented for wedding and other celebratory events and all other similar entertainment, recreational or social facilities.

B. The Zoological Society may operate outdoor areas only.

C. Libraries may not operate, other than to provide curbside book pickup and dropoff.

D. Occupancy of houses of worship and funeral homes is limited to 5% of the posted maximum occupancy limit, or if there is no posted limit, 5 people per 1,000 square feet of occupiable space.

E. All outdoor religious, cultural, recreational, entertainment or sporting events are limited in operation to the following:

1. For a facility with a defined seating capacity, no more than 10% of capacity may be utilized.

2. For a facility without seats, or where maximum capacity is otherwise undefined, no more than 10 people per 1,000 square feet of occupiable space.

3. For any facility or location, no more than 2,000 people total are permitted.

**Section 8.     Physical Recreation and Activities.**

A. Gyms and all other indoor facilities for physical exercise and training are prohibited from operating.  Trainers may operate classes in outdoor physical activities in accordance with outdoor gathering limitations of Section 2 and in compliance with all applicable guidance, including masking and social distancing requirements.

B. Formally organized games, competitions and practices in outdoor sports or sporting activities are not permitted for any age group, except as further provided. Formally organized means organized by a school, league or other entity or person that arranges for competition among teams, including organized teams themselves, involving any degree of advanced planning.

C. Collegiate and professional sports may operate solely pursuant to health and safety plans specifically approved by the Department of Public Health, which shall include spectators at games or events only as specifically authorized in such plans.

**Section 9.     Additional Responsibility for Masking, Density, and Signage Requirements.**

A. The owner, operator or host of any business, facility, workplace or gathering or event location shall also be liable and subject to fines and penalties under this Order for non-compliance by employees, customers, members, visitors and any other occupants of the business, facility, workplace or gathering or event location with the following, subject to fines and all other remedies under this Order:

1. All applicable masking requirements, established under the June 26, 2020 Emergency Order Concerning the Use of Face Coverings to Prevent the Spread of 2019 Novel Coronavirus (COVID-19) (the "June 26, 2020 Mask Order"), this Order, or any other applicable guidance documents; and

2. All applicable density limitations and social distancing requirements, as established under this Order or any other applicable order or guidance document; and

3. This liability shall be in addition to the personal responsibility and liability under this and all other Emergency Health Orders of individual employees, customers, members, visitors and other occupants of the business, facility, workplace or event location.

B. The owner, operator or host of any business, facility, workplace or gathering or event location is required to prominently display signage advising of health and safety requirements in accordance with applicable guidance of the Department of Public Health.

## Section 10.    Additional Mask Requirements.

A. The following additions and amendments are made to the June 26, 2020 Mask Order:

1. All individuals are required to wear a face mask or other face covering properly, which means in a manner that fully covers the mouth and nose, consistent with applicable guidance, at all times when they are in the same room with or are otherwise in the company of a person who lives in a different household, and at all times when they are likely, in the near future, to encounter a person from another household, whether indoors or outdoors.  This requirement applies in addition to any other requirements for wearing masks identified in the June 26, 2020 Mask Order.

2. The Department of Public Health strongly encourages the use of higher-quality masks (*e.g.,* cloth multi-layer rather than single-layer) that fit snugly around the nose and chin without gaps around the sides of the face.

3. Section 1(B)(a)(1) of the June 26, 2020 Mask Order, which provides for an exception to the masking requirement, is hereby amended, to reduce the age at which children are exempted from the masking requirement from 8 years or younger to younger than 2 years.

**Section 11.    Interpretation and Implementation.**

A.      Except to the extent of a direct conflict, this Order generally shall be interpreted as consistent with applicable orders and requirements of the Commonwealth of Pennsylvania. In the event of a direct conflict, the most restrictive order or requirement controls. The City shall continue to adhere to waivers, exemptions, or recategorizations issued by the Commonwealth from its emergency orders, subject to all applicable laws and regulations. The City shall continue reviewing inquiries and submissions regarding the applicability of the City's orders to businesses and activities.

B.      Consistent with prior emergency health orders of the City, this Order does not apply to government operations of the City of Philadelphia. Individuals interacting with government officers and employees must comply with the requirements of this Order and other City orders and guidance.

C.      The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.

D.      Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

E.    This Order shall be effective at **5 p.m.** on **November 20, 2020,** and shall expire at the end of **January 1, 2021,** unless otherwise rescinded, superseded, or amended by further Order.

Date:   November 16, 2020

James F. Kenney, Mayor
City of Philadelphia

Thomas A. Farley, MD, MPH
Health Commissioner
City of Philadelphia

11

# EXHIBIT "B"

| | |
|---|---|
| **CITY OF PHILADELPHIA**<br>**DEPARTMENT OF PUBLIC HEALTH** | BOARD OF HEALTH: November 24, 2020<br>LAW DEPARTMENT: November 24, 2020<br>RECORDS DEPARTMENT: |

## EIGHTEENTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING
## THE CONTROL AND PREVENTION OF COVID-19
## (SAFER AT HOME FALL-WINTER RESTRICTIONS)

**WHEREAS**, the Pennsylvania Disease Control and Prevention Act of 1955, 1956, April 23, P.L. 1510, 35 P.S. § 52.1 *et seq*., (the DCPA) and Chapter 6-200 of The Philadelphia Code authorize the Board of Health to establish lists of reportable diseases and conditions, and further provide that the Board and the Department of Public Health are responsible for implementing appropriate disease control and prevention measures in order to limit the spread of disease in an epidemic emergency; and

**WHEREAS**, the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS**, on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS**, on March 12, 2020, the Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS**, on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS**, on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS**, on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS**, the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19):  Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS**, on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS**, since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities; and

**WHEREAS**, on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS**, although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City had taken a cautious approach to moving to the Green Phase; and

**WHEREAS**, on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS**, at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in November, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS**, after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS**, the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS**, these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS**, there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS**, the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings, are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS**, the Department of Public Health has also identified indoor dining as a significant driver of the COVID-19 pandemic, in part because it is not possible to wear a mask while eating or drinking; and

**WHEREAS**, indoor gatherings and other activities, including indoor physical activity at gyms or other facilities, create significant opportunities for the transmission of COVID-19, particularly when compared to outdoor gatherings and other activities and particularly when participants are less transient; and

**WHEREAS**, the spread of COVID-19 through outdoor gatherings and activities is less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS**, pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS**, Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease; and

**WHEREAS**, on November 16, 2020, the Mayor and the Health Commissioner issued an "Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses for Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise That Philadelphians Are Safer at Home," ("November 16, 2020 Safer at Home Order") which, *inter alia*, restricted certain activities, including indoor and outdoor gatherings and educational, business, and other activities, and modified the preexisting masking requirement, subject to certain exceptions and other terms; and

**WHEREAS**, the Board of Health agrees with these determinations, and has recognized that the situation involving the COVID-19 pandemic is fast moving and often requires changes to control measures both to impose additional measures and to roll back required measures when appropriate; and

**WHEREAS,** consistent with the foregoing, the Board hereby promulgates the below Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions) to adopt the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, as a temporary regulation effective upon delivery to the Department of Records, while the remaining procedures and formalities of Section 8-407 are followed to promulgate these amendments as a permanent regulation; and

**NOW, THEREFORE,** the Board of Health hereby adopts the following regulation, effective immediately:

1.      This Emergency Regulation supplements the Philadelphia Department of Public Health's *Regulations Governing the Control of Communicable and Non-communicable Diseases and Conditions* and its other emergency regulations governing the control and prevention of COVID-19.

2.      The Board hereby fully adopts the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, which is attached hereto as Attachment A.

3.      The Board's emergency regulations governing the control and prevention of COVID-19 are hereby modified to the extent they adopt emergency orders that are themselves modified by the November 16, 2020 Order, in accordance with Section 1 of the November 16, 2020 Order.

4.      This Emergency Regulation shall be effective upon filing with the Department of Records and remain effective until expressly superseded or repealed by the Board at the conclusion of the COVID-19 emergency.

Attachment A



**CITY OF PHILADELPHIA**

**OFFICE OF THE MAYOR**
**DEPARTMENT OF PUBLIC HEALTH**

## EMERGENCY ORDER CONCERNING ADDITIONAL LIMITATIONS ON VISITING, GATHERINGS, EVENTS AND BUSINESSES FOR FALL/WINTER 2020-21, ESTABLISHING ADDITONAL SAFETY MEASURES TO PREVENT THE SPREAD OF THE 2019 NOVEL CORONAVIRUS (COVID-19) AND CONTINUING TO ADVISE THAT PHILADELPHIANS ARE SAFER AT HOME

**WHEREAS**, the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS**, on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS**, on March 12, 2020, the City's Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS,** on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS,** on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS**, on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the

Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS,** the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19):  Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS,** on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS,** since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities;  and

**WHEREAS,** on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS,** although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City has taken a cautious approach to moving to the Green Phase; and

**WHEREAS** on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS,** at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in recent days, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS,** after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS,** the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS,** these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS,** there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS,** the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS,** the spread of COVID-19 through outdoor gatherings and activities is

less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS**, pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS**, Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease;

**NOW, THEREFORE**, James F. Kenney, Mayor of the City of Philadelphia, and Dr. Thomas A. Farley, Health Commissioner of the City of Philadelphia, pursuant to all authority granted under the Philadelphia Home Rule Charter, The Philadelphia Code, the Regulations of the Board of Health of the City of Philadelphia and applicable state law, hereby **ORDER** as follows:

**Section 1.     Scope and Consistency with Prior Emergency Orders.**

This Order modifies, but not does not replace, some of the City's previous emergency COVID-19 related health orders, as applicable.  Any such previous order in effect that addresses and restricts any matter or activity not addressed in this Order, or that authorizes any activity not addressed in this Order, remains in effect.  To the extent any aspect of this Order is more restrictive than any such previous order or requirement, or in the event of a conflict between any such orders and this Order, this Order controls.  All applicable health and safety guidance incorporated in prior orders remains in effect for all activities allowed under this Order.  To the extent any such guidance conflicts or is less restrictive than this Order, this Order controls.

**Section 2.     Definitions.**

For purposes of this Order:

A. "Gathering" means any pair or group of individuals who reside in different households who are in close proximity of one another for more than several minutes.

4

B. "Indoor" means a location enclosed by three or more walls or other non-permeable barriers and an overhead covering, such as a roof or a tent top. Tents with one side open are considered indoor spaces. In contrast, a space that is fully open on two or more sides is considered an outdoor space.

**Section 3.    Indoor and Outdoor Social Gatherings of Persons from Different Households**

A. Except as otherwise provided in this Order, indoor gatherings of persons from more than one household in a residence or other private indoor location, other than to provide necessary care for a family member or as necessary due to emergency circumstances, are prohibited.

    1. Governmental and private personal care services (*e.g.*, governmental home visitation programs, home health aides, and childcare services) that require access to a person's home to provide such services are permitted.

    2. Home-based construction, renovation, repair and maintenance is permitted.

    3. Any person from outside a household entering the home for a purpose authorized under this or any other applicable order shall strictly comply with applicable Commonwealth and City guidance, including masking and distancing requirements.

B. Except as otherwise provided in this Order, outdoor social gatherings of persons including people from more than one household are limited as follows:

    1. No more than 10 people are permitted per 1,000 square feet of occupiable space and no more than 2,000 people total may gather;

    2. No food or drink service may be provided (*e.g.*, by a caterer) in any such gathering, and food or drink may only be consumed in a gathering of ten or fewer people in which all individuals maintain at least 6 feet of physical distance from all individuals who reside in a different household (including, for example, not sharing a table with members of a different household), according to applicable guidance, and all individuals gathering must remove their masks only while actively consuming food or drink. This rule applies to private gathering and not to restaurant dining, to which specific restaurant dining rules apply.

4.  Outdoor social gatherings are subject to all applicable guidance and requirements of the Commonwealth and the City, including masking and social distancing requirements.

**Section 4.    Educational Settings.**

A.  Secondary education (high schools); colleges and universities; and all other types of vocational, trade or other classroom-based educational programs are prohibited from conducting in-person classes or other instruction, except for the following, in each case subject to strict compliance with applicable Commonwealth and City guidance:

1.  Childcare and early education programs;

2.  Elementary and middle school education (K-8[th] grades);

3.   Virtual learning centers for supervised on-line learning (Access Centers); and

4.  Certain health care and allied professional clinical instruction as further provided in guidance of the Department of Public Health.

**Section 5.    Restaurants and Catered Events.**

A.  Indoor on-site dining at restaurants or other food service businesses is prohibited.

B.  Outdoor dining service may continue, but is limited to no more than four people per table.  No outdoor dining service for unseated customers is permitted.

C.  Catering service is prohibited at any gathering, or indoor or outdoor events or in connection with any activity comprising more than one household.

D.  Takeout and delivery service continue to be permitted.

**Section 6.     Retail Stores, Personal Care Services and Office-Based Settings.**

A. All non-restaurant retail and personal care service establishments, as well as indoor shopping malls, must maintain density limits of no more than 5 people per 1,000 square feet of occupiable space, as further defined in, and except as otherwise specifically provided with respect to a particular activity in, guidance of the Department of Public Health, and such activities must remain in strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

B. All work in office-based settings that does not involve the direct provision of services (such as medical services) must generally continue to be conducted remotely, and only those on-site business operations that are not conducive to operating remotely may be conducted on-site, all as required pursuant to the May 29, 2020 Yellow Phase Order. Density limits of no more than 5 people per 1,000 square feet of occupiable space must be maintained in connection with all such work, as well as strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

**Section 7.     Religious, Cultural, Recreational, Sports and Entertainment Activities.**

A. The following indoor facilities are prohibited from operating:  theaters, concert venues, museums, movie theaters, arcades, casinos, bowling alleys, private clubs, event centers and locations rented for wedding and other celebratory events and all other similar entertainment, recreational or social facilities.

B. The Zoological Society may operate outdoor areas only.

C. Libraries may not operate, other than to provide curbside book pickup and dropoff.

D. Occupancy of houses of worship and funeral homes is limited to 5% of the posted maximum occupancy limit, or if there is no posted limit, 5 people per 1,000 square feet of occupiable space.

E. All outdoor religious, cultural, recreational, entertainment or sporting events are limited in operation to the following:

7

1. For a facility with a defined seating capacity, no more than 10% of capacity may be utilized.

2. For a facility without seats, or where maximum capacity is otherwise undefined, no more than 10 people per 1,000 square feet of occupiable space.

3. For any facility or location, no more than 2,000 people total are permitted.

**Section 8.     Physical Recreation and Activities.**

A. Gyms and all other indoor facilities for physical exercise and training are prohibited from operating.  Trainers may operate classes in outdoor physical activities in accordance with outdoor gathering limitations of Section 2 and in compliance with all applicable guidance, including masking and social distancing requirements.

B. Formally organized games, competitions and practices in outdoor sports or sporting activities are not permitted for any age group, except as further provided. Formally organized means organized by a school, league or other entity or person that arranges for competition among teams, including organized teams themselves, involving any degree of advanced planning.

C. Collegiate and professional sports may operate solely pursuant to health and safety plans specifically approved by the Department of Public Health, which shall include spectators at games or events only as specifically authorized in such plans.

**Section 9.     Additional Responsibility for Masking, Density, and Signage Requirements.**

A. The owner, operator or host of any business, facility, workplace or gathering or event location shall also be liable and subject to fines and penalties under this Order for non-compliance by employees, customers, members, visitors and any other occupants of the business, facility, workplace or gathering or event location with the following, subject to fines and all other remedies under this Order:

8

1.  All applicable masking requirements, established under the June 26, 2020 Emergency Order Concerning the Use of Face Coverings to Prevent the Spread of 2019 Novel Coronavirus (COVID-19) (the "June 26, 2020 Mask Order"), this Order, or any other applicable guidance documents; and

2.  All applicable density limitations and social distancing requirements, as established under this Order or any other applicable order or guidance document; and

3.  This liability shall be in addition to the personal responsibility and liability under this and all other Emergency Health Orders of individual employees, customers, members, visitors and other occupants of the business, facility, workplace or event location.

B.  The owner, operator or host of any business, facility, workplace or gathering or event location is required to prominently display signage advising of health and safety requirements in accordance with applicable guidance of the Department of Public Health.

## Section 10.    Additional Mask Requirements.

A.  The following additions and amendments are made to the June 26, 2020 Mask Order:

1.  All individuals are required to wear a face mask or other face covering properly, which means in a manner that fully covers the mouth and nose, consistent with applicable guidance, at all times when they are in the same room with or are otherwise in the company of a person who lives in a different household, and at all times when they are likely, in the near future, to encounter a person from another household, whether indoors or outdoors. This requirement applies in addition to any other requirements for wearing masks identified in the June 26, 2020 Mask Order.

2.  The Department of Public Health strongly encourages the use of higher-quality masks (*e.g.,* cloth multi-layer rather than single-layer) that fit snugly around the nose and chin without gaps around the sides of the face.

3. Section 1(B)(a)(1) of the June 26, 2020 Mask Order, which provides for an exception to the masking requirement, is hereby amended, to reduce the age at which children are exempted from the masking requirement from 8 years or younger to younger than 2 years.

**Section 11.**   **Interpretation and Implementation.**

A.   Except to the extent of a direct conflict, this Order generally shall be interpreted as consistent with applicable orders and requirements of the Commonwealth of Pennsylvania. In the event of a direct conflict, the most restrictive order or requirement controls. The City shall continue to adhere to waivers, exemptions, or recategorizations issued by the Commonwealth from its emergency orders, subject to all applicable laws and regulations. The City shall continue reviewing inquiries and submissions regarding the applicability of the City's orders to businesses and activities.

B.   Consistent with prior emergency health orders of the City, this Order does not apply to government operations of the City of Philadelphia. Individuals interacting with government officers and employees must comply with the requirements of this Order and other City orders and guidance.

C.   The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.

D.   Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

E.     This Order shall be effective at **5 p.m.** on **November 20, 2020,** and shall expire at the end of **January 1, 2021,** unless otherwise rescinded, superseded, or amended by further Order.

Date:  November 16, 2020

James F. Kenney, Mayor
City of Philadelphia

Thomas A. Farley, MD, MPH
Health Commissioner
City of Philadelphia

11

# EXHIBIT "C"



# City of Philadelphia

City Council
Chief Clerk's Office
402 City Hall
Philadelphia, PA  19107

**BILL NO. 200678**

_____

**Introduced December 3, 2020**

_____

**Councilmember Oh**

_____

**Referred to the
Committee on Public Health and Human Services**

_____

**AN ORDINANCE**

Amending Chapter 6-200 of The Philadelphia Code, entitled "Preventive Medicine," by imposing duration limitations on emergency control measures, requiring Council approval of emergency control measures in certain circumstances, and to make technical changes, all under certain terms and conditions.

_THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:_

SECTION 1. Chapter 6-200 of The Philadelphia Code is amended to read as follows:

CHAPTER 6-200. PREVENTIVE MEDICINE.

\*          \*          \*

§ 6-205.  Emergency Epidemic Control.

*(1)* Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.  *Any such orders shall include a termination date no more than 60 days from the date of effectiveness. The*

# City of Philadelphia

*BILL NO. 200678 continued*

> *Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

§ 6-206.  Prevention of Congregation of Persons.

*(2)* Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.  *Any such orders shall include a termination date no more than 60 days from the date of effectiveness. The Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

*(3)* *Whenever measures preventing the congregation of persons are promulgated by the Board in accordance with regulations of the Board, or by order, as the case may deem necessary to prevent the spread of the disease, such measure shall include a termination date no more than 60 days from the date of effectiveness. The Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

*          *          *

SECTION 2. This Ordinance shall be effective immediately.

_____

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# EXHIBIT "D"

 Centers for Disease
Control and Prevention

# Considerations for Restaurant and Bar Operators

Updated Nov. 18, 2020      Print

As restaurants and bars resume and continue operations in some areas of the United States, CDC offers the following considerations for ways in which operators can reduce risk for employees, customers, and communities and slow the spread of COVID-19. Restaurants and bars can determine, in collaboration with state, local, territorial, or tribal health officials, whether and how to implement these considerations, making adjustments to meet the needs and circumstances of the local community. Implementation should be guided by what is feasible, acceptable, and tailored to the needs of each community. These considerations are meant to supplement—not replace—any state, local, territorial, or tribal health and safety laws, rules, and regulations with which businesses must comply.

**Guidance for customers on reducing the risk of spreading COVID-19 when dining at a restaurant can be found here.**

## Guiding Principles to Keep in Mind

The more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread. Masks may reduce the risk of COVID-19 spread when they are consistently used by customers and employees, especially when social distancing measures are difficult to maintain. The risk of COVID-19 spread increases in a restaurant or bar setting as interactions within 6 feet of others increase, as described below. Masks may reduce the risk of COVID-19 spread when worn in any of these risk scenarios.

- **Lowest Risk:** Food service limited to drive-through, delivery, take-out, and curb-side pick up.
- **More Risk:** Drive-through, delivery, take-out, and curb-side pick up emphasized. On-site dining limited to outdoor seating. Seating capacity reduced to allow tables to be spaced at least 6 feet apart.
- **Higher Risk:** On-site dining with indoor seating capacity reduced to allow tables to be spaced at least 6 feet apart. And/or on-site dining with outdoor seating, but tables **not** spaced at least six feet apart.
- **Highest Risk:** On-site dining with indoor seating. Seating capacity **not** reduced and tables **not** spaced at least 6 feet apart.

COVID-19 is mostly spread when people are physically near (within 6 feet) a person with COVID-19 or have direct contact with that person. When people with COVID-19 cough, sneeze, sing, talk, or breathe, they produce **respiratory droplets.** Infections occur mainly through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19.

There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. This is called airborne transmission. These transmissions occurred within enclosed spaces that had inadequate ventilation. Available data indicate that it is much more common for the virus that causes COVID-19 to spread through close contact with a person who has COVID-19 than through airborne transmission.

## Coronavirus Disease 2019 (COVID–19)



not thought to be a common way that COVID-19 spreads.

Fortunately, there are a number of actions operators of restaurants and bars can take to help lower the risk of COVID-19 exposure and spread. Personal prevention practices (such as handwashing, staying home when sick, and wearing masks) and workplace prevention practices, like environmental cleaning and disinfection, are important principles of preventing the spread of COVID-19.

## Promoting Behaviors that Reduce Spread

Restaurants and bars may implement several strategies that reduce the spread of COVID-19 among employees and customers.

- **Staying Home when Appropriate**
  - Educate employees about when they should stay home and when they can return to work.
    - Actively encourage employees who are sick or have recently had a close contact with a person with COVID-19 to stay home. Develop policies that encourage sick employees to stay at home (for example, sick leave) without fear of reprisal, and ensure employees are aware of these policies. See the Maintaining Healthy Operations section below for suggestions.
    - Employees should stay home if they have tested positive for or are showing COVID-19 symptoms.
    - Employees who have recently had a close contact with a person with COVID-19 should also stay home and monitor their health.
    - CDC's criteria can help inform when employees may return to work:
      - If they have been sick with COVID-19
      - If they have recently had close contact with a person with COVID-19
- **Masks**
- CDC recommends masks to reduce the risk of COVID-19 spread. Masks are currently recommended for employees and for customers as much as possible when not eating or drinking and when social distancing measures are difficult to maintain. These masks (sometimes called cloth masks) are meant to protect other people in case the wearer is infected. They are not appropriate substitutes for masks used by workers for personal protective equipment (PPE) such as surgical masks or respirators. (More information on masks used for PPE can be found here.)

- 
  - Consider requiring the use of masks among all staff. Masks are **most** essential in times when physical distancing is difficult. Information should be provided to staff on proper use, removal, and washing of masks.
    - Note: Masks should not be placed on:
  - 
    - Babies and children younger than 2 years old
      - Anyone who has trouble breathing or is unconscious
      - Anyone who is incapacitated or otherwise unable to remove the mask without assistance
  - Employees should avoid touching their masks once they are on their faces. Employees should wash their hands with soap and water for at least 20 seconds after touching masks on their faces.

- **Hand Hygiene and Respiratory Etiquette**
  - Require frequent employee handwashing (e.g. before, during, and after preparing food; after touching garbage) with soap and water for at least 20 seconds and increase monitoring to ensure adherence.
  - Ensure gloves are worn by employees when they are completing these activities:
    - Removing garbage bags or handling and disposing of trash
    - Handling used or dirty food service items
    - Cleaning and disinfecting surfaces; read and follow the directions on the label to ensure safe and effective use of disinfectant.
  - Employees should always wash their hands with soap and water for at least 20 seconds after removing gloves.
  - Encourage employees to cover coughs and sneezes with a tissue (or use the inside of their elbow). Used tissues should be thrown in the trash and hands washed immediately with soap and water for at least 20 seconds.
  - If soap and water are not readily available for handwashing, use hand sanitizer that contains at least 60% alcohol.
  - Employees should avoid touching their eyes, nose, and mouth with gloved or unwashed hands.
- **Adequate Supplies**
  - Ensure adequate supplies to support healthy hygiene behaviors. Supplies include soap, hand sanitizer containing at least 60% alcohol (placed on every table, if supplies allow), paper towels, tissues, disinfectant wipes, masks (as feasible), and no-touch/foot pedal trash cans.
- **Signs and Messages**
  - Post signs in highly visible locations (e.g., at entrances, in restrooms) that promote everyday protective measures for both employees and customers and describe how to stop the spread of germs such as by properly wearing a mask and properly washing hands.

- Include messages (for example, videos) about behaviors that prevent spread of COVID-19 when communicating with vendors, staff, and customers (such as on business websites, in emails, and on social media accounts).
- Communicate the prevention steps the restaurant or bar is taking and any changes in protocols on business websites, in emails, and on social media accounts.
- Find free CDC print and digital resources at the bars and restaurant page, as well as on CDC's communications resources main page.

# Maintaining Healthy Environments

Restaurants and bars may implement several strategies to maintain healthy environments.

- **Cleaning and Disinfection**
  - Clean and disinfect frequently touched surfaces (e.g., door handles, cash registers, workstations, sink handles, bathroom stalls) at least daily, and as much as possible. Clean shared objects (e.g., payment terminals, tables, countertops/bars, receipt trays, condiment holders) between each use.
    - Continue to follow all required safety laws, regulations, and rules.
    - Use products that meet EPA disinfection criteria ⧉ and that are appropriate for the surface. Allow the disinfectant to remain on the surface for the contact time recommended by the manufacturer. **Always read and follow the directions on the label** to ensure safe and effective use.
    - When cleaning and disinfecting, wear gloves appropriate for the disinfectant being used. Additional personal protective equipment may also be needed.
    - Establish a disinfection routine and train staff on proper cleaning timing and procedures to ensure safe and correct application of disinfectants.
    - Wash, rinse, and sanitize used or dirty food contact surfaces with an EPA-approved food contact surface sanitizer. If a food-contact surface must be disinfected for a specific reason, such as a blood or bodily fluid cleanup or deep clean in the event of likely contamination with SARS-CoV-2, use the following procedure: wash, rinse, disinfect according to the label instructions with a product approved for food contact surfaces, rinse, then sanitize with a food-contact surface sanitizer.
    - Ensure that cleaning or disinfecting product residues are not left on table surfaces. Residues could cause allergic reactions or cause someone to ingest the chemicals.
  - Develop a schedule for increased routine cleaning and disinfection.
  - Ensure safe and correct use and storage of disinfectants to avoid food contamination and harm to employees and other individuals. This includes storing products securely away from children.
  - Use gloves when removing garbage bags or handling and disposing of trash. Wash hands after removing gloves.
- **Shared Objects**
  - Discourage sharing of items that are difficult to clean, sanitize, or disinfect.
  - Limit any sharing of food, tools, equipment, or supplies by staff members.
  - Ensure adequate supplies to minimize sharing of high-touch materials (e.g., serving spoons) to the extent possible; otherwise, limit use of supplies and equipment by one group of workers at a time and clean and disinfect between use.
  - Avoid using or sharing items that are reusable, such as menus, condiments, and any other food containers. Instead, use disposable or digital menus (menus viewed on cellphones), single serving condiments, and no-touch trash cans and doors.
  - Use touchless payment options as much as possible, if available. Ask customers and employees to exchange cash or card payments by placing on a receipt tray or on the counter rather than by hand to avoid direct hand to hand contact. Clean and disinfect frequently touched surfaces such as counters, or hard surfaces between use. If pens are needed for some purposes, disinfect between uses and/or encourage customers to use their own pens.
  - Use disposable food service items (e.g., utensils, dishes, napkins, tablecloths). If disposable items are not feasible or desirable, ensure that used or dirty non-disposable food service items are handled with gloves and washed, rinsed, and sanitized to meet food safety requirements. Change and launder linen items (e.g., napkins and tablecloths) after each customer or party's use. Employees should wash their hands after removing their gloves or after handling used food service items.
  - Avoid use of food and beverage utensils and containers brought in by customers.

- Ventilation
- As noted above, available data indicate that it is much more common for the virus that causes COVID-19 to spread through close contact with a person who has COVID-19 than through airborne transmission. There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. This is called airborne transmission. These transmissions occurred in indoor spaces with inadequate ventilation. In general, being outdoors and in spaces with good ventilation reduces the risk of exposure to the virus that causes COVID-19.

  - Ensure that ventilation systems operate properly and increase circulation of outdoor air as much as possible, for example by opening windows and doors and prioritizing outdoor seating. Do not open windows and doors if doing so poses a safety or health risk to customers or employees (e.g., risk of falling or triggering asthma symptoms).
  - Consider improving the engineering controls using the building ventilation system. Consult with experienced heating, ventilating, and air-conditioning (HVAC) professionals when considering changes to HVAC systems and equipment. This may include some or all of the following activities:
    - Increase total airflow supply to occupied spaces, whenever feasible.
    - Increase outdoor air ventilation, using caution in highly polluted areas. With a lower occupancy level in the building, this increases the effective dilution ventilation per person.
    - Disable demand-controlled ventilation (DCV) controls that reduce air supply based on occupancy or temperature during occupied hours.
    - Open minimum outdoor air dampers to reduce or eliminate HVAC recirculation, if practical. In mild weather, this will not affect thermal comfort or humidity. However, this may be difficult to do in cold, hot, or humid weather.
    - Improve central air filtration to MERV-13 or to as high as possible without significantly diminishing design airflow.
  - Inspect filter housing and racks to ensure appropriate filter fit and check for ways to minimize filter bypass.
  - Check filters to ensure they are within service life and appropriately installed.
  - Consider running the HVAC system at maximum outside airflow for 2 hours before and after occupied times.

Additional guidance can be found in ASHRAE Standard 62.1, Ventilation for Acceptable Indoor Air Quality ↗ .

- Water Systems
  - To minimize the risk of Legionnaires' disease and other diseases associated with water, take steps to ensure that all water systems and features (e.g., sink faucets, decorative fountains, drinking fountains) are safe to use if there has been prolonged facility shutdown.
- Modified Layouts and Procedures
  - Change restaurant and bar layouts to ensure that all customer parties remain at least 6 feet apart (e.g., removing tables/stools/chairs, marking tables/stools/chairs that are not for use).
  - Limit seating capacity to allow for social distancing.
  - Offer drive-through, curbside take out, or delivery options as applicable. Prioritize outdoor seating as much as possible.
  - Ask customers to wait in their cars or away from the establishment while waiting to pick up food or when waiting to be seated. Inform customers of food pickup and dining protocols on the business's website and on posted signs.
  - Discourage crowded waiting areas by using phone app, text technology, or signs to alert patrons when their table is ready. Avoid using "buzzers" or other shared objects.
  - Consider options for dine-in customers to order ahead of time to limit the amount of time spent in the establishment.
  - Avoid offering any self-serve food or drink options, such as buffets, salad bars, and drink stations. This limits the use of shared serving utensils, handles, buttons, or touchscreens and helps customers to stay seated and at least 6 feet apart from people who do not live in their household.
- Physical Barriers and Guides
  - Install physical barriers, such as sneeze guards and partitions, particularly in areas where it is difficult for individuals to remain at least 6 feet apart. Barriers can be useful in restaurant kitchens and at cash registers, host stands, or food pickup areas where maintaining physical distance of at least 6 feet is difficult.

- Provide physical guides, such as tape on floors or sidewalks and signage, to ensure that individuals remain at least 6 feet apart. Consider providing these guides where lines form, in the kitchen, and at the bar.
- **Communal Spaces**
  - Close shared spaces such as break rooms, if possible; otherwise stagger use, require mask use, and clean and disinfect between use.
  - Consistent with applicable law, develop policies to protect the privacy of persons at higher risk for severe illness in accordance with applicable privacy and confidentiality laws and regulations.

# Maintaining Healthy Operations

Restaurants and bars may consider implementing several strategies to maintain healthy operations.

- **Protections for Employees at Higher Risk for Severe Illness from COVID-19**
  - Offer options for employees at higher risk for severe illness (including older adults and people of all ages with certain underlying medical conditions) that limits their exposure risk (e.g., modified job responsibilities such as managing inventory rather than working as a cashier, or managing administrative needs through telework).
  - Consistent with applicable law, develop policies to protect the privacy of persons at in accordance with applicable privacy and confidentiality laws and regulations.
- **Regulatory Awareness**
  - Be aware of local or state policies and recommendations related to group gatherings to determine if events can be held.
- **Staggered or Rotated Shifts and Sittings**
  - Rotate or stagger shifts to limit the number of employees in the restaurant or bar at the same time.
  - Stagger and limit dining times to minimize the number of customers in the establishment.
  - When possible, use flexible worksites (e.g., telework) and flexible work hours (e.g., staggered shifts) to help establish policies and practices for social distancing (maintaining distance of approximately 6 feet) between employees and others, especially if social distancing is recommended by state and local health authorities.
- **Gatherings**
  - Avoid group events, gatherings, or meetings where social distancing of at least 6 feet between people who do not live in the same household cannot be maintained. See the Modified Layouts and Procedures section above for suggestions on social distancing.
- **Travel and Transit**
  - Encourage employees to use transportation options that minimize close contact with others (e.g., walking or biking, driving or riding by car—alone  or with household members only).
  - For employees who commute to work using public transportation or ride sharing:
    - Ask employees to follow the CDC guidance on how to protect yourself when using transportation and to wear masks on public transportation.
    - Ask them to wash their hands as soon as possible after their trip.
    - Consider allowing employees to shift their hours so they can commute during less busy times.
- **Designated COVID-19 Point of Contact**
  - Designate a staff person for each shift to be responsible for responding to COVID-19 concerns. All staff members should know who this person is and how to contact them.
- **Communication Systems**
  - Put systems in place for:
    - Consistent with applicable law and privacy policies, having staff self-report to the establishment's point of contact if they have symptoms of COVID-19, a positive test for COVID-19, or were exposed to someone with COVID-19 within the last 14 days in accordance with health information sharing regulations for COVID-19 ☐ (e.g. see "Notify Health Officials and Close Contacts" in the **Preparing for When Someone Gets Sick section below**), and other applicable privacy and confidentiality laws and regulations.
    - Notifying staff, customers, and the public of business closures, and restrictions in place to limit COVID-19

exposure (e.g., limited hours of operation).

- **Leave (Time Off) Policies**
  - Implement flexible sick leave policies and practices that enable employees to stay home when they are sick, have been exposed, or are caring for someone who is sick.
    - Examine and revise policies for leave, telework, and employee compensation.
    - Leave policies should be flexible and not punish people for taking time off and should allow sick employees to stay home and away from co-workers. Leave policies should also account for employees who need to stay home with their children if there are school or childcare closures, or to care for sick family members.
  - Develop policies for return-to-work after COVID-19 illness. CDC's criteria to discontinue home isolation can inform these policies.
- **Back-Up Staffing Plan**
  - Monitor absenteeism of employees, cross-train staff, and create a roster of trained back-up staff.
- **Staff Training**
  - Train all employees in safety actions.
  - Conduct training virtually, or ensure that social distancing is maintained during training.
- **Recognize Signs and Symptoms**
  - Conduct daily health checks (e.g., temperature screening and/or symptom checking) of staff safely and respectfully, and in accordance with any applicable privacy laws and regulations.
    - Consider using examples of screening methods in CDC's General Business FAQs as a guide.
- **Support Coping and Resilience**
  - Promote employees eating healthy, exercising, getting sleep, and finding time to unwind.
  - Encourage employees to talk with people they trust about their concerns and how they are feeling.
  - Consider posting signs for the national distress hotline: 1-800-985-5990, or text TalkWithUs to 66746.

# Preparing for Sick Employees

Restaurants and bars may implement several strategies to prepare for when someone gets sick.

- **Advise Sick Employees of Home Isolation Criteria**
  - Communicate to sick employees that they should not return to work until they have met CDC's criteria to discontinue home isolation.
- **Isolate and Transport Those Who Are Sick**
  - Make sure that employees know they should not come to work if they are sick, and they should notify their manager or other designated COVID-19 point of contact if they become sick with COVID-19 symptoms, test positive for COVID-19, or have been exposed to someone with COVID-19 or have been exposed to someone with COVID-19 symptoms or a confirmed or suspected case.
  - Immediately separate employees or customers with COVID-19 symptoms (i.e., fever, cough, shortness of breath). Individuals who are sick should go home or to a healthcare facility, depending on how severe their symptoms are, and follow CDC guidance for caring for oneself and others who are sick.
- **Clean and Disinfect**
  - Close off areas used by a sick person and do not use these areas until after cleaning and disinfecting them.
  - Wait at least 24 hours before cleaning and disinfecting. If 24 hours is not feasible, wait as long as possible. Ensure safe and correct use and storage of cleaning and disinfection products ⧉ , including storing them securely away from children.
- **Notify Health Officials and Close Contacts**
  - In accordance with state, territorial, tribal, or local laws, restaurant and bar operators should notify the health officials in their jurisdiction and staff immediately of any case of COVID-19 among employees, while maintaining confidentiality in accordance with the Americans with Disabilities Act (ADA) ⧉ .
  - Advise those who have had close contact with a person diagnosed with COVID-19 to stay home and self-monitor for symptoms, and follow CDC guidance if symptoms develop. Critical infrastructure workers may refer to CDC Guidance for Critical Infrastructure Workers, if applicable.
  - Consider collaborating with health officials in your jurisdiction to determine whether and how to implement employee COVID-19 testing strategies and which one(s) would be most appropriate for your circumstances.

## Communication Resources






### 5 Safety Steps for Staff
Restaurants and Bars: follow these 5 safety steps to keep us all healthy

Download 📄 [PDF – 290 KB]



### Assess Your Risk
Use this graphic to assess risk

Download 🖼 [image 586 KB]



### Letter to Staff Template
Send out a customized letter to your staff to inform them about steps taken to protect them.

Download 📄 [DOC – 64 KB]



### Daily Checklist for Managers of Restaurants and Bars
Managers can use this helpful checklist

Download 📄 [PDF – 1 page]

## Other Resources

- Latest COVID-19 information
- Cleaning and Disinfection
- Guidance for Businesses and Employers
- COVID-19 Prevention
- Handwashing information
- Face coverings
- Social Distancing

- COVID-19 Frequently Asked Questions
- Frequently Asked Questions for Businesses
- Persons at higher risk
- Managing Stress and Coping
- HIPAA and COVID-19 ↗
- CDC communication resources
- Community Mitigation

Last Updated Nov. 18, 2020

# EXHIBIT "E"

CITY OF PHILADELPHIA
DEPARTMENT OF PUBLIC HEALTH
MEETING OF THE BOARD OF HEALTH

Thursday, September 10, 2020

The Philadelphia Board of Health held a special public meeting on Thursday, September 10, 2020. The meeting was held virtually using the GoToWebinar platform in light of restrictions related to the ongoing COVID-19 pandemic, allowing access to the public via computer or other device and via a toll-free phone number.

**Board Members Present**

Dr. Tyra Bryant-Stephens, Dr. Ana Diez-Roux, Dr. Thomas Farley, Dr. Marla Gold, Dr. Jennifer Ibrahim, Dr. Scott McNeal, Dr. John Rich

**WELCOME AND INTRODUCTIONS**

Health Commissioner and Board President Thomas Farley, MD, MPH called the meeting to order at 6:05 PM.

**MINUTES**

The Board unanimously approved the minutes from August 13, 2020.

**BACKGROUND**

Dr. Farley provided an update on the COVID-19 coronavirus pandemic. The Health Department reports that case counts have been relatively level for a few weeks, albeit with a spike due to an outbreak on Temple's campus, then a drop after that. Hospitalizations continue to be low throughout the entire region. The number of deaths is also continuing to drop, with only four deaths in the last week of August, which is 98% below the peak week in April. There are about 60 testing sites and are receiving about 3,000 results per day. Contact tracing is happening, with about 120 staff doing case investigations and contact tracing. They are reaching about 70% of cases and about 75% of contacts. Mask use among people exiting retails store is approaching 95%. Through a state grant, Penn, Temple, and Jefferson health systems are working with nursing homes and personal care homes to assist with testing, infection control, and response.

**ELEVENTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING THE CONTROL AND PREVENTION OF COVID-19 (INDOOR EXERCISE AND RECREATION FACILITIES)**

Jo Rosenberger-Altman, City of Philadelphia Law Department, presented a supplemental regulation approving two interim orders on reopening indoor exercise gyms and recreation facilities. Limitations in the orders include a barring of food or drink in the facilities, adequate

spacing, and mask wearing. These orders are similar to other orders in terms or recommendations made for safety.

Dr. Farley noted that the Health Department has, for the first time, begun inspecting gyms as a result of this order and has found that the vast majority have been compliant. The inspections look for mask use, adequate spacing between exercise machines, and adherence to capacity limits.

Dr. Ibrahim moved; Dr. McNeal seconded.
**Motion for approval of regulation approved unanimously.**

## TWELFTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING THE CONTROL AND PREVENTION OF COVID-19 (INDOOR DINING AND THEATER)

The second order, effective September 8, is about indoor dining and indoor theaters and performance events. For indoor events, there are capacity limits and a barring of food or drink service as well as social distancing and mask requirements. Indoor dining rules are more strict than for the rest of the Commonwealth: for example, in addition to wearing masks servers must wear face shields, only four or fewer people per table, no smoking or vaping areas, service at bars is prohibited, alcohol service is limited to on-site consumption with a meal, and there are additional capacity limits and a reiteration of indoor events capacity limits.

Dr. Farley mentioned that he has spoken with his counterparts in other counties and they haven't seen problems with an increase in cases associated with that activity. He feels that the greatest risk is to the servers, who will come in contact with large numbers of unmasked people. The Health Department is having volunteers visit restaurants to help educate them on the new recommendations in addition to normal restaurant inspections.

Dr. McNeal moved; Dr. Ibrahim seconded.
**Motion for approval of regulation approved unanimously.**

## ADJOURNMENT

Dr. Farley adjourned the meeting at 6:55 PM.

**FRITZ & BIANCULLI, LLC**
By:    BRIAN E. FRITZ, ESQUIRE
       WILLIAM A. WEISS, ESQUIRE         **ATTORNEYS FOR PLAINTIFF**
Attorney ID No.: 84044 / 309817
1515 Market Street, Suite 1801
Philadelphia, Pennsylvania 19102
(215) 458-2222
*bfritz@fbesq.com*
*wweiss@fbesq.com*

| | | |
|---|---|---|
| PHILADELPHIA RESTAURANT | : | |
| OWNERS AGAINST LOCKDOWN, LLC | : | |
| | : | COURT OF COMMON PLEAS |
| Plaintiff, | : | PHILADELPHIA COUNTY |
| | : | |
| v. | : | DECEMBER TERM, 2020, NO. |
| | : | |
| JAMES KENNEY, in his official capacity | : | THE HONORABLE PAULA PATRICK |
| as Mayor of the City of Philadelphia | : | |
| | : | |
| AND | : | |
| | : | |
| THOMAS A. FARLEY, in his official | : | |
| capacity as Health Commissioner | : | |
| | : | |
| AND | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |
| | : | |
| AND | : | |
| | : | |
| PHILADELPHIA DEPARTMENT OF | : | |
| PUBLIC HEALTH | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR A SPECIAL AND PRELIMINARY INJUNCTION</u>

### I.    <u>MATTER BEFORE THE COURT</u>

Plaintiff, Philadelphia Restaurant Owners Against Lockdown, LLC's, Motion for a

Special and Preliminary Injunction and Prayer for Declaratory Judgment as Ancillary Relief

pursuant to Pennsylvania Rule of Civil Procedure §§ 1531 and 1602 against Defendants, James Kenney, in his official capacity as Mayor of the City of Philadelphia, Thomas A. Farley, in his official capacity as Health Commissioner, the City of Philadelphia, and the Philadelphia Department of Public Health, to enjoin the Defendants from enforcing their Emergency Restrictions, including the November 24, 2020 Safer at Home Restrictions, as said restrictions violate bedrock constitutional principles of our Commonwealth and our nation, namely, the prohibition against the delegation of power, and the due process right to work.

## II.   **<u>QUESTIONS PRESENTED</u>**

    a.   Have the Defendants' actions since March 2020, and most recently with the enactment of the Safer at Home Restrictions, violated the non-delegation doctrine of the Pennsylvania Constitution by their usurpation of all three (3) branches of government, and total disregard for procedural safeguards that protect against arbitration regulations?

    b.   Have the Defendants' actions since March 2020, and most recently with the enactment of the Safer at Home Restrictions, violated the substantive due process right to work, which is a fundamental freedom protected by the United States Constitution and Pennsylvania Constitution pay passing and enforcing arbitrary regulations against businesses, thereby depriving Plaintiff of his occupation and livelihood, without providing any evidence of the rationale behind their restrictions?

    c.   Should the Defendants' be enjoined from furthering ongoing constitutional violations, so that the status quo may be maintained?

d.  Should the Court enter a Declaratory Judgment as Ancillary Relief that Defendants' emergency regulations are deemed void and unenforceable because they violate Plaintiff's constitutional and civil rights, violate the non-delegation doctrine and separation of powers of the Pennsylvania Constitution, and violate the Philadelphia Home Rule Charter, as well as City Council's intent?

**Suggested Response**: Yes. The Defendants' conduct is an unconstitutional encroachment into all three (3) of government, in violation of the non-delegation doctrine, and an irrational assault on Plaintiff's fundamental right to work based on ad hoc, unexplained reasoning. Accordingly, the Defendants should be enjoined from continuing to violate the constitutional rights of Plaintiff because Plaintiff is suffering an irreparable harm which is causing him greater injury than the Defendants will suffer if the status quo is preserved. Plaintiff is likely to prove that the Defendants' conduct is unconstitutional, and an injunction will stop that conduct. The public clearly has an interest in maintaining their guaranteed constitutional rights. Plaintiff is entitled to Declaratory Judgment as Ancillary Relief, and Defendants' emergency regulations are deemed void and unenforceable.

## III.   FACTUAL BACKGROUND

On March 11, 2020, Defendant, Mayor James Kenney, entered an Order suspending the legislative provisions afforded under Philadelphia Code § 8-407. In conjunction with this suspension, Defendants, Dr. Tom Farley (a pediatrician) and the Philadelphia Board of Health, issued the first of eighteen Emergency Regulations. These regulations effectively closed gyms, catering halls, restaurants and other businesses.

In the months that followed, Defendant, Dr. Tom Farley (a pediatrician), allowed the closed businesses to re-open on a limited basis and with restrictions in place. These initial business lock downs and ongoing operating restrictions were premised on a notion that these businesses were likely to cause the spread of the COVID virus. Over the course of the next 281 days (March 11, 2020 to December 17, 2020), Defendants had the opportunity to engage in efforts and scientific methodology to determine if their initial hunches and guesses were correct.

To date, Defendants have provided no evidence that the gyms, restaurants or catering halls or other businesses had/have contributed to the COVID infections in the City of Philadelphia. To date, Defendants have provided no information on what efforts, if any, they took to determine if operating limitations imposed on gyms, restaurants or catering halls in Philadelphia were effective. To date, Defendants have provided no information on what efforts they undertook or the results of same to determine whether any other businesses contributed to the spread of COVID. To date, Defendants have provided no information to support their notion that Philadelphia gyms, restaurants or catering halls are more likely contributors to the spread of COVID than other businesses or activities. To date, Defendants have provided no information to support their notion that lockdowns of Philadelphia gyms, restaurants or catering halls actually mitigates the spread of COVID. In fact, the last published meeting minutes of the Board of Health indicate the following:

- Gyms in Philadelphia were largely compliant with COVID restrictions

- Philadelphia had more restrictions on restaurants than the surrounding suburbs

- The less restrictive suburbs reported that they had seen no increase in COVID infections related to restaurants

  *See* infra.

From March 11, 2020 to present, Defendant, Dr. Tom Farley (a pediatrician), has referenced and relied upon the Centers for Disease Control (CDC) as an authority on the COVID virus. On November 18, 2020, the CDC published guidelines for dining establishments related to COVID mitigation. *See* infra. Nowhere in these published guidelines did the CDC ever mention, discuss or recommend lockdowns of restaurants as a necessary step to prevent the spread of COVID. *Id.*

The CDC Guidelines expect that restaurants would continue to operate, and do not express the looming fear that the Board of Health has promoted without substantiation. For example, the CDC sets forth as follows:

## Promoting Behaviors that Reduce Spread

Restaurants and bars may implement several strategies that reduce the spread of COVID-19 among employees and customers.

## Maintaining Healthy Environments

Restaurants and bars may implement several strategies to maintain healthy environments.

## Maintaining Healthy Operations

Restaurants and bars may consider implementing several strategies to maintain healthy operations.

## Preparing for Sick Employees

Restaurants and bars may implement several strategies to prepare for when someone gets sick.

*See Infra.*

5

The CDC, the authority relied upon and referenced by Defendants, does not share or support the Defendants' pessimism regarding restaurants. In fact, the tone and content of the CDC guidelines for restaurants paint a picture of an expectation that restaurants can and will continue to be open and operational. The CDC does not remotely state, suggest or imply that the Draconian action of shut downs is necessary, warranted or even effective. To the contrary, the CDC actually says that restaurants can implement several strategies that reduce the spread of COVID.

The contrast between the authority in the field, the CDC, versus Defendants, Dr. Tom Farley and the Philadelphia Health Department, begs specific questions that have never been answered:

- What has the Philadelphia Department of Health compiled to reach such a drastic conclusion that shut downs are a remedy?

- What has the Philadelphia Department of Health relied upon to reach its conclusions that are so starkly different from the Center for Disease Control?

- What studies has the Philadelphia Department of Health commissioned or conducted regarding Philadelphia based businesses and the spread of COVID since March 2020?

- What has the Philadelphia Department of Health done to determine that continuing the implementation of restrictions during restaurant operations would be less effective than a full shut down of an entire industry?

- What exactly is the "science" that the Philadelphia Department of Health has either compiled, generated or relied upon to justify an of the restrictions that it has implemented since March 2020?

Notwithstanding the lack of CDC support of lockdowns in relation to COVID, Defendant, Dr. Tom Farley (a pediatrician), issued an Order to close indoor dining, gyms and catering halls in the City. This Order went into effect on November 20, 2020, two days after the aforementioned guidelines of the CDC.

For nearly one year, the Defendants have acted as the legislative, executive and judicial branches ruling over the City and wielding power through perpetual "Emergency" regulations. There is no evidence that the Defendants have engaged or consulted with City Council, the actual legislative body of the City, in relation to the enactment of COVID restrictions. There is no evidence that the Defendants intend to yield their unprecedented consolidation of power. The actions of the Defendants against the business owners subject to the November 20, 2020, lockdowns supports that position, as well as the instant application and requirement for judicial relief.

### a. THE BOARD OF HEALTH HAS ENGAGED IN INTIMIDATION TACTICS AGAINST BUSINESS OWNERS

As soon as the lockdown regulations went into effect, Board of Health inspectors began to descend on restaurant owners to issue citations, threaten and close businesses down entirely for periods of 48 hours or more. To display their power, the Health Inspectors would arrive at establishments accompanied by multiple Pennsylvania State Troopers, with as many as 20 troopers with them. This complement of State Troopers may be something expected with the apprehension of a dangerous fugitive, but it is entirely illogical with enforcing COVID regulations. In fact, the only logical explanation for such an unnecessary show of force is to scare and intimidate business owners, while simultaneously placing them on display for public ridicule and stigmatization.

**b.  THE BOARD OF HEALTH ISSUES CEASE OPERATION ORDERS
BASED ON NON-EXISTENT OR INAPPLICABLE CODE SECTIONS**

To further their lockdown order, the Board of Health is issuing cease operation orders that must be posted on the front windows of businesses. The Board of Health has issued these cease operation orders on the basis of Philadelphia COVID Code §§70.0.1, 70.0.2, 70.0.3 and 70.0.4. However, these sections DO NOT EXIST in the Philadelphia Code and the Philadelphia City Council never passed any such sections. This reference is the belief that the Board of Health's regulations are NOW the Philadelphia Code, which it does not have the power to do.

Further, the Board of Health has issued COVID cease operation orders pursuant to §§6-205, 6-206 and 19-2602. These sections actually state as follows:

**Title 6. Health Code**
**Chapter 6-200. Preventive Medicine**

**§ 6-205.  Emergency Epidemic Control.**

(1)   Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.

**§ 6-206.  Prevention of Congregation of Persons.**

(1)   Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.

8

**Title 19. Finance, Taxes and Collections**
**Chapter 19-2600. Business Income and Receipts Taxes**

**§ 19-2602.  Licenses.**

(1)  Every person desiring to engage in or to continue to engage in any business within the City of Philadelphia shall, whether or not such person maintains a place of business in the City, prior to engaging in such business, procure a commercial activity license from the Department of Licenses and Inspections. A person exclusively engaged in a hobby or other not-for-profit activity, excluded from the definition of business set forth in Section 19-2601, shall not be required to procure or maintain a commercial activity license.

(2)  There shall be no fee for the issuance of the business privilege license required by this Section…

The foregoing Code sections are entirely inapplicable to any basis for closure of a business for purported COVID violations.

The Board of Health clearly has no idea what is or is not a violation, but is intent on citing these business owners for something and closing their businesses down for days on end. Business owners cannot comply with non-existent code sections or sections that have absolutely nothing to do with COVID restrictions. In fact, what business owners should or should not do is not known and is strictly left to the whimsical and subjective determination of the Health Inspector. The Health Inspectors when concluding an outdoor tent arrangement is "non-compliant" they have refused to provide their basis stating "I cannot say, because you will hold me to it." In essence, the Board of Health has created a Kafkaesque game of "Go Fish" for the Business Owners as they have no idea what they have violated, how they can be in compliance or what the inspector may find wrong at any given "COVID" inspection. However, their businesses continue to be closed by the Health Department.

**c.  THE BOARD OF HEALTH HAS ENGAGED IN THREATS AGAINST BUSINESS OWNERS**

In the process of attempting to appease the Board of Health and have cease operations orders lifted, Business Owners have been confronted with Health Inspectors threatening to force the owners to remove outdoor tents or state that the business needs additionally permits from the department of Licenses and Inspections (L&I). In fact, the Health Inspectors have threatened to bring L&I to the location for a "full inspection" of the premises.

What is implied with that threat, is the prospect of L&I possibly issuing fines, requiring additional construction or possibly declaring that some other forms of operation permits are required. All of which serves to add potential costs to the business owners, who are already on financial life support. The Health Inspectors have even refused to return to locations for a "re-inspection," which leaves the cease operations orders in place with an ongoing loss of revenue. To the extent these business owners have been able to expend the vast sums to provide for "outdoor dining" in the Winter months in Philadelphia, they are now burdened with the Health Department threatening to increase their costs or subject the business owners to the threat of additional inspections, fines and extended cease operations orders.

**d.  THE BOARD OF HEALTH'S DETERMINATION OF WHICH BUSINESSES MUST BE LOCKDOWNED AND WHICH BUSINESSES CAN REMAIN OPEN IS INEXPLICABLE AND ARBITRARY**

Defendants have now reverted to the business closures that existed in March 2020. However, since the initial Orders were put in place, the Defendants have failed to provide any information or scientific validation that closing gyms, restaurants and/or catering halls actually achieves their stated purpose. In fact, Defendants' determination of what is safe versus unsafe has not been explained. Thus, one is left to their own attempts to reach a logical conclusion, which proves to be a maddening Sisyphean endeavor.

10

For example, the Defendants have failed to explain how the COVID virus behaves so differently in big box retail stores versus a restaurant or a gym. Or, how dining in an outdoor enclosure in the Winter months is safer than the more traditional dining setting at an indoor table. The Defendants have had almost one year to prove or disprove their hunches and theories; however, their lack of produced information on these issues suggests they have failed to do so.

The Defendants have issued regulation after regulation impacting businesses based on their beliefs without providing the necessary support, which should not have to be requested. At present, the Defendants have condemned business owners and their employees to economic annihilation, while they watch other businesses, including the City operated Christmas Village, flourish and be packed with patrons.

Our Courts and the Framers of our State and Federal Constitutions prophetically anticipated that consolidation of power into one group would lead to arbitrary decision making when left unchecked, and they prohibited such occurrences. The present Safer at Home restrictions, as well as the perpetual Emergency powers of the Defendants provide a concrete and real-life depiction of what our Supreme Court and the Framers provided safeguards against, as the actions of Defendants and the application of their restrictions squarely fits within our Supreme Court's definition of arbitrary: "based on random or convenient selection or choice rather than on reason or nature." *Thunberg v. Strause*, 545 Pa. 607 (1996).

The Defendants' *ad hoc* regulations, which are heavy on fear, and light on facts, have led to absurd results. We are living in a city where this is "legal:"



*Christmas Village packed with guests*

But this is illegal, and will result in numerous fines and a cease operations order:



Where Walmart is allowed to operate like this:



*Photo taken at the South Philadelphia Walmart on 12/17/20*

But, this indoor dining like this is forbidden:



## IV.   <u>LEGAL ARGUMENT</u>

### a.   <u>THE PENNSYLVANIA CONSTITUTION PROHIBITS THE DELEGATION OF POWERS</u>

The Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." *See* PA CONST. art. II, § 1. When the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the legislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975).

This constraint against the delegation of power serves two purposes. First, it ensures that duly authorized and politically responsible officials make **all** the necessary policy decisions, as is

their mandate per the electorate. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 291 (Pa. 1975) (emphasis added). And second, **it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power**. *Id.*(emphasis added). At the heart of the non-delegation doctrine is the tenet that the General Assembly cannot delegate "to any other branch of government or to any other body or authority" the power to make law. *See State Bd. of Chiropractic Exam'rs v. Life Fellowship of Pa.*, 272 A.2d 478, 480 (Pa. 1971). Or, as John Locke put it, legislative power consists of the power "to make laws, and not to make legislators." *Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645, 655 (2017) (*citing* JOHN LOCKE, SECOND TREATISE OF GOVERNMENT 87 (R. Cox ed.1982)). Indeed, the rule against delegation of power is essential to the American system of representative government. The framers of the Constitution believed that the integrity of the legislative function was vital to the preservation of liberty. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S.Ct. 1225, 1237 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested power exists to protect liberty.")

Our Courts have frequently reviewed "delegation of powers" cases and placed significant restraints on agencies, such as the Department of Public Health, that make laws and regulations pursuant to their purported delegated authority. For example, in *Tosto v. Pennsylvania Nursing Home Loan Agency*, 331 A.2d 198 (Pa. 1975), the Pennsylvania Supreme Court reviewed a taxpayer's lawsuit seeking an injunction of the Nursing Home Loan Agency Law, which was passed by the defendant, and stressed the importance of procedural mechanisms that serve to limit or prevent the arbitrary and capricious exercise of delegated power.  The statute at issue in *Tosto* required that the administrative agency establish neutral operating procedures, develop standardized documents, and give the public notice of proposed agency rules and regulations

before promulgating them. *Id*. at 204.  Although the Court upheld the law, it found that such procedural mechanisms were "important safeguards against the arbitrariness of ad hoc decision-making."  *Id*. As discussed more fully herein, the procedural safeguards and requirements identified by the *Tosto* court are not present in Defendants' actions in the present matter, or in the Safer at Home Restrictions.

Likewise, in *W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 635 Pa. 127 (2016), the Pennsylvania Supreme Court reviewed provisions in the Public School Code that gave sweeping power to the School Reform Commission to improve the finances of distressed Philadelphia public schools, with very few procedural restrictions. The Court found that this delegation of power was unconstitutional, and **violated the non-delegation doctrine, because it did not include concrete measures to channel the Commission's discretion to wield its suspension power, nor did it include safeguards to protect against arbitrary,** *ad hoc* **decision making,** such as a requirement that the Commission hold hearings, allow for public notice and comment, or explain the grounds for its suspensions in a reasoned opinion subject to judicial review. *Id*. at 142-43 (emphasis added).The issues and concerns that formulated the basis for the holding in *W. Phila. Achievement Charter Elementary Sch.* are identical to our present situation, except the Safer at Home Restrictions and the Defendants' actions since March 2020 provide the actual manifestation of the Pennsylvania Supreme Court's prophetic concerns, versus a theoretical potential.

In *Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645 (2017), the Pennsylvania Supreme Court invalidated Section 306(a.2) of the Workers' Compensation Act ("Act") for violating the non-delegation doctrine.  Section 306(a.2) permitted employers to demand an injured claimant undergo an evaluation to determine their level of impairment.  *Id*. at 650.  The Act required

physicians determine a claimant's level of impairment using guidelines set forth by the American Medical Association ("AMA"). *Id*. After being denied a permanent impairment rating, Plaintiff appealed, and claimed that Section 306(a.2), and its reliance on guidelines set forth by the AMA, was an unconstitutional delegation of power from the General Assembly to the AMA. The Pennsylvania Supreme Court agreed, and found Section 306(a.2) unconstitutional. *Id*. at 668. The Court found that the AMA failed to rely on a standardized methodology to create their guidelines. *Id*. at 658. They were, in essence, free to change their guidelines as frequently or as infrequently as they wished. *Id*. at 659. Thus, the AMA had *de facto*, unfettered control over Pennsylvania's Workers' Compensation Act. *Id*. In striking down the law, the Court held:

> The Pennsylvania Constitution prevents the General Assembly from passing off to another branch or body *de facto* control over matters of policy. As we have explained, this is exactly what the General Assembly did in Section 306(a.2). Because we must enforce Article II, Section 1 [of the Pennsylvania Constitution] without consideration of the exigencies that arise or "how trying our economic or social conditions become"… Section 306(a.2) violates the non-delegation doctrine.

> *Id*. at 668.

The Safer at Home Restrictions embody the concerns raised with the unconstitutional delegation of power in *Protz*. There is no standardized methodology or definition provided in the Safer at Home Restrictions as to why some businesses must shut down entirely, such as indoor catering, while others are permitted to remain open, like national big-box retailers. Since there is no standardization to their methodology, the Defendants have been allowed to change their guidelines at will, as frequently or infrequently as they please, with no time constraints. Accordingly, the Safer at Home Restrictions are the very definition of arbitrary.

**b. THE SAFER AT HOME RESTRICTIONS ARE UNCONSTITUTIONAL BECAUSE THEY VIOLATE THE NON-DELEGATION OF POWERS DOCTRINE**

### i. BACKGROUND OF THE SAFER AT HOME RESTRICTIONS

On November 16, 2020, Defendant Kenney signed the Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses for Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise that Philadelphians are Safer at Home (hereinafter "Safer at Home Restrictions"). *See* Safer at Home Restrictions, attached as Exhibit "A." The Safer at Home Restrictions went into "law" at 5 p.m. on November 20, 2020, and expire at the end of the day on January 1, 2021. *See* Exhibit "A" at p. 11. The Safter at Home Restrictions place a total ban on indoor on-site dining, catering, and gyms. *See* Exhibit "A" at §§ 5(A), 5(C) and 8(a).

On November 24, 2020, Defendant, City of Philadelphia, by and through Defendant, the Department of Public Health, adopted the Safer at Home Restrictions in its entirety, and enacted emergency regulations consistent thereto. *See* Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions), attached as Exhibit "B."

### ii. LEGISLATIVE POWER BELONGS TO CITY COUNCIL, NOT ADMINISTRATIVE AGENCIES LIKE THE PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH

Legislative power of the City of Philadelphia rests exclusively with an elected City Council. This is codified in Philadelphia Home Rule Charter §1-101, which says "[t]he legislative power of the City… shall be exclusively vested in and exercised by a Council, subject only to the provisions of this charter." *See* Philadelphia Home Rule Charter § 1-101.

The Department of Public Health was also created pursuant to the Philadelphia Home Rule Charter to administer and enforce statutes, ordinances, and regulations relating to public health.  *See* Philadelphia Home Rule Charter § 5-300(a). Pursuant to Philadelphia Home Rule Charter §5-301(b), the Board of Health was created to make "reasonable regulations, not contrary to any statute or ordinance, for the preservation and promotion of the health of the people of the City."  *See* Philadelphia Home Rule Charter §5-301(b).

Critically, the Board of Health's power is limited and distinct from the legislative function of City Council.  As set forth in the notes to Philadelphia Home Rule Charter §5-301, "[t]he power of the Board to make regulations is, under existing case law, an administrative function. The Board, **cannot**, therefore, legislate. [Legislating] remains a function of the Council."  *See* Philadelphia Home Rule Charter §5-301 at n. 3.

Philadelphia Code §§ 6-205 and 6-206 set forth emergency scenarios under which the Department of Health and Board of Health may act.  *See* Philadelphia Code §§ 6-205 and 6-206. Philadelphia Code § 6-205 relates to emergency epidemic control, and provides:

> Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.

> *See* Philadelphia Code § 6-205.

19

Philadelphia Code § 6-206 enables the Philadelphia Board of Health to enact restrictions on the congregation of persons during an epidemic:

> Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.

> *See* Philadelphia Code § 6-206.

Since March 2020, the Defendants have been acting pursuant to §§ 6-205 and 6-206 in an absolute and unchecked manner. This has now emerged in the most resent Safer at Home Restrictions presently in effect, and discussed herein.

### iii. THE DEPARTMENT OF HEALTH HAS IMPERMISSIBLY ENGAGED IN LAW MAKING AND HAS FAILED TO FOLLOW PROCEDURAL LIMITATIONS AND REQUIREMENTS

The protocol and procedure that must be followed by the Defendants for enacting regulations is set forth in Philadelphia Home Rule Charter § 8-407, which provides that a department, board, or commission promulgating a regulation shall first submit them for approval to the Law Department, and, upon receiving approval from the Law Department, file the regulation with the Department of Records, where the regulation shall be available for public inspection for thirty (30) days. *See* Philadelphia Home Rule Charter § 8-407(a). The Department of Records shall give public notice of the regulation by advertising in three (3) daily newspapers, advising that any person affected by the regulation may request a hearing. If a person affected by the regulation requests a hearing, then he/she shall be afforded a public hearing before the department. *See* Philadelphia Home Rule Charter § 8-407(b)-(c).

Critically for purposes of this motion, "the requirements of [Philadelphia Home Rule Charter § 8-407] may be suspended by the Mayor in writing and temporary regulations promulgated in emergencies affecting the public health or safety, **but any regulations so put into force shall NOT remain effective unless the procedures otherwise required by this section are complied with forthwith.**"  *See* Philadelphia Home Rule Charter § 8-407 (emphasis added).[1] As the notes to Philadelphia Home Rule Charter § 8-407 explain, administrative agencies, such as Defendant, Philadelphia Department of Public Health, **may not legislate**.  *See* Philadelphia Home Rule Charter § 8-407 at n. 2 (emphasis added).  The requirement to hold a hearing **forthwith** is intended to protect persons who will be affected by arbitrary administrative action.  *See* Philadelphia Home Rule Charter § 8-407 at n. 3 (emphasis added).

Although emergencies affecting the public health or safety may require immediate action through regulations, and regulations in emergencies may go into force immediately if the Mayor suspends the procedural requirements of § 8-407, "for such **temporary** regulations to remain effective, the steps **normally** required by this section **must immediately be initiated and followed.**"  *See* Philadelphia Home Rule Charter § 8-407 at n. 11 (emphasis added).

### iv.  THE DEFENDANTS HAVE FAILED TO FOLLOW THE SPECIFIC PROCEDURAL REQUIREMENTS OF § 8-407, THUS THEIR REGULATIONS INCLUDING THE SAFER AT HOME REGULATIONS ARE VOID

Presently, the restrictions at issue have been elongated by the unquestioned "suspension" of § 8-407 by Defendant Kenney on March 11, 2020. That order has been in place for 9 months and 6 days, **without the procedural requirements of § 8-407 being observed.** Therefore, the failure to follow the required procedures renders the Mayor's emergency suspension of §8-407 ,

---

[1] Defendant Kenney did, in fact, suspend the formal requirements of §8-407 in writing on March 11, 2020. But, as referenced herein, the Defendants are required to comply with the plain-language and spirit of the law underlined immediately thereafter. They have failed to do so.

and the 18 derivative "emergency" orders and regulations issued by the Philadelphia Department of Heath and the Board of Heath **VOID**.

The Philadelphia Home Rule Charter specifically prohibits the Defendants' actions. It states that the procedural safeguards against arbitrary regulations must be immediately followed, or else the temporary, emergency regulations **cannot remain effective because administrative agencies cannot legislate and create new law.** *See* Philadelphia Home Rule Charter § 8-407 at n. 2. Despite the limitations built into the Philadelphia Home Rule Charter and the Pennsylvania Constitution– namely, that only City Council may pass legislation, that agencies must follow a specific protocol to prevent passing arbitrary regulations, that administrative agencies are restricted from acting as legislative bodies, and the non-delegation doctrine – the Defendants have violated all procedural and constitutional norms in passing the "Safer at Home Restrictions."

The Defendants' actions are analogous to the unconstitutional delegation of power in *W. Phila. Achievement Charter Elementary Sch.,* where the Pennsylvania Supreme Court invalidated the Public School Code because the School Reform Commission was not mandated to hold hearings, allow for public notice and comment, or explain the grounds for its suspensions in a reasoned opinion subject to judicial review. *See W. Phila. Achievement Charter Elementary Sch. v. Sch. Dist. of Phila.*, 635 Pa. 127 (2016). Here, the Defendants have simply disregarded all requirements to provide notice, allow for public comment, and explain the rationale behind their decision-making. Failing to follow these critical safeguards allows for ad hoc policymaking, in contravention of the Pennsylvania Constitution.

The Defendants' conduct is also comparable to the unconstitutional behavior in *Protz*, because they have gained de facto control over all legislation surrounding COVID-19, and maintain unfettered, never-ending discretion to pass laws without following the procedural

requirements. *See Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645 (2017). The Defendants then get to serve as prosecutor, judge and jury – enforcing their regulations, and imposing their own fines and sanctions for failing to comply.

With regard to the procedural safeguards of Philadelphia Home Rule Charter § 8-407, the Defendants have:

   a.   Failed to provide public inspection of the emergency regulations;

   b.   Failed to provide public notice of the emergency regulations;

   c.   Failed to allow affected citizens to request a hearing;

   d.   Failed to hold a public hearing;

   e.   Failed to not act arbitrarily in the creation and imposition of the Safer at Home Regulations;

   f.   Attempted to legislate by failing to set forth a time-limit on the Safer at Home Regulations.

While Philadelphia Code §§ 6-205 and 6-206 provide the authority to declare the spread of disease such as the novel coronavirus, COVID-19, an epidemic, and take steps to prevent the spread of the disease, **this authority is limited by the procedural protections of the Philadelphia Home Rule Charter §8-407, as referenced in the law itself**. Specifically, when the Mayor orders the suspension of the procedural requirements of Philadelphia Home Rule Charter § 8-407, then the Philadelphia Department of Health and Board of Health may enact regulations immediately, without following the usual requirements of the Philadelphia Home Rule Charter § 8-407, such as public notice and inspection for thirty (30) days, with the opportunity for an affected person to request a hearing prior to the enactment of the regulation. However, as previously referenced, the Philadelphia Department of Public Health does not have *carte blanche*

authority to enact regulations that are free from public scrutiny by affected persons. The Philadelphia Home Rule Charter § 8-407 provides that, after a regulation is enacted emergently under the Mayor's emergency powers, the regulations put into force **will not remain effective unless the usual procedural requirements are immediately followed.** *See* Philadelphia Home Rule Charter § 8-407(c).  The steps normally required to enact regulations, such as providing public notice of their ability to request a hearing, and holding a public hearing, must be **immediately initiated, and followed**.  *See* Philadelphia Home Rule Charter § 8-407 at n. 11. Thus, even under the authority provided by Philadelphia Code §§ 6-205 and 6-206, the Defendants have failed to comply with the procedural requirements since March 2020 – over 9 months. Likewise, the manifestation of their most recent transgression – the Safer at Home Restrictions – fail to comply.

Since the Safer at Home Restrictions failed to comply with the law and should be enjoined, as they are procedurally **void**. As referenced herein, Defendants failed to follow the procedural steps that must be immediately initiated after enacting emergency regulations, including failing to provide public notice to allow persons affected by the Safer at Home Restrictions to request a hearing, and failing to hold a public hearing (via remote technology or otherwise) with persons affected by the Safer at Home Restrictions, despite the requirement that the procedure be followed "forthwith."   Accordingly, pursuant to the Philadelphia Home Rule Charter § 8-407, "**any regulations so put into force shall not remain effective unless the procedures otherwise required by this section are complied with forthwith,**" thus the Safer at Home Restrictions violate the law on which they are based, and should be enjoined from further enforcement.

v. **THE SAFER AT HOME RESTRICTIONS VIOLATE SEPERATION OF POWERS AS WELL AS THE NON-DELEGATION DOCTRINE, RENDERING THEM UNCONSTITUTIONAL**

This abrogation of authority is the exact conduct that was forbidden and deemed unconstitutional by our Supreme Court in *Protz* and *W. Phila. Achievement Charter Elementary Sch.,* as referenced herein. The Defendants' appropriation of power far surpasses any official act done on behalf of the local legislative, executive, or judicial branch through our city's history. It has resulted in a consolidation of all three (3) branches of government into a group of unelected officials in the Department of Health and Board of Health.

The separation of powers doctrine is essential to our tripartite governmental framework and is the cornerstone of judicial independence. It is inherent in the Pennsylvania Constitution and makes manifest that the three branches of government are co-equal and independent, and divides power accordingly. *Commonwealth v. Hill*, 2020 Pa. Super. LEXIS 774, *5.

The governing structure of our Commonwealth, like the federal government, is divided into three equal branches, the legislative, *see* Pa. Const. art II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly ...."); the executive, *see* Pa. Const. art. IV, § 2 ("The supreme executive power shall be vested in the Governor ...."); and the judicial, *see* Pa. Const. art. V, § 1 ("The judicial power of the Commonwealth shall be vested in a unified judicial system ...."). *Id.* The rationale underlying this separation of powers is that it prevents one branch of government from exercising, infringing upon, or usurping the powers of the other two branches. *Id.*

To avert the danger inherent in the concentration of power in any single branch or body, **no branch may exercise the functions delegated to another branch**. *Jefferson County Court*

*Appointed Employees Association v. Pennsylvania Labor Relations Board*, 603 Pa. 482 (Pa.2009) (emphasis added).  The prohibition on one branch of government encroaching upon a sister branch's powers is, in turn, related to the system of checks and balances, which prevents one branch from acting unchecked. *Id.*

For checks and balances to properly work, each branch must be kept from controlling or coercing the other. Insuring that each branch is co-equal and independent is the foundation of the separation of powers doctrine, **and the avoidance of the concentration of governmental powers in one branch is essential to our freedom and liberty**. *See Commonwealth v. Hill, supra* (emphasis added). In our Commonwealth, the roots of the separation of powers doctrine run deep. The delineation of the three branches of government, each with distinct and independent powers, has been inherent in the structure of Pennsylvania's government since its genesis — the constitutional convention of 1776. *Id.* In the present scenario, Defendants have inserted themselves into all three branches of government under the guise of a perpetual emergency.

1. **THE BOARD OF HEALTH HAS ASSUMED THE LEGISLATIVE FUNCTION**

Intoxicated with their unchecked authority to legislate in violation of the Pennsylvania Constitution and Philadelphia Home Rule Charter, the Defendants have even insinuated their intention to make their emergency regulations **permanent, as if it was a law**:

> **WHEREAS,** consistent with the foregoing, the Board hereby promulgates the below Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions) to adopt the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, as a temporary regulation effective upon delivery to the Department of Records, while the remaining procedures and formalities of Section 8-407 are followed to promulgate these amendments as ==a permanent regulation;== and

*See* Exhibit "B" at p. 4.

In recognition of this unprecedented consolidation of power, a bill was recently proposed in City Council to reign in the Department of Public Health's unconstitutional encroachment on the legislature, seeking to put a sixty (60) day time limit on their authority under Philadelphia Code § 6-205 and § 6-206. *See* City of Philadelphia Bill No. 200678, attached as Exhibit "C." By way of introducing the aforementioned bill, coupled with the historically built-in restrictions on granting "emergency" powers, City Council has acknowledged that the Board of Health is not only "legislating," but also it is acting beyond Council's legislative intent in the passing of §§ 6-205, 6-206 and 8-407. City Council's proposed bill to put a time limit on the Defendants' authority under Philadelphia Code § 6-205 and § 6-206 shows that the Defendants have clearly been acting contrary to City Council's legislative intent.

Indeed, the Safer at Home Restrictions, and the unfettered power being exercised by the Defendants under the guise of Philadelphia Code § 6-205 and § 6-206, goes far beyond that of other emergency regulations enacted by City Council throughout its history. For example, the COVID-19 Emergency Housing Protections law was introduced as a bill by City Council pursuant to their legislative authority. The bill passed, and was codified into law, with an end date of August 31, 2020. *See* Philadelphia Code § 9-809. Unlike the Safer at Home Restrictions, the COVID-19

Emergency Housing Protections law came from City Council, the legislative body of the City, and set forth a specific timeframe in which it would be valid: July 1, 2020 to August 31, 2020.

Even the Mayor's emergency powers at times of civil unrest are not as broad as the unrestrained encroachment on the legislative branch by the Philadelphia Department of Health in the Safer at Home Restrictions. Pursuant to Philadelphia Code § 10-819, the Mayor may declare a state of emergency, and take specific enumerated actions if "the City or any part thereof is suffering or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens." *See* Philadelphia Code § 10-819.  This power may only last two (2) weeks. *See* Philadelphia Code § 10-819(2). As the Pennsylvania Superior Court has explained, Philadelphia Code §10-819, and the State of Emergency power granted to the Mayor of Philadelphia therein, only applies to riots. *See Commonwealth v. Stotland*, 251 A.2d 701 (Pa. Super. 1968).

In *Stotland*, the Superior Court reviewed three (3) summary criminal convictions following the enactment of a state of emergency from April 5, 1968 at 9:00 p.m. to April 10, 1968 at 6:00 a.m. in response to "widespread public disorder" across the city and nation in the aftermath of the Martin Luther King, Jr. assassination. *Id*. at n. 2.  The state of emergency was enacted by the Mayor of Philadelphia, pursuant to Philadelphia Code §10-819, and set forth limitations on groups of twelve (12) people or more from assembling in the city. *Id.* The Petitioners challenged the constitutionality of §10-819, but the Superior Court upheld all three (3) convictions, and, in the concurring opinion, set forth a detailed analysis of the purpose of §10-819, and the limitations on the Mayor of Philadelphia's emergency powers under the law.  Philadelphia Code §10-819 authorizes the Mayor of Philadelphia to declare a State of Emergency within the City, and to impose certain extraordinary measures to maintain public order for the duration of the emergency

28

period. *Id*. at 702. Emergency powers may only be invoked if may be invoked only if the city "is suffering, or is in imminent danger of suffering civil disturbance, disorder, riot or other occurrence which will seriously and substantially endanger the health, safety and property of the citizens…" *Id*. at 704. The words "imminent danger" mean a "clear and present danger." *Id*. Thus, Philadelphia Code §10-819 may only be enacted during a riot. As the Court explained:

> Both the ordinance and its history indicate that the only danger defined by the language "civil disturbance, disorder, riot or other occurrence" is a large scale urban riot. In 1964, a large scale riot occurring in Philadelphia resulted in scores of injuries and extensive property damage. During the summer of 1967, only one month prior to the enactment of Ordinance 10-819, the prospect of an impending riot of these proportions prompted the Mayor of Philadelphia to make an executive decree similar to the Proclamation of April 5 without legislative authorization. The ordinance was enacted to give the Mayor more effective power to restore order or prevent disorder in future outbreaks of this kind.
>
> The language of the ordinance supports the conclusion that the powers may be exercised only to control or avert a large scale riot. The eight specific measures which the Mayor is authorized to apply are uniquely designed to combat this catastrophic form of civil disorder. The powers to restrict surface and air transportation into and within the city are aimed at containing a riot within existing riot-struck areas. The prohibitions upon the sale of weapons and inflammable liquids are designed to restrict or prevent arson and violence by limiting the availability of articles which might be employed to these ends. Restrictions imposed on the sale of alcoholic beverages may prevent the further aggravation and release of inflamed passions and hostilities. The powers to limit public assembly and to impose a curfew provide readily enforceable crowd control devices during an existing riot and limit the opportunities for the public venting of emotions which, when there is a clear and present danger of riot, may turn the possibility of riot into reality.
> A large scale urban riot involving widespread arson, looting, vandalism and sniping is the most destructive form of civil disturbance. The magnitude of the rioting which has occurred in major cities in recent years is measured in scores of deaths, hundreds of injuries, and millions of dollars of property damage. 5 In many instances, city and state executives have been required to employ State National Guard or United States Army troops to restore order to the community.

> *Id*. at 704-5.

In fact, the Court declared that §10-819 only authorizes the Mayor of Philadelphia to declare a State of Emergency only after he has found there is a clear and present danger of a large

scale civil disorder.  *Id*. at 705.  Such a State [of Emergency] may be declared <u>only</u> if the city is faced with the clear and present danger of a riot.  *Id*. at 706.

The Defendants' ongoing usurpation is a consolidation of all three (3) branches of government, and violates the required separation of powers. To be sure, the Safer at Home Restrictions are an unprecedented and unconstitutional exercise of power by an administrative agency. The Defendants have encroached on the non-delegable legislative function of City Council, in violation of Pennsylvania law. *See e.g. Tosto*, *Protz*, supra.  They have ignored the procedural safeguards required by the Pennsylvania Constitution, and Philadelphia Home Rule Charter § 8-407, to protect citizens from the enactment and enforcement of arbitrary regulations. They have exercised unrestrained emergency authority in ways never before seen, even by City Council or the Mayor during times of emergency.

## 2. <u>THE BOARD OF HEALTH HAS ASSUMED THE EXECUTIVE FUNCTION</u>

The Safer at Home Restrictions also invade the executive functions of government. Under the Philadelphia Home Rule Charter § 4-100, the Mayor is the chief executive officer of the City, and shall be responsible for the conduct of executive work, administrative work, and law enforcement within the City.  *See* Philadelphia Home Rule Charter § 4-100.

The Board of Health demonstrates its usurping of the executive role through its administration of its restrictions, including the Safer at Home Restrictions. It now sits in the executive role of law enforcement.

 Under Section 11 of the Safer at Home Restrictions, the Department of Health authorizes itself to allow continuous inspection of affected premises, such as catering halls, restaurants, bars and gyms:

> **C.**   **The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.**

*See* Exhibit "A" at § 11(c).

### 3.  THE BOARD OF HEALTH HAS ASSUMED THE JUDICIAL FUNCTION

Under the Pennsylvania Constitution, judicial power of the Commonwealth rests in the unified judicial system.  *See* PA CONST. art. V, § 1.

The Department of Health has assigned itself to hold hearings and determine not only guilt, but also the consequences levied against any business or individual it determines is recalcitrant to its directives. Specifically, the Safer at Home Restrictions allow Department of Health employees, or other city employees, acting pursuant to the Safer at Home Restrictions to impose penalties, fines, license suspensions, and, ominously, "other penalties."

> **D.**   Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

*See* Exhibit "A" at § 11(d).

vi.  **THE ARBITRARY SAFER AT HOME RESTRICTIONS HAVE LED TO IRRATIONAL RESULTS**

The Defendants' *ad hoc* regulations, which are heavy on fear, and light on facts, have led

to absurd results. We are living in a city where this is "legal:"



*Christmas Village packed with guests*

But this is illegal, and will result in numerous fines and a cease operations order:



32

Where Walmart is allowed to operate like this:



*Photo taken at the South Philadelphia Walmart on 12/17/20*

But, this indoor dining is forbidden:



Accordingly, the Defendants' ongoing regulations and the most recent Safer at Home Restrictions violate the non-delegation and separation of powers doctrines of Pennsylvania law, and are unconstitutional pursuant to Article 2, Section 1 of the Pennsylvania Constitution. Moreover, they violate the procedural requirements to enact emergency regulations pursuant to the Philadelphia Home Rule Charter and cannot be enforced.

    c.   **THE SAFER AT HOME RESTRICTIONS ARE AN UNCONSTITUTIONAL VIOLATION OF THE SUBSTANTIVE DUE PROCESS RIGHT TO WORK**

    i.   **THE RIGHT TO WORK IS PROTECTED BY THE UNITED STATES CONSTITUTION AND PENNSYLVANIA CONSTITUTION**

Substantive due process guarantees that "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." *Planned*

*Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 847 (1992)(*quoting Whitney*

*v. California*, 274 U.S. 357, 373 (1927)). This includes the right to work.

In fact, the United States Supreme Court has stated:

> Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.
>
> While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also **the right of the individual to contract, to engage in any of the common occupations of life,** to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. *See*, *e. g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499-500; *Stanley v. Illinois*, 405 U.S. 645.

*Board of Regents v. Roth*, 408 U.S. 564, 572 (1972) (emphasis added)

The Pennsylvania Constitution likewise guarantees the inherent and indefeasible rights of

its citizens: "all men are born equally free and independent, and have certain inherent and

indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring,

possessing and protecting property and reputation, and of pursuing their own happiness."  *See* PA

CONST. art. I, § 1.  In fact, our Constitution likewise explicitly prohibits the passage of laws that

abridge our civil rights: "[n]either the Commonwealth nor any political subdivision thereof shall

deny to any person the enjoyment of any civil right, nor discriminate against any person in the

exercise of any civil right."  *See* PA CONST. art. I, § 26.

As the Pennsylvania Supreme Court has held: "within the concept of liberty protected by

the Fourteenth Amendment [is] the right to engage in any of the common occupations of life.

The established doctrine… is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." *Adler v. Montefiore Hospital Asso.*, 453 Pa. 60, 72 (1972) (*citing* Meyer v. Nebraska 262 U.S. at 399, 400 (1923)).

In *Adler*, the Pennsylvania Supreme Court reviewed whether a private physician associated with a public teaching hospital was entitled to render what he considered comprehensive medical treatment to his patients using hospital facilities and equipment, or whether his right to provide treatment must yield to rules and regulations established by the hospital. The hospital downgraded the physician's employment from full-time to part-time, which eliminated his ability to perform operations using the hospital's facilities.  *Id*. at 65-66. Although the Court upheld the hospital rules, it confirmed the significant limitations on the government's interference into protected freedoms, like the right to work.  "[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Id*. (*citing* NAACP v. Alabama, 377 U.S. 288 (1964)). Critically, a law "which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained.  Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations."  *Id*. (*citing* Gambone v. Commonwealth, 375 Pa. 547, 551 (1954)).

## ii.  THE SAFER AT HOME RESTRICTIONS ARE AN UNCONSTITUTIONAL LIMIT ON THE RIGHT TO WORK

In the instant case, the Safer at Home Restrictions violate the protections enshrined in *Adler*. The regulations set forth by Defendants are overbroad, in that they shutdown all indoor dining, catering, and gyms, thereby depriving Plaintiff and others of the right to work, without any study of the safety protocols able to be followed by individual businesses. Furthermore, the Defendants have yet to publicly release any of their data showing how their regulations have a real and substantial relation to the goal of stopping the spread of COVID-19. The regulations also arbitrarily differentiate between businesses which are permitted to remain open, and those which must close. For example, the Christmas Village and national big-box retailers are allowed to remain open, despite the massive crowds of people they attract during the holidays, while mom-and-pop restaurants, catering halls and gyms are forced to close, regardless of how busy they become.  Such ad hoc and irrational regulations violate the mandate of Adler, which forbids imposing unusual and unnecessary restrictions upon lawful occupations under the guise if public interest.  *Id*. at 65-66.

Government encroachment into the right to work via regulations and emergency orders in the context of the COVID-19 pandemic was recently addressed in *Cty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. Sept. 14, 2020). The Court affirmed that substantive due process includes the right of citizens to support themselves by engaging in their chosen occupation, and invalidated Governor Wolf's business closures.  *Id*. at 5. The Court found "[t]here is no question… that the Fourteenth Amendment recognizes a liberty interest in citizens… to pursue their chosen occupation."  *Id*. at 79.

In *Cty. of Butler*, the Court reviewed the constitutionality of public health measures enacted by Governor Wolf and the Commonwealth of Pennsylvania to stop the spread of COVID-19,

including orders closing "non-life sustaining" businesses, and stay-at-home requirements. The challenge of this endeavor – the balance of constitutional freedoms versus a public health crisis – was not lost on the Court. Nonetheless, the Court found that the government cannot restrict the due process freedoms guaranteed by the Constitution:

> The unprecedented nature of the business closure—even in light of historic emergency situations—makes its examination difficult from a constitutional perspective. It simply does not neatly fit with any precedent ever addressed by our courts. Never before has the government exercised such vast and immediate power over every business, business owner, and employee in the Commonwealth. Never before has the government taken a direct action which shuttered so many businesses and sidelined so many employees and rendered their ability to operate, and to work, solely dependent on government discretion. As with the analysis of lockdowns, the unprecedented nature of the business shutdowns poses a challenge to its review. **Nevertheless, having reviewed this novel issue in light of established Due Process principles, the Court holds that the business closure orders violated the Fourteenth Amendment.**

> *Id*. at 74-75 (emphasis added).

The Court found that the restrictions set forth by Governor Wolf were unconstitutional because they had the potential, and actual effect, of destroying businesses and putting employees out of work.  *Id*. at 89.  Although the defendants were acting hastily to prevent a public health situation, they exercised "raw governmental authority in a way that could (and did) critically wound or destroy the livelihoods of so many."  *Id*. at 90.  The citizens of the Commonwealth deserved an objective plan, the ability to determine with certainty how the critical classifications were to be made, and a mechanism to challenge an alleged misclassification, but the arbitrary design, implementation, and administration of the business shutdowns deprived the plaintiffs of all protection.  *Id*.

As in *Cty. Of Butler*, the Defendants' ongoing restrictions, including their Safer at Home Restrictions, are likewise an arbitrary deprivation of Plaintiff's constitutional right to work. Under

the Constitution's substantive due process protections, Plaintiff has the right to pursue his chosen occupation. The Safer at Home Restrictions, however, have forced Plaintiff to lose their jobs, livelihoods and, if prosecuted for violating the restrictions, potentially fines, jail time reputation, Despite this significant encroachment, the Defendants have failed to provide to the public with any of their rationale or data to support the Safer at Home Restrictions, and demonstrate their necessity

A non-exhaustive list of the Defendants' "findings" and "rationale" that they have failed to explain or support with data, studies, and/or scientific methodology includes, but is not limited to:

    a.   The differentiation between "essential" business and "non-essential" business;

    b.   That COVID-19 may remain viable for hours or days on surfaces;

    c.   That group settings are at a heightened risk for transmission of COVID-19 when individuals leave and return;

    d.   That construction creates a heightened risk for transmission of COVID-19 and should therefore be limited;

    e.   That reopening in phases reduces the risk for transmission of COVID-19;

    f.   That indoor exercise creates a heightened risk for transmission of COVID-19;

    g.   That indoor dining creates a heightened risk for transmission of COVID-19;

    h.   That indoor catering creates a heightened risk for transmission of COVID-19;

    i.   That indoor theaters create a heightened risk for transmission of COVID-19;

    j.   That outdoor sports create a heightened risk for transmission of COVID-19;

    k.   The differentiation between small-business retail stores and national retailers;

    l.   That gatherings with persons from different households creates a heightened risk for transmission of COVID-19;

m. That indoor facilities such as museums, concert halls, arcades, bowling alleys, private clubs, and event centers create a heightened risk for transmission of COVID-19;

By failing to report the underlying data or studies surrounding the above-referenced "findings" and "rationale" behind their regulations, the Defendants violated Philadelphia Home Rule Charter § 8-407 because they passed arbitrary and inconsistent regulations, and the due process protections of the Fourteenth Amendment.

To date, the Defendants have not shown any analysis of whether their purported "findings" and "rationale" will hurt, rather than help, the city. At the enactment of the Safer at Home Restrictions, nearby counties remained operational and unrestricted, permitting indoor catering and banquet events to continue, to the detriment of similarly-situated Philadelphia businesses, like Plaintiff's.

In fact, the Center for Disease Control (hereinafter "CDC"), which the Defendants have referenced since March 2020 as an authoritative agency with regard to information and guidance on stopping the spread of COVID-19, does not recommend lockdowns and a total ban of indoor catering, dining and other events. *See supra*. The CDC has published mitigation guidelines for the restaurant industry. Nowhere in the guidelines does the CDC recommend that the restaurant industry should or must be "locked down" to mitigate COVID-19 spread.  See Centers for Disease Control Guidelines, attached as Exhibit "D."

Moreover, at the last published Department of Public Health meeting minutes of September 10, 2020, Dr. Farley noted that indoor gyms **were compliant** with distancing, masking and capacity restrictions, and that the Department of Health was just starting to monitor their compliance with health restrictions.  *See* Department of Public Health Meeting Minutes from

September 10, 2020, attached as Exhibit "E." To date, Defendants have not made the Department of Health inspection data on indoor gyms publicly available, or any other data.

Further, at the September 10, 2020 Department of Public Health meeting, Dr. Farley indicated that even though Philadelphia's restrictions on indoor dining were stricter than the rest of the Commonwealth, other counties have **not** seen an increase of coronavirus cases due to indoor dining. *See* Exhibit "E" at p. 2.  The fact that the CDC has not issued any guidelines that suggest a lockdown of restaurants, catering halls, and gyms would be necessary, couple with the lack of Defendants' own data, renders any argument that the public interest is supported by a lockdown to be unsubstantiated.

Before exercising "raw governmental authority that could critically wound or destroy the livelihoods of so many," Plaintiff and others deserved to see objective regulations supported by scientific fact, an ability to analyze the data to see how and why specific regulations were made, and a mechanism to challenge the regulation. *See Cty. of Butler*, at 90 (W.D. Pa. Sept. 14, 2020). Instead, Defendant, the Philadelphia Department of Public Health, through its Board of Health, all unelected officials who do not have legislative powers, enacted the Safer at Home Restrictions pursuant to their unfettered and unchecked discretion. Their reasoning has not been explained, nor has any appeal mechanism been provided. They did not follow the procedural requirements of the Philadelphia Home Rule Charter. Simply put, the Defendants have created a system where they can deprive citizens of their property rights, intrude on their business, and destroy their livelihood, without any potential recourse for those affected by the government's actions.

**d. AN EMERGENCY INJUNCTION IS NECESSARY TO STOP THE DEFENDANTS FROM VIOLATING THE CONSTITUTION BY USURPING THE LEGISLATIVE FUNCTION AND DEPRIVING PLAINTIFF OF THE RIGHT TO WORK**

Preliminary injunctive relief is an equitable remedy available in equity actions. *Barcia v. Fenlon*, 37 A.3d 1, 6 (Pa. Cmwlth. 2012). "A preliminary injunction is designed to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status quo until the legality of the challenged conduct can be determined on the merits." *Greater Nanticoke Area Education Association v. Greater Nanticoke Area School District*, 938 A.2d 1177, 1183 (Pa. Cmwlth. 2007).To issue a preliminary injunction pursuant to Pa. R.C.P. § 1531(a), Plaintiff must show:

    a. An injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

    b. Greater injury will result from refusing an injunction than from granting it, and an injunction will not substantially harm other interested parties in the proceedings;

    c. A preliminary injunction will properly restore the parties to their status as it existed immediately before the alleged wrongful conduct;

    d. The moving party is likely to prevail on the merits;

    e. The injunction is reasonably suited to abate the offending activity; and

    f. A preliminary injunction will not adversely affect the public interest.

*See e.g. Summit Towne Centre, Inc. v. Show of Rocky Mount, Inc.*, 573 Pa. 637, 646-47 (2003).

### i.  PLAINTIFF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM

A party seeking a preliminary injunction must show the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. *Com. Ex rel. Corbett v. Snyder*, 977 A.2d 28, 41 (Pa. Commw. Ct. 2009).

This Honorable Court granted a preliminary injunction in *SPTR, Inc. v. City of Phila*, 2015 Phila. Ct. Com. Pl. LEXIS 280 at 17. In that case, Plaintiff was operating a beer garden in a yard on their property, until the City issued a cease and desist order because the yard was not properly zoned. *Id*. at 2-4.  Profits from the beer garden were going to be donated to charity.  *Id*. at 2. In finding that an injunction was warranted to prohibit the City from shutting down the beer garden, this Court found that Plaintiff suffered immediate and irreparable harm – namely, that "several charitable organizations relied upon the beer garden for funding, including funding a trip for a youth dance troupe to travel to New Orleans to teach local children, which would not be possible without said funding." *Id*. at 18. The Court indicated the license to operate a business, such as Plaintiff's, is a property right, which cannot be adequately compensated by damages.  *Id*. at 20.

Here, Plaintiff will suffer similar immediate and irreparable harm from the Safer at Home Restrictions, which provide the Board of Health with unchecked power to enforce mercurial regulations and continuous close Plaintiff's businesses, as well as, ban indoor dining. Plaintiff's businesses will be lost, their employees without jobs and plaintiff unable to provide themselves or their families with a way of life they have worked so hard to build and have struggled to maintain since Defendants began issuing shut down and restrictive operation Orders in March 2020.  The effect of the Safer at Home Restrictions will not only be felt by Plaintiff but will have reverberating effects throughout the community.

Furthermore, the ongoing imposition of fines, costs and business closures at the hands of the Defendants as they have assumed all three (3) branches of government is an immediate and irreparable harm. Plaintiff has no recourse but to bow to the Defendants' authority, and serve any imposed penalties, unless Defendants' power grab is placed in check and their Safer at Home Restrictions are enjoined. Each unconstitutional and invalid encroachment on the Plaintiff's property by the Defendants inflicts new harm on Plaintiff, and those similarly situated.

### ii.  **PLAINTIFF WILL SUFFER A GREATER INJURY THAN DEFENDANTS**

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands… may justly be pronounced the very definition of tyranny." *See* The Federalist No. 47 (J. Cooke ed. 1961).

The Defendants have violated the Pennsylvania Constitution's prohibition on delegated authority, as well as separation of powers, the Fourteenth Amendment's due process guarantee of the right to work, and the Philadelphia Home Rule Charter's procedural protections against arbitrary regulations. They have yet to provide the underlying data and rationale for their ban on indoor dining, gyms and catering, while leaving other indoor facilities open to the public, and permitting other mass gatherings in close environments, such as the Christmas Village. At the time the Safer at Home Restrictions were enacted, nearby counties remained operational and unrestricted, permitting indoor catering and catering events to continue. In light of such inconsistent, unexplained, unjustified, and nonsensical reasons for restricting businesses, such as Plaintiff's, the Defendants have failed to demonstrate any harm if their power was placed in check and their Safer at Home Restrictions enjoined.

### iii. <u>A PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO</u>

An injunction is proper to restore the parties to their status quo as it existed "immediately prior to the alleged wrongful conduct." *Summit Towne Ctr., Inc.*, 828 A.2d at 1001.

This Court has found that the status quo was preserved when a business (the beer garden) was operating prior to a cease order, and an injunction would return it to operation. *SPTR, Inc.*, 2015 Phila. Ct. Com. Pl. LEXIS 280 at 23. Here, enjoining the Safer at Home Restrictions would prevent the city from shutting down Plaintiff's business with aggressive and unnecessary enforcement tactics, thus returning it to its unencumbered status before the Defendant's regulations.

### iv. <u>PLAINTIFF'S RIGHT TO RELIEF IS CLEAR</u>

Pursuant to the Pennsylvania Rules of Civil Procedure and case law, the party seeking an injunction must show that their right to relief is clear. *Anglo-Am. Ins. Co. v. Molin*, 547 Pa. 504, 691 A.2d 929, A.2d 929, 933-34 (1997). Plaintiff, as well as all Philadelphians, have an absolute right to their Constitutionally guaranteed rights and liberties and to be free from being subjected to oppressive, arbitrary, overly broad and unsubstantiated restrictions that are derived from an administrative agency's abuse of authority and power that has been specifically prohibited by our Supreme Court's rulings.

Plaintiff has a right to relief when the City is required to issue permits for the operation of a business, but failed to follow the Philadelphia Code. *SPTR, Inc.*, 2015 Phila. Ct. Com. Pl. LEXIS 280 at 23. In the instant case, Plaintiff cannot operate their business if the Defendants impose regulations prohibiting its operation, and Defendants have not followed the required procedures, as set forth in the Philadelphia Home Rule Charter. Moreover, Plaintiff's constitutional rights are

being actively violated by the Defendants, in their encroachment into the legislative, executive and judicial branches of government, and impeding on Plaintiff's right to earn a living.

### v. AN INJUNCTION IS REASONABLY SUITED TO ABATE THE OFFENDING ACTIVITY

A preliminary injunction must also be reasonably suited to abate the offending activity. *Com. ex rel. Corbett v. Snyder*, 977 A.2d 28, 48 (Pa. Commw. Ct. 2009). Here, an injunction would stop the Defendants from enforcing the Safer at Home Restrictions, which are unconstitutional. Thus, the offending activity would be prohibited, and abated, by the injunction.

### vi. AN INJUNCTION IS IN THE PUBLIC INTEREST

A party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest. *Philadelphia v. District Council 33, AFSCME*, 528 Pa. 355, 598 A.2d 256, 260-61 (1991).

There is public interest in maintaining the guaranteed rights of the United States' Constitution and Pennsylvania Constitution, including the right to work, and the right to be free from usurpation of power by administrative agencies. The public has an interest in not having their rights and way-of-life trampled by the arbitrary, unexplained, and unjustified conduct of the Defendants. There is a public interest in avoiding Plaintiff's economic destruction, and the reverberating cataclysmic impact on the livelihoods of thousands of residents of Philadelphia through the shutdown of small businesses, like Plaintiff's. The vibrancy of neighborhoods, maintained by a strong foundation of small businesses, would remain intact. Tens of thousands of Philadelphians who depend on the restaurant industry for work and income, and to support their families and feed their kids, will not be displaced. The city, already dealing with a crime epidemic, will not be confronted with the sudden influx of thousands of newly unemployed citizens and a

dearth of job opportunities, while the Defendants close the last of the remaining businesses. Granting an injunction preserves the status quo. Denying an injunction will alter the nature of the City of Philadelphia for years into the future.

### e. **PRAYER FOR DECLARTORY JUDGMENT AS ANCILLARY RELIEF**

In any civil action, a party may include in the claim for relief a prayer for declaratory relief and the practice and procedure shall follow, as nearly as may be, the rules governing that action. _See_ _Pa.R.C.P. 1602._ The Declaratory Judgments Act, **which is to be liberally construed and administered**, **was promulgated to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations**. _Pa.Democratic Party v. Boockvar,_ 238 A.2d 345 (2020) (emphasis added); _see also 42. Pa.C.S. §7541(a)._

The Act  provides in pertinent part as follows:

> "Any person… whose rights, status, or other legal relations are affected by a statute, municipal ordinance...may have determined any question of construction or validity arising under the... statute, ordinance… obtain a declaration of rights, status, or other legal reations thereunder. _Pa. Democratic Party_, supra, _quoting 42 Pa.C.S. §7533._

As has been set forth at length herein, it is clear that Plaintiff's Constitutional rights are directly affected by the Defendants' ongoing restrictions. Liberally construing and applying the right to declaratory relief as is prescribed b y the Act and our Supreme Court, it is clear that Plaintiff is entitled to declaratory relief from the uncertainty and insecurity that surrounds their Constitutional rights as set forth herein. See _Pa. Democratic Party, supra._

Therefore, Plaintiff prays that this Court grant Declaratory Relief and Order that Defendants' Emergency Regulations are void and unenforceable for the following reasons:

- Defendants' Emergency Regulations, including the Safer at Home Restrictions are are violative of Plaintiff's Constitutional and Civil Rights;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the Non-Delegation and Separation of Powers of the Pennsylvania Constitution;

- Defendants' Emergency Regulations, including the Safer at Home Restrictions violate the requirements of the Philadelphia Home Rule Charter, as well as, City Council's intent.

## V.   <u>CONCLUSION</u>

The liberties protected by the Constitution are not fair-weather freedoms that can be cast aside in times of trouble, including during a pandemic. *Cty. of Butler v. Wolf*, 2020 U.S. Dist. LEXIS 167544, at 99 (W.D. Pa. Sept. 14, 2020). The solution to a crisis can never be permitted to supersede the liberty and freedom that stands as the bedrock of our society. Indeed, the Constitution sets lines that may not be crossed.  *Id*. at 100.

The "Safer at Home" Restrictions violate bedrock constitutional principles of our Commonwealth and our nation, namely, the prohibition against the delegation of power, as well as the separation of powers, and the due process right to work. Contrary to these constitutional guarantees, since March 2020 with emergency regulations, and most recently by enacting and enforcing the Safer at Home Restrictions, Defendants have encroached into impermissible territory across all three (3) branches of government – legislative, executive, and judicial. The accrual of this unchecked power by Defendants is antithetical to the constitutional principles set forth in the founding of our nation. As the Pennsylvania Supreme Court has held: "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." *See Protz v. Workers' Comp. Appeal Bd.*, 639 Pa. 645, 656 (2017) The Federalist No. 47 (J. Cooke ed. 1961)

Additionally, the Safer at Home Restrictions, by placing arbitrary and unjustified restrictions across entire industries, such as indoor dining and catering, impermissibly impedes on the freedom to work. **As set forth by Justice Douglas of the United States Supreme Court:**

> The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on Politics, 'A man has a right to be employed, to be trusted, to be loved, to be revered.' It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.

> *Barsky v. Board of Regents of University of State of New York*, 347 U.S. 442, 472 (1954) (Douglas, J., dissenting).

An economy is not a machine that can be shut down and restarted at will by government. It is an organic system made up of free people each pursuing their dreams. The ability to support oneself is essential to free people in a free economy. *Butler*, 2020 U.S. Dist. LEXIS 167544, at 92. The ability to earn a living by pursing one's calling and to support oneself and one's family is not an economic good, it is a human good. *Id.* at 93. This essential right and human good is trampled by the ongoing arbitrary, unconstitutional actions of Defendants, and most recently with the "Safer at Home" Restrictions.

Arbitrary has been defined by the Pennsylvania Supreme Court as "based on random or convenient selection or choice rather than on reason or nature." *Thunberg v. Strause*, 545 Pa. 607 (1996). Defendants' ongoing restrictions, and most recently the Safer at Home Restrictions, have never been supported with data, or undergone any of the constitutional and procedural safeguards required to ensure that regulations are not *ad hoc* and irrational. **This Honorable Court should not stand for such an unprecedented power grab and shockingly arbitrary shutdown by the Defendants, and must enjoin them from continuing to violate the rights of the citizens of Philadelphia.**

Respectfully Submitted,

**FRITZ & BIANCULLI, LLC**

By:   ***/s/ Brian E. Fritz***
BRIAN E. FRITZ, ESQUIRE (84044)
WILLIAM A. WEISS, ESQUIRE (309817)
*Attorneys for Plaintiff, Philadelphia Restaurant Owners Against Lockdown, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian E. Fritz, Esquire, attorney for Plaintiff, hereby certify that a true and correct copy of Plaintiff's Complaint in Equity, Motion for Special and Preliminary Injunction, and Memorandum of Law, were served on the following defendants:

JAMES KENNEY, in his official capacity
as Mayor of the City of Philadelphia
City Hall, Rm. 204
Philadelphia, PA 19107

THOMAS A. FARLEY, in his official
capacity as Health Commissioner
1101 Market Street, 13th Floor
Philadelphia, PA 19107

CITY OF PHILADELPHIA
1515 Arch Street, Suite 15
Philadelphia, PA 19102

PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH
1101 Market Street, 13th Floor
Philadelphia, PA 19107


By:___*/s/ Brian E. Fritz*_____
BRIAN E. FRITZ, ESQUIRE (84044)
*Attorneys for Plaintiff, Philadelphia Restaurant*
*Owners Against Lockdown, LLC*

DATE: December 18, 2020

# EXHIBIT "A"



CITY OF PHILADELPHIA

OFFICE OF THE MAYOR
DEPARTMENT OF PUBLIC HEALTH

## EMERGENCY ORDER CONCERNING ADDITIONAL LIMITATIONS ON VISITING, GATHERINGS, EVENTS AND BUSINESSES FOR FALL/WINTER 2020-21, ESTABLISHING ADDITONAL SAFETY MEASURES TO PREVENT THE SPREAD OF THE 2019 NOVEL CORONAVIRUS (COVID-19) AND CONTINUING TO ADVISE THAT PHILADELPHIANS ARE SAFER AT HOME

**WHEREAS**, the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS**, on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS**, on March 12, 2020, the City's Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS,** on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS,** on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS**, on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the

Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS,** the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19): Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS,** on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS**, since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities;  and

**WHEREAS**, on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS,** although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City has taken a cautious approach to moving to the Green Phase; and

**WHEREAS** on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS,** at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in recent days, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS,** after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS,** the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS,** these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS,** there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS,** the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS,** the spread of COVID-19 through outdoor gatherings and activities is

3

less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS**, pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS**, Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease;

**NOW, THEREFORE**, James F. Kenney, Mayor of the City of Philadelphia, and Dr. Thomas A. Farley, Health Commissioner of the City of Philadelphia, pursuant to all authority granted under the Philadelphia Home Rule Charter, The Philadelphia Code, the Regulations of the Board of Health of the City of Philadelphia and applicable state law, hereby **ORDER** as follows:

**Section 1.      Scope and Consistency with Prior Emergency Orders.**

This Order modifies, but not does not replace, some of the City's previous emergency COVID-19 related health orders, as applicable.  Any such previous order in effect that addresses and restricts any matter or activity not addressed in this Order, or that authorizes any activity not addressed in this Order, remains in effect.  To the extent any aspect of this Order is more restrictive than any such previous order or requirement, or in the event of a conflict between any such orders and this Order, this Order controls.  All applicable health and safety guidance incorporated in prior orders remains in effect for all activities allowed under this Order.  To the extent any such guidance conflicts or is less restrictive than this Order, this Order controls.

**Section 2.      Definitions.**

For purposes of this Order:

A. "Gathering" means any pair or group of individuals who reside in different households who are in close proximity of one another for more than several minutes.

4

B. "Indoor" means a location enclosed by three or more walls or other non-permeable barriers and an overhead covering, such as a roof or a tent top. Tents with one side open are considered indoor spaces. In contrast, a space that is fully open on two or more sides is considered an outdoor space.

**Section 3.**   **Indoor and Outdoor Social Gatherings of Persons from Different Households**

A. Except as otherwise provided in this Order, indoor gatherings of persons from more than one household in a residence or other private indoor location, other than to provide necessary care for a family member or as necessary due to emergency circumstances, are prohibited.

   1. Governmental and private personal care services (*e.g.*, governmental home visitation programs, home health aides, and childcare services) that require access to a person's home to provide such services are permitted.

   2. Home-based construction, renovation, repair and maintenance is permitted.

   3. Any person from outside a household entering the home for a purpose authorized under this or any other applicable order shall strictly comply with applicable Commonwealth and City guidance, including masking and distancing requirements.

B. Except as otherwise provided in this Order, outdoor social gatherings of persons including people from more than one household are limited as follows:

   1. No more than 10 people are permitted per 1,000 square feet of occupiable space and no more than 2,000 people total may gather;

   2. No food or drink service may be provided (*e.g.*, by a caterer) in any such gathering, and food or drink may only be consumed in a gathering of ten or fewer people in which all individuals maintain at least 6 feet of physical distance from all individuals who reside in a different household (including, for example, not sharing a table with members of a different household), according to applicable guidance, and all individuals gathering must remove their masks only while actively consuming food or drink. This rule applies to private gathering and not to restaurant dining, to which specific restaurant dining rules apply.

5

4.  Outdoor social gatherings are subject to all applicable guidance and requirements of the Commonwealth and the City, including masking and social distancing requirements.

**Section 4.     Educational Settings.**

A.  Secondary education (high schools); colleges and universities; and all other types of vocational, trade or other classroom-based educational programs are prohibited from conducting in-person classes or other instruction, except for the following, in each case subject to strict compliance with applicable Commonwealth and City guidance:

1.  Childcare and early education programs;

2.  Elementary and middle school education (K-8th grades);

3.   Virtual learning centers for supervised on-line learning (Access Centers); and

4.  Certain health care and allied professional clinical instruction as further provided in guidance of the Department of Public Health.

**Section 5.     Restaurants and Catered Events.**

A.  Indoor on-site dining at restaurants or other food service businesses is prohibited.

B.  Outdoor dining service may continue, but is limited to no more than four people per table.  No outdoor dining service for unseated customers is permitted.

C.  Catering service is prohibited at any gathering, or indoor or outdoor events or in connection with any activity comprising more than one household.

D.  Takeout and delivery service continue to be permitted.

**Section 6.**     **Retail Stores, Personal Care Services and Office-Based Settings.**

A. All non-restaurant retail and personal care service establishments, as well as indoor shopping malls, must maintain density limits of no more than 5 people per 1,000 square feet of occupiable space, as further defined in, and except as otherwise specifically provided with respect to a particular activity in, guidance of the Department of Public Health, and such activities must remain in strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

B. All work in office-based settings that does not involve the direct provision of services (such as medical services) must generally continue to be conducted remotely, and only those on-site business operations that are not conducive to operating remotely may be conducted on-site, all as required pursuant to the May 29, 2020 Yellow Phase Order. Density limits of no more than 5 people per 1,000 square feet of occupiable space must be maintained in connection with all such work, as well as strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

**Section 7.**     **Religious, Cultural, Recreational, Sports and Entertainment Activities.**

A. The following indoor facilities are prohibited from operating:  theaters, concert venues, museums, movie theaters, arcades, casinos, bowling alleys, private clubs, event centers and locations rented for wedding and other celebratory events and all other similar entertainment, recreational or social facilities.

B. The Zoological Society may operate outdoor areas only.

C. Libraries may not operate, other than to provide curbside book pickup and dropoff.

D. Occupancy of houses of worship and funeral homes is limited to 5% of the posted maximum occupancy limit, or if there is no posted limit, 5 people per 1,000 square feet of occupiable space.

E. All outdoor religious, cultural, recreational, entertainment or sporting events are limited in operation to the following:

1. For a facility with a defined seating capacity, no more than 10% of capacity may be utilized.

2. For a facility without seats, or where maximum capacity is otherwise undefined, no more than 10 people per 1,000 square feet of occupiable space.

3. For any facility or location, no more than 2,000 people total are permitted.

**Section 8.     Physical Recreation and Activities.**

A. Gyms and all other indoor facilities for physical exercise and training are prohibited from operating.  Trainers may operate classes in outdoor physical activities in accordance with outdoor gathering limitations of Section 2 and in compliance with all applicable guidance, including masking and social distancing requirements.

B. Formally organized games, competitions and practices in outdoor sports or sporting activities are not permitted for any age group, except as further provided. Formally organized means organized by a school, league or other entity or person that arranges for competition among teams, including organized teams themselves, involving any degree of advanced planning.

C. Collegiate and professional sports may operate solely pursuant to health and safety plans specifically approved by the Department of Public Health, which shall include spectators at games or events only as specifically authorized in such plans.

**Section 9.     Additional Responsibility for Masking, Density, and Signage Requirements.**

A. The owner, operator or host of any business, facility, workplace or gathering or event location shall also be liable and subject to fines and penalties under this Order for non-compliance by employees, customers, members, visitors and any other occupants of the business, facility, workplace or gathering or event location with the following, subject to fines and all other remedies under this Order:

8

1. All applicable masking requirements, established under the June 26, 2020 Emergency Order Concerning the Use of Face Coverings to Prevent the Spread of 2019 Novel Coronavirus (COVID-19) (the "June 26, 2020 Mask Order"), this Order, or any other applicable guidance documents; and

2. All applicable density limitations and social distancing requirements, as established under this Order or any other applicable order or guidance document; and

3. This liability shall be in addition to the personal responsibility and liability under this and all other Emergency Health Orders of individual employees, customers, members, visitors and other occupants of the business, facility, workplace or event location.

B. The owner, operator or host of any business, facility, workplace or gathering or event location is required to prominently display signage advising of health and safety requirements in accordance with applicable guidance of the Department of Public Health.

## Section 10.   Additional Mask Requirements.

A. The following additions and amendments are made to the June 26, 2020 Mask Order:

1. All individuals are required to wear a face mask or other face covering properly, which means in a manner that fully covers the mouth and nose, consistent with applicable guidance, at all times when they are in the same room with or are otherwise in the company of a person who lives in a different household, and at all times when they are likely, in the near future, to encounter a person from another household, whether indoors or outdoors. This requirement applies in addition to any other requirements for wearing masks identified in the June 26, 2020 Mask Order.

2. The Department of Public Health strongly encourages the use of higher-quality masks (*e.g.*, cloth multi-layer rather than single-layer) that fit snugly around the nose and chin without gaps around the sides of the face.

3. Section 1(B)(a)(1) of the June 26, 2020 Mask Order, which provides for an exception to the masking requirement, is hereby amended, to reduce the age at which children are exempted from the masking requirement from 8 years or younger to younger than 2 years.

**Section 11.    Interpretation and Implementation.**

A.    Except to the extent of a direct conflict, this Order generally shall be interpreted as consistent with applicable orders and requirements of the Commonwealth of Pennsylvania.  In the event of a direct conflict, the most restrictive order or requirement controls.  The City shall continue to adhere to waivers, exemptions, or recategorizations issued by the Commonwealth from its emergency orders, subject to all applicable laws and regulations.  The City shall continue reviewing inquiries and submissions regarding the applicability of the City's orders to businesses and activities.

B.    Consistent with prior emergency health orders of the City, this Order does not apply to government operations of the City of Philadelphia.  Individuals interacting with government officers and employees must comply with the requirements of this Order and other City orders and guidance.

C.    The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.

D.    Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

E.       This Order shall be effective at **5 p.m.** on **November 20, 2020,** and shall
          expire at the end of **January 1, 2021,** unless otherwise rescinded,
          superseded, or amended by further Order.

Date:   November 16, 2020

James F. Kenney, Mayor
City of Philadelphia

Thomas A. Farley, MD, MPH
Health Commissioner
City of Philadelphia

# EXHIBIT "B"

| | |
|---|---|
| **CITY OF PHILADELPHIA**<br>**DEPARTMENT OF PUBLIC HEALTH** | BOARD OF HEALTH: November 24, 2020<br>LAW DEPARTMENT: November 24, 2020<br>RECORDS DEPARTMENT: |

## EIGHTEENTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING THE CONTROL AND PREVENTION OF COVID-19 (SAFER AT HOME FALL-WINTER RESTRICTIONS)

**WHEREAS**, the Pennsylvania Disease Control and Prevention Act of 1955, 1956, April 23, P.L. 1510, 35 P.S. § 52.1 *et seq.*, (the DCPA) and Chapter 6-200 of The Philadelphia Code authorize the Board of Health to establish lists of reportable diseases and conditions, and further provide that the Board and the Department of Public Health are responsible for implementing appropriate disease control and prevention measures in order to limit the spread of disease in an epidemic emergency; and

**WHEREAS**, the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS**, on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS**, on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS**, on March 12, 2020, the Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS**, on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS**, on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS**, on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS**, the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19):  Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS**, on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS**, since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities; and

**WHEREAS**, on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS**, although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City had taken a cautious approach to moving to the Green Phase; and

**WHEREAS**, on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS**, at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in November, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS**, after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS**, the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS**, these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS**, there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS**, the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings, are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS**, the Department of Public Health has also identified indoor dining as a significant driver of the COVID-19 pandemic, in part because it is not possible to wear a mask while eating or drinking; and

**WHEREAS**, indoor gatherings and other activities, including indoor physical activity at gyms or other facilities, create significant opportunities for the transmission of COVID-19, particularly when compared to outdoor gatherings and other activities and particularly when participants are less transient; and

**WHEREAS**, the spread of COVID-19 through outdoor gatherings and activities is less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS**, pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS**, Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease; and

**WHEREAS**, on November 16, 2020, the Mayor and the Health Commissioner issued an "Emergency Order Concerning Additional Limitations on Visiting, Gatherings, Events and Businesses for Fall/Winter 2020-21, Establishing Additional Safety Measures to Prevent the Spread of the 2019 Novel Coronavirus (COVID-19) and Continuing to Advise That Philadelphians Are Safer at Home," ("November 16, 2020 Safer at Home Order") which, *inter alia*, restricted certain activities, including indoor and outdoor gatherings and educational, business, and other activities, and modified the preexisting masking requirement, subject to certain exceptions and other terms; and

**WHEREAS**, the Board of Health agrees with these determinations, and has recognized that the situation involving the COVID-19 pandemic is fast moving and often requires changes to control measures both to impose additional measures and to roll back required measures when appropriate; and

**WHEREAS**, consistent with the foregoing, the Board hereby promulgates the below Eighteenth Supplemental Emergency Regulation Governing the Control and Prevention of COVID-19 (Safer at Home Fall-Winter Restrictions) to adopt the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, as a temporary regulation effective upon delivery to the Department of Records, while the remaining procedures and formalities of Section 8-407 are followed to promulgate these amendments as a permanent regulation; and

**NOW, THEREFORE,** the Board of Health hereby adopts the following regulation, effective immediately:

1.     This Emergency Regulation supplements the Philadelphia Department of Public Health's *Regulations Governing the Control of Communicable and Non-communicable Diseases and Conditions* and its other emergency regulations governing the control and prevention of COVID-19.

2.     The Board hereby fully adopts the Mayor and Health Commissioner's November 16, 2020 Safer at Home Order, which is attached hereto as Attachment A.

3.     The Board's emergency regulations governing the control and prevention of COVID-19 are hereby modified to the extent they adopt emergency orders that are themselves modified by the November 16, 2020 Order, in accordance with Section 1 of the November 16, 2020 Order.

4.     This Emergency Regulation shall be effective upon filing with the Department of Records and remain effective until expressly superseded or repealed by the Board at the conclusion of the COVID-19 emergency.

Attachment A



**CITY OF PHILADELPHIA**

**OFFICE OF THE MAYOR**
**DEPARTMENT OF PUBLIC HEALTH**

**EMERGENCY ORDER CONCERNING ADDITIONAL LIMITATIONS**
**ON VISITING, GATHERINGS, EVENTS AND BUSINESSES**
**FOR FALL/WINTER 2020-21,**
**ESTABLISHING ADDITONAL SAFETY MEASURES TO PREVENT**
**THE SPREAD OF THE 2019 NOVEL CORONAVIRUS (COVID-19) AND**
**CONTINUING TO ADVISE THAT PHILADELPHIANS ARE SAFER AT HOME**

**WHEREAS,** the 2019 novel coronavirus disease, COVID-19, can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS,** on March 6, 2020, in response to the emerging spread of COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS,** on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS,** on March 12, 2020, the City's Board of Health by emergency regulation added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS,** on March 17, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS,** on March 19, 2020, the Governor and the Secretary of the Pennsylvania Department of Health issued orders requiring all non-life-sustaining businesses to close across the Commonwealth, to help stop the spread of COVID-19 and the Governor and Secretary updated the aforementioned orders and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and multiple times thereafter; and

**WHEREAS,** on March 22, 2020, the Mayor and the Health Commissioner jointly issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which superseded the

Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, and which was approved as a regulation of the City by the Board of Health on March 26, 2020, which expressly authorized the Health Commissioner to issue such additional orders as the Commissioner determines are necessary or appropriate to limit the spread of COVID-19; and

**WHEREAS**, on April 15, 2020, the Secretary of Health of the Commonwealth of Pennsylvania issued an Order "Directing Public Health Safety Measures for Businesses Permitted to Maintain In-person Operations," which requires comprehensive safety measures to be employed in all businesses maintaining physical operations, including standards for cleaning and disinfecting high-touch areas, establishing protocols for businesses exposed to probable or confirmed cases of COVID-19, limiting the numbers of employees on the premises and ensuring access to protective and sanitary equipment and supplies; and

**WHEREAS**, on April 23, 2020, the Governor announced a *Plan for Pennsylvania* that set residents and businesses on a path to recovery from the COVID-19 pandemic while continuing to protect life from the dangers of this deadly virus, which included, *inter alia*, Red, Yellow, and Green Phases of reopening; and

**WHEREAS,** the Mayor and Health Commissioner determined on May 29, 2020, that Philadelphia could move to the Yellow Phase with additional, Philadelphia-specific restrictions that would apply in addition to restrictions established by the Governor, including limitations on outdoor dining, and executed an Order entitled "Emergency Order Allowing Limited Reopening of Businesses, Advising Philadelphians That They are Safer at Home, and Establishing Safety Measures to Prevent the Spread of 2019 Novel Coronavirus (COVID-19): Yellow Phase of Reopening" ("Yellow Phase Order") to implement that decision; and

**WHEREAS,** on or around May 28, 2020, the City's Department of Public Health released *Safe Mode: Guidelines for Safer Operations During the COVID-19 Pandemic*, which has been periodically updated and which provides specific reopening guidance for specific types of facilities; and

**WHEREAS**, since that time, the Mayor and Health Commissioner, in recognition that cautious reopening with constant review of potential impacts on public health is in the best interests of Philadelphia, have issued a series of Orders gradually easing restrictions with respect to many different types of business and activities; and

**WHEREAS**, on June 26, 2020, the Mayor and Health Commissioner issued an order requiring the wearing of masks in many indoor and outdoor situations, and on July 1, 2020, the Governor issued a similar order; and

**WHEREAS,** although the Governor announced that Philadelphia was authorized to join other southeastern Pennsylvania counties in moving to the Green Phase of reopening on June 26, 2020, the Mayor and Health Commissioner, in consideration of public health data and the noted effects on public health in June and July in states that have hastily reopened, the City has taken a cautious approach to moving to the Green Phase; and

**WHEREAS** on July 3, 2020, the Mayor and Health Commissioner issued an Order that moved the City from the Yellow Phase to a Modified Green Phase and that, among other things, generally increased the permitted capacity for outdoor gatherings and small events, the rules for which were subsequently modified by further Orders on September 15, 2020 and October 23, 2020 to allow greater capacity at such events; and

**WHEREAS,** at this time the country is experiencing a sharp increase in COVID-19 case counts, repeatedly breaking daily records in recent days, and is currently averaging more than 1,000 daily COVID-19 deaths (using a 7-day average); and

**WHEREAS,** after a steady decline and plateauing of daily COVID-19 case counts in Philadelphia beginning in May of this year, daily case counts have increased dramatically to levels exceeding the peak experienced in April; and

**WHEREAS,** the Department of Public Health has identified a recent, significant uptick in percent positivity among those tested for COVID-19; and

**WHEREAS,** these alarming national and local trends require tailored but significant intervention to limit the community spread of COVID-19 and its attendant morbidity and mortality; and

**WHEREAS,** there is substantial evidence that widespread mask use can prevent the spread of COVID-19, and observational data has suggested that people who wear masks and become infected may be less likely to develop severe disease; and

**WHEREAS,** the Department of Public Health and other public health experts have identified that, although COVID-19 continues to be spread through a variety of settings and activities, social gatherings, including small social gatherings are a significant and deceptively dangerous driver of the COVID-19 pandemic; and

**WHEREAS,** the spread of COVID-19 through outdoor gatherings and activities is

less likely than through indoor gatherings and activities, but still represents a significant risk, particularly in the absence of strict mask usage, which is not possible when eating or drinking; and

**WHEREAS,** pursuant to authority set forth in The Philadelphia Code and The Philadelphia Home Rule Charter, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS,** Sections 6-205 and 6-206 of The Philadelphia Code and applicable state law provide that the Department of Public Health may by order forbid the congregation of persons when necessary to prevent the further spread of a communicable and quarantinable disease and may take such other measures as are necessary to prevent the spread of such disease;

**NOW, THEREFORE,** James F. Kenney, Mayor of the City of Philadelphia, and Dr. Thomas A. Farley, Health Commissioner of the City of Philadelphia, pursuant to all authority granted under the Philadelphia Home Rule Charter, The Philadelphia Code, the Regulations of the Board of Health of the City of Philadelphia and applicable state law, hereby **ORDER** as follows:

**Section 1.      Scope and Consistency with Prior Emergency Orders.**

This Order modifies, but not does not replace, some of the City's previous emergency COVID-19 related health orders, as applicable.  Any such previous order in effect that addresses and restricts any matter or activity not addressed in this Order, or that authorizes any activity not addressed in this Order, remains in effect.  To the extent any aspect of this Order is more restrictive than any such previous order or requirement, or in the event of a conflict between any such orders and this Order, this Order controls.  All applicable health and safety guidance incorporated in prior orders remains in effect for all activities allowed under this Order.  To the extent any such guidance conflicts or is less restrictive than this Order, this Order controls.

**Section 2.      Definitions.**

For purposes of this Order:

A. "Gathering" means any pair or group of individuals who reside in different households who are in close proximity of one another for more than several minutes.

4

B. "Indoor" means a location enclosed by three or more walls or other non-permeable barriers and an overhead covering, such as a roof or a tent top. Tents with one side open are considered indoor spaces. In contrast, a space that is fully open on two or more sides is considered an outdoor space.

**Section 3.    Indoor and Outdoor Social Gatherings of Persons from Different Households**

A. Except as otherwise provided in this Order, indoor gatherings of persons from more than one household in a residence or other private indoor location, other than to provide necessary care for a family member or as necessary due to emergency circumstances, are prohibited.

1. Governmental and private personal care services (*e.g.*, governmental home visitation programs, home health aides, and childcare services) that require access to a person's home to provide such services are permitted.

2. Home-based construction, renovation, repair and maintenance is permitted.

3. Any person from outside a household entering the home for a purpose authorized under this or any other applicable order shall strictly comply with applicable Commonwealth and City guidance, including masking and distancing requirements.

B. Except as otherwise provided in this Order, outdoor social gatherings of persons including people from more than one household are limited as follows:

1. No more than 10 people are permitted per 1,000 square feet of occupiable space and no more than 2,000 people total may gather;

2. No food or drink service may be provided (*e.g.*, by a caterer) in any such gathering, and food or drink may only be consumed in a gathering of ten or fewer people in which all individuals maintain at least 6 feet of physical distance from all individuals who reside in a different household (including, for example, not sharing a table with members of a different household), according to applicable guidance, and all individuals gathering must remove their masks only while actively consuming food or drink. This rule applies to private gathering and not to restaurant dining, to which specific restaurant dining rules apply.

5

    4.  Outdoor social gatherings are subject to all applicable guidance and requirements of the Commonwealth and the City, including masking and social distancing requirements.

**Section 4.**    **Educational Settings.**

A. Secondary education (high schools); colleges and universities; and all other types of vocational, trade or other classroom-based educational programs are prohibited from conducting in-person classes or other instruction, except for the following, in each case subject to strict compliance with applicable Commonwealth and City guidance:

    1.  Childcare and early education programs;

    2.  Elementary and middle school education (K-8th grades);

    3.  Virtual learning centers for supervised on-line learning (Access Centers); and

    4.  Certain health care and allied professional clinical instruction as further provided in guidance of the Department of Public Health.

**Section 5.**    **Restaurants and Catered Events.**

A. Indoor on-site dining at restaurants or other food service businesses is prohibited.

B. Outdoor dining service may continue, but is limited to no more than four people per table.  No outdoor dining service for unseated customers is permitted.

C. Catering service is prohibited at any gathering, or indoor or outdoor events or in connection with any activity comprising more than one household.

D. Takeout and delivery service continue to be permitted.

**Section 6.**    **Retail Stores, Personal Care Services and Office-Based Settings.**

A. All non-restaurant retail and personal care service establishments, as well as indoor shopping malls, must maintain density limits of no more than 5 people per 1,000 square feet of occupiable space, as further defined in, and except as otherwise specifically provided with respect to a particular activity in, guidance of the Department of Public Health, and such activities must remain in strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

B. All work in office-based settings that does not involve the direct provision of services (such as medical services) must generally continue to be conducted remotely, and only those on-site business operations that are not conducive to operating remotely may be conducted on-site, all as required pursuant to the May 29, 2020 Yellow Phase Order.  Density limits of no more than 5 people per 1,000 square feet of occupiable space must be maintained in connection with all such work, as well as strict compliance with all applicable Commonwealth and City guidance, including masking and social distancing requirements.

**Section 7.**    **Religious, Cultural, Recreational, Sports and Entertainment Activities.**

A. The following indoor facilities are prohibited from operating:  theaters, concert venues, museums, movie theaters, arcades, casinos, bowling alleys, private clubs, event centers and locations rented for wedding and other celebratory events and all other similar entertainment, recreational or social facilities.

B. The Zoological Society may operate outdoor areas only.

C. Libraries may not operate, other than to provide curbside book pickup and dropoff.

D. Occupancy of houses of worship and funeral homes is limited to 5% of the posted maximum occupancy limit, or if there is no posted limit, 5 people per 1,000 square feet of occupiable space.

E. All outdoor religious, cultural, recreational, entertainment or sporting events are limited in operation to the following:

7

1. For a facility with a defined seating capacity, no more than 10% of capacity may be utilized.

2. For a facility without seats, or where maximum capacity is otherwise undefined, no more than 10 people per 1,000 square feet of occupiable space.

3. For any facility or location, no more than 2,000 people total are permitted.

**Section 8.     Physical Recreation and Activities.**

A. Gyms and all other indoor facilities for physical exercise and training are prohibited from operating.  Trainers may operate classes in outdoor physical activities in accordance with outdoor gathering limitations of Section 2 and in compliance with all applicable guidance, including masking and social distancing requirements.

B. Formally organized games, competitions and practices in outdoor sports or sporting activities are not permitted for any age group, except as further provided. Formally organized means organized by a school, league or other entity or person that arranges for competition among teams, including organized teams themselves, involving any degree of advanced planning.

C. Collegiate and professional sports may operate solely pursuant to health and safety plans specifically approved by the Department of Public Health, which shall include spectators at games or events only as specifically authorized in such plans.

**Section 9.     Additional Responsibility for Masking, Density, and Signage Requirements.**

A. The owner, operator or host of any business, facility, workplace or gathering or event location shall also be liable and subject to fines and penalties under this Order for non-compliance by employees, customers, members, visitors and any other occupants of the business, facility, workplace or gathering or event location with the following, subject to fines and all other remedies under this Order:

1. All applicable masking requirements, established under the June 26, 2020 Emergency Order Concerning the Use of Face Coverings to Prevent the Spread of 2019 Novel Coronavirus (COVID-19) (the "June 26, 2020 Mask Order"), this Order, or any other applicable guidance documents; and

2. All applicable density limitations and social distancing requirements, as established under this Order or any other applicable order or guidance document; and

3. This liability shall be in addition to the personal responsibility and liability under this and all other Emergency Health Orders of individual employees, customers, members, visitors and other occupants of the business, facility, workplace or event location.

B. The owner, operator or host of any business, facility, workplace or gathering or event location is required to prominently display signage advising of health and safety requirements in accordance with applicable guidance of the Department of Public Health.

## Section 10.   Additional Mask Requirements.

A. The following additions and amendments are made to the June 26, 2020 Mask Order:

1. All individuals are required to wear a face mask or other face covering properly, which means in a manner that fully covers the mouth and nose, consistent with applicable guidance, at all times when they are in the same room with or are otherwise in the company of a person who lives in a different household, and at all times when they are likely, in the near future, to encounter a person from another household, whether indoors or outdoors.  This requirement applies in addition to any other requirements for wearing masks identified in the June 26, 2020 Mask Order.

2. The Department of Public Health strongly encourages the use of higher-quality masks (*e.g.,* cloth multi-layer rather than single-layer) that fit snugly around the nose and chin without gaps around the sides of the face.

3. Section 1(B)(a)(1) of the June 26, 2020 Mask Order, which provides for an exception to the masking requirement, is hereby amended, to reduce the age at which children are exempted from the masking requirement from 8 years or younger to younger than 2 years.

**Section 11.    Interpretation and Implementation.**

A.    Except to the extent of a direct conflict, this Order generally shall be interpreted as consistent with applicable orders and requirements of the Commonwealth of Pennsylvania. In the event of a direct conflict, the most restrictive order or requirement controls. The City shall continue to adhere to waivers, exemptions, or recategorizations issued by the Commonwealth from its emergency orders, subject to all applicable laws and regulations. The City shall continue reviewing inquiries and submissions regarding the applicability of the City's orders to businesses and activities.

B.    Consistent with prior emergency health orders of the City, this Order does not apply to government operations of the City of Philadelphia. Individuals interacting with government officers and employees must comply with the requirements of this Order and other City orders and guidance.

C.    The owners, operators and individuals in possession of any facility subject to this Order must allow inspection of ongoing operations as a condition of operation.

D.    Failure to comply with this Order shall result in orders to cease operations and the imposition of penalties, fines, license suspensions, and other remedies as provided for by law, including such penalties and remedies set forth in the April 29, 2020 Emergency Regulation of the Board of Health Governing the Control and Prevention of COVID-19 Pertaining to Fines and Penalties (providing for fines of up to $2,000 per violation for businesses and $500 per violation for individuals).

E.  This Order shall be effective at **5 p.m.** on **November 20, 2020,** and shall expire at the end of **January 1, 2021,** unless otherwise rescinded, superseded, or amended by further Order.

Date:  November 16, 2020

James F. Kenney, Mayor
City of Philadelphia

Thomas A. Farley, MD, MPH
Health Commissioner
City of Philadelphia

# EXHIBIT "C"



# City of Philadelphia

City Council
Chief Clerk's Office
402 City Hall
Philadelphia, PA  19107

**BILL NO. 200678**

_____

**Introduced December 3, 2020**

_____

**Councilmember Oh**

_____

**Referred to the
Committee on Public Health and Human Services**

_____

## AN ORDINANCE

Amending Chapter 6-200 of The Philadelphia Code, entitled "Preventive Medicine," by imposing duration limitations on emergency control measures, requiring Council approval of emergency control measures in certain circumstances, and to make technical changes, all under certain terms and conditions.

_THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:_

SECTION 1. Chapter 6-200 of The Philadelphia Code is amended to read as follows:

CHAPTER 6-200. PREVENTIVE MEDICINE.

\*          \*          \*

§ 6-205.  Emergency Epidemic Control.

   *(1)*  Where a communicable disease which constitutes a serious danger to health is spreading either in the City or in the communities surrounding the City, and threatens to reach epidemic proportions unless immediately controlled; where the danger thereof is such that the Board does not have time to list the said disease as quarantinable and issue regulations for its effective control; and where the Mayor of the City has suspended the requirements of Section 8-407 of the Charter, the Department shall have the authority to issue orders, which shall be effective until the Board may meet and promulgate regulations, listing said disease as a quarantinable disease and providing for quarantine or isolation of persons who have, or are reasonably suspected of having, or have been exposed to such disease, providing for the control of animals, the control of environmental sanitation, and for such other measures as are necessary to prevent the spread of said disease.  *Any such orders shall include a termination date no more than 60 days from the date of effectiveness. The*

# City of Philadelphia

> *Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

§ 6-206.  Prevention of Congregation of Persons.

   *(2)* Whenever an epidemic of a listed quarantinable disease or whenever an emergency as described in subsection 6-205(1) is found to exist or to be seriously threatened, the Department may in accordance with the regulations of the Board, or by order, as the case may be, forbid congregation of persons at schools, theaters, swimming places, or any public place where such measure is necessary to prevent the spread of such disease.  *Any such orders shall include a termination date no more than 60 days from the date of effectiveness. The Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

   *(3)* *Whenever measures preventing the congregation of persons are promulgated by the Board in accordance with regulations of the Board, or by order, as the case may deem necessary to prevent the spread of the disease, such measure shall include a termination date no more than 60 days from the date of effectiveness. The Department shall be required to request approval from Council to extend such order beyond the initially specified termination date.*

*     *     *

SECTION 2. This Ordinance shall be effective immediately.

_____

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# EXHIBIT "D"

 Centers for Disease
Control and Prevention

# Considerations for Restaurant and Bar Operators

Updated Nov. 18, 2020     Print

As restaurants and bars resume and continue operations in some areas of the United States, CDC offers the following considerations for ways in which operators can reduce risk for employees, customers, and communities and slow the spread of COVID-19. Restaurants and bars can determine, in collaboration with state, local, territorial, or tribal health officials, whether and how to implement these considerations, making adjustments to meet the needs and circumstances of the local community. Implementation should be guided by what is feasible, acceptable, and tailored to the needs of each community. These considerations are meant to supplement—not replace—any state, local, territorial, or tribal health and safety laws, rules, and regulations with which businesses must comply.

**Guidance for customers on reducing the risk of spreading COVID-19 when dining at a restaurant can be found here.**

## Guiding Principles to Keep in Mind

The more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread. Masks may reduce the risk of COVID-19 spread when they are consistently used by customers and employees, especially when social distancing measures are difficult to maintain. The risk of COVID-19 spread increases in a restaurant or bar setting as interactions within 6 feet of others increase, as described below. Masks may reduce the risk of COVID-19 spread when worn in any of these risk scenarios.

- **Lowest Risk:** Food service limited to drive-through, delivery, take-out, and curb-side pick up.
- **More Risk:** Drive-through, delivery, take-out, and curb-side pick up emphasized. On-site dining limited to outdoor seating. Seating capacity reduced to allow tables to be spaced at least 6 feet apart.
- **Higher Risk:** On-site dining with indoor seating capacity reduced to allow tables to be spaced at least 6 feet apart. And/or on-site dining with outdoor seating, but tables **not** spaced at least six feet apart.
- **Highest Risk:** On-site dining with indoor seating. Seating capacity **not** reduced and tables **not** spaced at least 6 feet apart.

COVID-19 is mostly spread when people are physically near (within 6 feet) a person with COVID-19 or have direct contact with that person. When people with COVID-19 cough, sneeze, sing, talk, or breathe, they produce **respiratory droplets**. Infections occur mainly through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19.

There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. This is called airborne transmission. These transmissions occurred within enclosed spaces that had inadequate ventilation. Available data indicate that it is much more common for the virus that causes COVID-19 to spread through close contact with a person who has COVID-19 than through airborne transmission.

## Coronavirus Disease 2019 (COVID-19)



not thought to be a common way that COVID-19 spreads.

Fortunately, there are a number of actions operators of restaurants and bars can take to help lower the risk of COVID-19 exposure and spread. Personal prevention practices (such as handwashing, staying home when sick, and wearing masks) and workplace prevention practices, like environmental cleaning and disinfection, are important principles of preventing the spread of COVID-19.

## Promoting Behaviors that Reduce Spread

Restaurants and bars may implement several strategies that reduce the spread of COVID-19 among employees and customers.

- **Staying Home when Appropriate**
  - Educate employees about when they should stay home and when they can return to work.
    - Actively encourage employees who are sick or have recently had a close contact with a person with COVID-19 to stay home. Develop policies that encourage sick employees to stay at home (for example, sick leave) without fear of reprisal, and ensure employees are aware of these policies. See the Maintaining Healthy Operations section below for suggestions.
    - Employees should stay home if they have tested positive for or are showing COVID-19 symptoms.
    - Employees who have recently had a close contact with a person with COVID-19 should also stay home and monitor their health.
    - CDC's criteria can help inform when employees may return to work:
      - If they have been sick with COVID-19
      - If they have recently had close contact with a person with COVID-19
- **Masks**
- CDC recommends masks to reduce the risk of COVID-19 spread. Masks are currently recommended for employees and for customers as much as possible when not eating or drinking and when social distancing measures are difficult to maintain. These masks (sometimes called cloth masks) are meant to protect other people in case the wearer is infected. They are not appropriate substitutes for masks used by workers for personal protective equipment (PPE) such as surgical masks or respirators. (More information on masks used for PPE can be found here.)

  - Consider requiring the use of masks among all staff. Masks are **most** essential in times when physical distancing is difficult. Information should be provided to staff on proper use, removal, and washing of masks.
    - Note: Masks should not be placed on:
      - Babies and children younger than 2 years old
      - Anyone who has trouble breathing or is unconscious
      - Anyone who is incapacitated or otherwise unable to remove the mask without assistance
  - Employees should avoid touching their masks once they are on their faces. Employees should wash their hands with soap and water for at least 20 seconds after touching masks on their faces.

- **Hand Hygiene and Respiratory Etiquette**
  - Require frequent employee handwashing (e.g. before, during, and after preparing food; after touching garbage) with soap and water for at least 20 seconds and increase monitoring to ensure adherence.
  - Ensure gloves are worn by employees when they are completing these activities:
    - Removing garbage bags or handling and disposing of trash
    - Handling used or dirty food service items
    - Cleaning and disinfecting surfaces; read and follow the directions on the label to ensure safe and effective use of disinfectant.
  - Employees should always wash their hands with soap and water for at least 20 seconds after removing gloves.
  - Encourage employees to cover coughs and sneezes with a tissue (or use the inside of their elbow). Used tissues should be thrown in the trash and hands washed immediately with soap and water for at least 20 seconds.
  - If soap and water are not readily available for handwashing, use hand sanitizer that contains at least 60% alcohol.
  - Employees should avoid touching their eyes, nose, and mouth with gloved or unwashed hands.
- **Adequate Supplies**
  - Ensure adequate supplies to support healthy hygiene behaviors. Supplies include soap, hand sanitizer containing at least 60% alcohol (placed on every table, if supplies allow), paper towels, tissues, disinfectant wipes, masks (as feasible), and no-touch/foot pedal trash cans.
- **Signs and Messages**
  - Post signs in highly visible locations (e.g., at entrances, in restrooms) that promote everyday protective measures for both employees and customers and describe how to stop the spread of germs such as by properly wearing a mask and properly washing hands.

- Include messages (for example, videos) about behaviors that prevent spread of COVID-19 when communicating with vendors, staff, and customers (such as on business websites, in emails, and on social media accounts).
- Communicate the prevention steps the restaurant or bar is taking and any changes in protocols on business websites, in emails, and on social media accounts.
- Find free CDC print and digital resources at the bars and restaurant page, as well as on CDC's communications resources main page.

# Maintaining Healthy Environments

Restaurants and bars may implement several strategies to maintain healthy environments.

- **Cleaning and Disinfection**
  - Clean and disinfect frequently touched surfaces (e.g., door handles, cash registers, workstations, sink handles, bathroom stalls) at least daily, and as much as possible. Clean shared objects (e.g., payment terminals, tables, countertops/bars, receipt trays, condiment holders) between each use.
    - Continue to follow all required safety laws, regulations, and rules.
    - Use products that meet EPA disinfection criteria ☑ and that are appropriate for the surface. Allow the disinfectant to remain on the surface for the contact time recommended by the manufacturer. **Always read and follow the directions on the label** to ensure safe and effective use.
    - When cleaning and disinfecting, wear gloves appropriate for the disinfectant being used. Additional personal protective equipment may also be needed.
    - Establish a disinfection routine and train staff on proper cleaning timing and procedures to ensure safe and correct application of disinfectants.
    - Wash, rinse, and sanitize used or dirty food contact surfaces with an EPA-approved food contact surface sanitizer. If a food-contact surface must be disinfected for a specific reason, such as a blood or bodily fluid cleanup or deep clean in the event of likely contamination with SARS-CoV-2, use the following procedure: wash, rinse, disinfect according to the label instructions with a product approved for food contact surfaces, rinse, then sanitize with a food-contact surface sanitizer.
    - Ensure that cleaning or disinfecting product residues are not left on table surfaces. Residues could cause allergic reactions or cause someone to ingest the chemicals.
  - Develop a schedule for increased routine cleaning and disinfection.
  - Ensure safe and correct use and storage of disinfectants to avoid food contamination and harm to employees and other individuals. This includes storing products securely away from children.
  - Use gloves when removing garbage bags or handling and disposing of trash. Wash hands after removing gloves.
- **Shared Objects**
  - Discourage sharing of items that are difficult to clean, sanitize, or disinfect.
  - Limit any sharing of food, tools, equipment, or supplies by staff members.
  - Ensure adequate supplies to minimize sharing of high-touch materials (e.g., serving spoons) to the extent possible; otherwise, limit use of supplies and equipment by one group of workers at a time and clean and disinfect between use.
  - Avoid using or sharing items that are reusable, such as menus, condiments, and any other food containers. Instead, use disposable or digital menus (menus viewed on cellphones), single serving condiments, and no-touch trash cans and doors.
  - Use touchless payment options as much as possible, if available. Ask customers and employees to exchange cash or card payments by placing on a receipt tray or on the counter rather than by hand to avoid direct hand to hand contact. Clean and disinfect frequently touched surfaces such as counters, or hard surfaces between use. If pens are needed for some purposes, disinfect between uses and/or encourage customers to use their own pens.
  - Use disposable food service items (e.g., utensils, dishes, napkins, tablecloths). If disposable items are not feasible or desirable, ensure that used or dirty non-disposable food service items are handled with gloves and washed, rinsed, and sanitized to meet food safety requirements. Change and launder linen items (e.g., napkins and tablecloths) after each customer or party's use. Employees should wash their hands after removing their gloves or after handling used food service items.
  - Avoid use of food and beverage utensils and containers brought in by customers.

- Ventilation
- As noted above, available data indicate that it is much more common for the virus that causes COVID-19 to spread through close contact with a person who has COVID-19 than through airborne transmission. There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. This is called airborne transmission. These transmissions occurred in indoor spaces with inadequate ventilation. In general, being outdoors and in spaces with good ventilation reduces the risk of exposure to the virus that causes COVID-19.

  - Ensure that ventilation systems operate properly and increase circulation of outdoor air as much as possible, for example by opening windows and doors and prioritizing outdoor seating. Do not open windows and doors if doing so poses a safety or health risk to customers or employees (e.g., risk of falling or triggering asthma symptoms).
  - Consider improving the engineering controls using the building ventilation system. Consult with experienced heating, ventilating, and air-conditioning (HVAC) professionals when considering changes to HVAC systems and equipment. This may include some or all of the following activities:
    - Increase total airflow supply to occupied spaces, whenever feasible.
    - Increase outdoor air ventilation, using caution in highly polluted areas. With a lower occupancy level in the building, this increases the effective dilution ventilation per person.
    - Disable demand-controlled ventilation (DCV) controls that reduce air supply based on occupancy or temperature during occupied hours.
    - Open minimum outdoor air dampers to reduce or eliminate HVAC recirculation, if practical. In mild weather, this will not affect thermal comfort or humidity. However, this may be difficult to do in cold, hot, or humid weather.
    - Improve central air filtration to MERV-13 or to as high as possible without significantly diminishing design airflow.
  - Inspect filter housing and racks to ensure appropriate filter fit and check for ways to minimize filter bypass.
  - Check filters to ensure they are within service life and appropriately installed.
  - Consider running the HVAC system at maximum outside airflow for 2 hours before and after occupied times.

Additional guidance can be found in ASHRAE Standard 62.1, Ventilation for Acceptable Indoor Air Quality ⧉ .

- Water Systems
  - To minimize the risk of Legionnaires' disease and other diseases associated with water, take steps to ensure that all water systems and features (e.g., sink faucets, decorative fountains, drinking fountains) are safe to use if there has been prolonged facility shutdown.
- Modified Layouts and Procedures
  - Change restaurant and bar layouts to ensure that all customer parties remain at least 6 feet apart (e.g., removing tables/stools/chairs, marking tables/stools/chairs that are not for use).
  - Limit seating capacity to allow for social distancing.
  - Offer drive-through, curbside take out, or delivery options as applicable. Prioritize outdoor seating as much as possible.
  - Ask customers to wait in their cars or away from the establishment while waiting to pick up food or when waiting to be seated. Inform customers of food pickup and dining protocols on the business's website and on posted signs.
  - Discourage crowded waiting areas by using phone app, text technology, or signs to alert patrons when their table is ready. Avoid using "buzzers" or other shared objects.
  - Consider options for dine-in customers to order ahead of time to limit the amount of time spent in the establishment.
  - Avoid offering any self-serve food or drink options, such as buffets, salad bars, and drink stations. This limits the use of shared serving utensils, handles, buttons, or touchscreens and helps customers to stay seated and at least 6 feet apart from people who do not live in their household.
- Physical Barriers and Guides
  - Install physical barriers, such as sneeze guards and partitions, particularly in areas where it is difficult for individuals to remain at least 6 feet apart. Barriers can be useful in restaurant kitchens and at cash registers, host stands, or food pickup areas where maintaining physical distance of at least 6 feet is difficult.

- Provide physical guides, such as tape on floors or sidewalks and signage, to ensure that individuals remain at least 6 feet apart. Consider providing these guides where lines form, in the kitchen, and at the bar.
- **Communal Spaces**
  - Close shared spaces such as break rooms, if possible; otherwise stagger use, require mask use, and clean and disinfect between use.
  - Consistent with applicable law, develop policies to protect the privacy of persons at higher risk for severe illness in accordance with applicable privacy and confidentiality laws and regulations.

# Maintaining Healthy Operations

Restaurants and bars may consider implementing several strategies to maintain healthy operations.

- **Protections for Employees at Higher Risk for Severe Illness from COVID-19**
  - Offer options for employees at higher risk for severe illness (including older adults and people of all ages with certain underlying medical conditions) that limits their exposure risk (e.g., modified job responsibilities such as managing inventory rather than working as a cashier, or managing administrative needs through telework).
  - Consistent with applicable law, develop policies to protect the privacy of persons at in accordance with applicable privacy and confidentiality laws and regulations.
- **Regulatory Awareness**
  - Be aware of local or state policies and recommendations related to group gatherings to determine if events can be held.
- **Staggered or Rotated Shifts and Sittings**
  - Rotate or stagger shifts to limit the number of employees in the restaurant or bar at the same time.
  - Stagger and limit dining times to minimize the number of customers in the establishment.
  - When possible, use flexible worksites (e.g., telework) and flexible work hours (e.g., staggered shifts) to help establish policies and practices for social distancing (maintaining distance of approximately 6 feet) between employees and others, especially if social distancing is recommended by state and local health authorities.
- **Gatherings**
  - Avoid group events, gatherings, or meetings where social distancing of at least 6 feet between people who do not live in the same household cannot be maintained. See the Modified Layouts and Procedures section above for suggestions on social distancing.
- **Travel and Transit**
  - Encourage employees to use transportation options that minimize close contact with others (e.g., walking or biking, driving or riding by car—alone or with household members only).
  - For employees who commute to work using public transportation or ride sharing:
    - Ask employees to follow the CDC guidance on how to protect yourself when using transportation and to wear masks on public transportation.
    - Ask them to wash their hands as soon as possible after their trip.
    - Consider allowing employees to shift their hours so they can commute during less busy times.
- **Designated COVID-19 Point of Contact**
  - Designate a staff person for each shift to be responsible for responding to COVID-19 concerns. All staff members should know who this person is and how to contact them.
- **Communication Systems**
  - Put systems in place for:
    - Consistent with applicable law and privacy policies, having staff self-report to the establishment's point of contact if they have symptoms of COVID-19, a positive test for COVID-19, or were exposed to someone with COVID-19 within the last 14 days in accordance with health information sharing regulations for COVID-19 [link] (e.g. see "Notify Health Officials and Close Contacts" in the **Preparing for When Someone Gets Sick section below**), and other applicable privacy and confidentiality laws and regulations.
    - Notifying staff, customers, and the public of business closures, and restrictions in place to limit COVID-19

exposure (e.g., limited hours of operation).

- **Leave (Time Off) Policies**
  - Implement flexible sick leave policies and practices that enable employees to stay home when they are sick, have been exposed, or are caring for someone who is sick.
    - Examine and revise policies for leave, telework, and employee compensation.
    - Leave policies should be flexible and not punish people for taking time off and should allow sick employees to stay home and away from co-workers. Leave policies should also account for employees who need to stay home with their children if there are school or childcare closures, or to care for sick family members.
  - Develop policies for return-to-work after COVID-19 illness. CDC's criteria to discontinue home isolation can inform these policies.
- **Back-Up Staffing Plan**
  - Monitor absenteeism of employees, cross-train staff, and create a roster of trained back-up staff.
- **Staff Training**
  - Train all employees in safety actions.
  - Conduct training virtually, or ensure that social distancing is maintained during training.
- **Recognize Signs and Symptoms**
  - Conduct daily health checks (e.g., temperature screening and/or symptom checking) of staff safely and respectfully, and in accordance with any applicable privacy laws and regulations.
    - Consider using examples of screening methods in CDC's General Business FAQs as a guide.
- **Support Coping and Resilience**
  - Promote employees eating healthy, exercising, getting sleep, and finding time to unwind.
  - Encourage employees to talk with people they trust about their concerns and how they are feeling.
  - Consider posting signs for the national distress hotline: 1-800-985-5990, or text TalkWithUs to 66746.

# Preparing for Sick Employees

Restaurants and bars may implement several strategies to prepare for when someone gets sick.

- **Advise Sick Employees of Home Isolation Criteria**
  - Communicate to sick employees that they should not return to work until they have met CDC's criteria to discontinue home isolation.
- **Isolate and Transport Those Who Are Sick**
  - Make sure that employees know they should not come to work if they are sick, and they should notify their manager or other designated COVID-19 point of contact if they become sick with COVID-19 symptoms, test positive for COVID-19, or have been exposed to someone with COVID-19 or have been exposed to someone with COVID-19 symptoms or a confirmed or suspected case.
  - Immediately separate employees or customers with COVID-19 symptoms (i.e., fever, cough, shortness of breath). Individuals who are sick should go home or to a healthcare facility, depending on how severe their symptoms are, and follow CDC guidance for caring for oneself and others who are sick.
- **Clean and Disinfect**
  - Close off areas used by a sick person and do not use these areas until after cleaning and disinfecting them.
  - Wait at least 24 hours before cleaning and disinfecting. If 24 hours is not feasible, wait as long as possible. Ensure safe and correct use and storage of cleaning and disinfection products ⧉ , including storing them securely away from children.
- **Notify Health Officials and Close Contacts**
  - In accordance with state, territorial, tribal, or local laws, restaurant and bar operators should notify the health officials in their jurisdiction and staff immediately of any case of COVID-19 among employees, while maintaining confidentiality in accordance with the Americans with Disabilities Act (ADA) ⧉
  - Advise those who have had close contact with a person diagnosed with COVID-19 to stay home and self-monitor for symptoms, and follow CDC guidance if symptoms develop. Critical infrastructure workers may refer to CDC Guidance for Critical Infrastructure Workers, if applicable.
  - Consider collaborating with health officials in your jurisdiction to determine whether and how to implement employee COVID-19 testing strategies and which one(s) would be most appropriate for your circumstances.

## Communication Resources






### 5 Safety Steps for Staff
Restaurants and Bars: follow these 5 safety steps to keep us all healthy

Download 📄 [PDF – 290 KB]



### Assess Your Risk
Use this graphic to assess risk

Download 🖼 [image 586 KB]



### Letter to Staff Template
Send out a customized letter to your staff to inform them about steps taken to protect them.

Download 📄 [DOC – 64 KB]



### Daily Checklist for Managers of Restaurants and Bars
Managers can use this helpful checklist

Download 📄 [PDF – 1 page]

## Other Resources

- Latest COVID-19 information
- Cleaning and Disinfection
- Guidance for Businesses and Employers
- COVID-19 Prevention
- Handwashing information
- Face coverings
- Social Distancing

- COVID-19 Frequently Asked Questions
- Frequently Asked Questions for Businesses
- Persons at higher risk
- Managing Stress and Coping
- HIPAA and COVID-19 ☐
- CDC communication resources
- Community Mitigation

Last Updated Nov. 18, 2020

# EXHIBIT "E"

CITY OF PHILADELPHIA
DEPARTMENT OF PUBLIC HEALTH
MEETING OF THE BOARD OF HEALTH

Thursday, September 10, 2020

The Philadelphia Board of Health held a special public meeting on Thursday, September 10, 2020. The meeting was held virtually using the GoToWebinar platform in light of restrictions related to the ongoing COVID-19 pandemic, allowing access to the public via computer or other device and via a toll-free phone number.

**Board Members Present**

Dr. Tyra Bryant-Stephens, Dr. Ana Diez-Roux, Dr. Thomas Farley, Dr. Marla Gold, Dr. Jennifer Ibrahim, Dr. Scott McNeal, Dr. John Rich

**WELCOME AND INTRODUCTIONS**

Health Commissioner and Board President Thomas Farley, MD, MPH called the meeting to order at 6:05 PM.

**MINUTES**

The Board unanimously approved the minutes from August 13, 2020.

**BACKGROUND**

Dr. Farley provided an update on the COVID-19 coronavirus pandemic. The Health Department reports that case counts have been relatively level for a few weeks, albeit with a spike due to an outbreak on Temple's campus, then a drop after that. Hospitalizations continue to be low throughout the entire region. The number of deaths is also continuing to drop, with only four deaths in the last week of August, which is 98% below the peak week in April. There are about 60 testing sites and are receiving about 3,000 results per day. Contact tracing is happening, with about 120 staff doing case investigations and contact tracing. They are reaching about 70% of cases and about 75% of contacts. Mask use among people exiting retails store is approaching 95%. Through a state grant, Penn, Temple, and Jefferson health systems are working with nursing homes and personal care homes to assist with testing, infection control, and response.

**ELEVENTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING THE CONTROL AND PREVENTION OF COVID-19 (INDOOR EXERCISE AND RECREATION FACILITIES)**

Jo Rosenberger-Altman, City of Philadelphia Law Department, presented a supplemental regulation approving two interim orders on reopening indoor exercise gyms and recreation facilities. Limitations in the orders include a barring of food or drink in the facilities, adequate

spacing, and mask wearing. These orders are similar to other orders in terms or recommendations made for safety.

Dr. Farley noted that the Health Department has, for the first time, begun inspecting gyms as a result of this order and has found that the vast majority have been compliant. The inspections look for mask use, adequate spacing between exercise machines, and adherence to capacity limits.

Dr. Ibrahim moved; Dr. McNeal seconded.
**Motion for approval of regulation approved unanimously.**

## TWELFTH SUPPLEMENTAL EMERGENCY REGULATION GOVERNING THE CONTROL AND PREVENTION OF COVID-19 (INDOOR DINING AND THEATER)

The second order, effective September 8, is about indoor dining and indoor theaters and performance events. For indoor events, there are capacity limits and a barring of food or drink service as well as social distancing and mask requirements. Indoor dining rules are more strict than for the rest of the Commonwealth: for example, in addition to wearing masks servers must wear face shields, only four or fewer people per table, no smoking or vaping areas, service at bars is prohibited, alcohol service is limited to on-site consumption with a meal, and there are additional capacity limits and a reiteration of indoor events capacity limits.

Dr. Farley mentioned that he has spoken with his counterparts in other counties and they haven't seen problems with an increase in cases associated with that activity. He feels that the greatest risk is to the servers, who will come in contact with large numbers of unmasked people. The Health Department is having volunteers visit restaurants to help educate them on the new recommendations in addition to normal restaurant inspections.

Dr. McNeal moved; Dr. Ibrahim seconded.
**Motion for approval of regulation approved unanimously.**

## ADJOURNMENT

Dr. Farley adjourned the meeting at 6:55 PM.